# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* | ) |
| WILLIAM LaCORTE, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) Civil Action No. 06-11724-DPW |
| v. | ) |
|  | ) |
| WYETH, | ) |
|  | ) |
| Defendant. | ) |

_____)

## MEMORANDUM IN SUPPORT OF RELATOR WILLIAM
## ST. JOHN LACORTE'S MOTION FOR ATTORNEYS' FEES AND COSTS

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................... 1

    A.    Wyeth Submitted Hundreds of Millions of Dollars' Worth of False Claims to Federal and State Governments ....................................................................... 1

    B.    Dr. LaCorte's Central Role in the 14-Year Course of Litigation ................................. 2

ARGUMENT ............................................................................................................ 6

    I.    RELATOR'S REQUESTED ATTORNEYS' FEES ARE REASONABLE .................... 6

    A.    Relator's Requested Hourly Rates Are Reasonable Because They Reflect the Prevailing Market Rate in the Relevant Community ...................................................... 7

        1. Relator's Counsel Are of Exceptional Skill, Experience, and Reputation .............. 7

        2. The Requested Billing Rates Are Within the Range of Rates Charged By Comparable Attorneys .................................................................................. 8

        3. Current Hourly Rates Are Applicable .................................................................. 11

    B.    The Number of Hours Requested by Relator Is Reasonable ...................................... 11

        1. The Length and Complexity of the Case Required a Substantial Investment of Attorney Time .......................................................................... 13

        2. The Number of Hours Claimed Is Supported by Contemporaneous Records ........ 13

        3. Based on the Complexity of the Case and the Risk Involved, The Number of Hours Requested Is Reasonable .......................................................... 15

    C.    The Facts of This Case Merit an Upward Adjustment to the Lodestar Amount ........ 16

    D.    An Award of Fully Compensatory Attorneys' Fees Satisfies the FCA's Remedial Goals ............................................................................................ 17

    II.    RELATOR'S REQUESTED COSTS AND EXPENSES ARE REASONABLE ........... 18

SUMMARY OF ATTORNEYS' FEES AND COSTS .............................................. 19

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**CASES**

*Awuah v. Coverall N. Am., Inc.*, 791 F. Supp. 2d 284 (D. Mass. 2011) ...................................13, 14

*Blum v. Stenson*, 465 U.S. 886 (1984) ...................................................................................7

*Ferraro v. Kelley*, No. 08-CV-11065-DPW, 2011 WL 576074 (D. Mass. Feb. 8, 2011) .........................................................................................................................6

*Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980) .......................................................7, 16

*Galvan v. Federal Prison Indus., Inc.*, 199 F.3d 461 (D.C. Cir. 1999) ...........................17

*Gay Officers Action League v. Puerto Rico*, 247 F.3d 288 (1st Cir. 2001) ...................13

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...............................................6, 7, 11, 12, 16

*Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274 (1989) ..................................................11

*Palmigiano v. Garrahy*, 707 F.2d 636 (1st Cir. 1983) ...................................................18

*Rogers v. Okin*, 821 F.2d 22 (1st Cir. 1987) ...........................................................11, 12

*Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331 (1st Cir. 2008) ......................................16

*United States ex rel Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995) ...................17

*United States ex rel. Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538 (10th Cir. 2000) ........................................................................................................................6

**STATUTES AND RULES**

False Claims Act, 31 U.S.C. §§ 3729-3733 ........................................................... *passim*

31 U.S.C. § 3730 .............................................................................................................17

31 U.S.C. § 3730(d) ......................................................................................................1, 6

31 U.S.C. § 3730(d)(1) .....................................................................................................6

Anti-Kickback Statute, 42 U.S.C. § 1320a-7(a) .........................................................2, 12

42 U.S.C. § 1396r-8 ..........................................................................................................4

Fed. R. Civ. P. 54 .............................................................................................................1

**OTHER MATERIALS**

S. Rep. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266......................................................17

Sixth Monthly Statement of Ropes & Gray LLP of Fees For Professional Services
      Rendered and Disbursements Incurred as Counsel for the Official
      Committee of Unsecured Creditors for the Period From January 1, 2016
      Through January 31, 2016, *In re Sabine Oil & Gas Corp.*, No. 15-11835
      (SCC) (Bankr. S.D.N.Y.), ECF No. 841......................................................................9, 10

Ninth Monthly Statement of Ropes & Gray LLP of Fees For Professional Services
      Rendered and Disbursements Incurred as Counsel for the Official
      Committee of Unsecured Creditors for the Period From April 1, 2016
      Through April 31, 2016, *In re Sabine Oil & Gas Corp.*, No. 15-11835
      (SCC) (Bankr. S.D.N.Y.), ECF No. 1120......................................................................10

Application of Ropes & Gray LLP, Corporate and Special Counsel for the
      Debtors, For Interim Allowance of Compensation and For the
      Reimbursement of Expenses for Services Rendered During the Period
      From October 1, 2015, Through January 31, 2016, *In re GT Advanced
      Techs., Inc.*, No. 1:14-bk-11916, (Bankr. D.N.H.), ECF No. 3349 ..............................9, 10

Taxpayers Against Fraud Education Fund, *Top 100 FCA Cases*,
      http://www.taf.org/general-resources/top-100-fca-cases......................................................1

Pursuant to 31 U.S.C. § 3730(d), Rule 54 of the Federal Rules of Civil Procedure, the parties' signed settlement agreement, and the parties' Stipulation of Dismissal (ECF No. 536) ("Stipulation"), Relator William St. John LaCorte ("Dr. LaCorte") hereby petitions the Court to order Defendant Wyeth Pharmaceuticals, Inc. ("Wyeth") to pay Dr. LaCorte's reasonable attorneys' fees in the amount of $7,740,985.94 and costs in the amount of $321,236.43.

As a result of the efforts of Dr. LaCorte and his counsel, the United States and 17 States plus the District of Columbia (the "intervening States") achieved a stunning outcome in this case. After 14 years of litigation, and on the eve of trial, Wyeth, and its parent company Pfizer, Inc. ("Pfizer"), agreed to settle the claims against them by paying the United States and intervening States $784,600,000.  By dollar amount, the settlement is the *seventh largest* in False Claims Act ("FCA") history.[1]  Dr. LaCorte and his counsel were directly responsible for this recovery.  Dr. LaCorte now asks this Court to award him the attorneys' fees and costs incurred in obtaining that settlement on behalf of the United States and the intervening States.

## BACKGROUND

### A.    Wyeth Submitted Hundreds of Millions of Dollars' Worth of False Claims to Federal and State Governments

Wyeth manufactures a Proton Pump Inhibitor ("PPI") called Protonix in both tablet and intravenous form ("Protonix IV").  Though Protonix IV was the first intravenous PPI available on the market, three competing PPI tablets beat Protonix to market.  Once it was released, the tablet form of Protonix was hindered by its limited FDA indications.  For those reasons, Protonix in its tablet form claimed only a small market share.

To boost its market share, Wyeth offered hospitals "bundled" discounts, under which the hospitals would get steep discounts on Protonix tablets and Protonix IV if a significant

---

[1] *See* Taxpayers Against Fraud Education Fund, *Top 100 FCA Cases*, http://www.taf.org/general-resources/top-100-fca-cases (last accessed June 27, 2016).

percentage of PPI tablets prescribed in the hospital were Protonix.  At the time, the market price of Protonix tablets was $2.70-$3.00 per pill, and the market price for Protonix IV was approximately $25.00 per dose.  The bundling scheme promised hospitals prices as low as $0.16 per pill for Protonix tablets and $4.00 per dose for Protonix IV.  The goal of Wyeth's bundling scheme was to encourage hospitals to either start patients on Protonix or switch patients to Protonix while in the hospital, with the hope that the patients would continue to use Protonix tablets after discharge, creating a "spillover effect" on Protonix's market share.

As alleged in Dr. LaCorte's First Supplemental and Amended Consolidated Complaint ("Consolidated Complaint") (ECF No. 111), the common core of facts comprising Wyeth's bundling scheme rendered that scheme unlawful in three respects.  *First*, Wyeth failed to report the steep discounts offered to hospitals under its bundling deals to CMS pursuant to the Medicaid Rebate Agreement, in violation of the Medicaid Drug Rebate Program's requirement that pharmaceutical companies report the "best price" offered.  *Second*, non-FDA approved uses (so-called "off-label" uses) of Protonix were required for the hospitals to achieve the market share necessary to obtain the steep discounts.  *Third*, the deep discounts that were given for drug conversion in hospital pharmacies constituted violations of the Anti-Kickback Statute.  Taken together, these unlawful practices cost taxpayers hundreds of millions of dollars in the form of more expensive prescription drugs and less effective treatment.

### B.      Dr. LaCorte's Central Role in the 14-Year Course of Litigation

Beginning in 2001, Dr. LaCorte became aware of Wyeth's unlawful scheme.  Dr. LaCorte consulted with his attorney, Dr. Sherif K. Sakla, (who is also an M.D.), regarding Wyeth's conduct related to Protonix.  Dr. LaCorte previously hired Dr. Sakla in the late 1990s after discovering a separate unlawful bundling scheme perpetrated by Merck & Co., Inc. ("Merck").

Working together, Dr. LaCorte and Dr. Sakla collected and analyzed Protonix pricing data in order to file a whistleblower suit against Wyeth. On March 21, 2002, Dr. LaCorte filed a Complaint against Wyeth in the Eastern District of Louisiana asserting claims under the FCA. In June of 2003, the Department of Justice ("DOJ") declined to intervene in the case.

Dr. LaCorte, represented by Dr. Sakla's firm, The Sakla Law Firm and former co-counsel, continued to pursue claims against Wyeth on behalf of the United States and various States. On October 24, 2003, Dr. LaCorte filed a First Amended Complaint in the Eastern District of Louisiana. On January 10, 2005, Dr. LaCorte filed a Second Amended Complaint in the Eastern District of Louisiana.

In 2005, the United States government disclosed the existence of a second sealed *qui tam* action against Wyeth, filed by Relator Lauren Kieff in this Court on November 24, 2003. The United States partially lifted the seals on both cases so that Ms. Kieff and Dr. LaCorte could review each other's complaints. Like Dr. LaCorte's earlier complaint, Ms. Kieff's complaint also alleged that Wyeth bundled sales of Protonix tablets and Protonix IV, and that Wyeth reported false prices on both of these drugs to Medicare and Medicaid. In 2005, Dr. Sakla met with Ms. Kieff's counsel, and the two relators entered into a co-relator agreement.

Thereafter, Dr. LaCorte's case against Wyeth was transferred to this Court on September 18, 2006, and was consolidated with Ms. Kieff's case. Once the two cases were consolidated, Sakla[2] worked together with Ms. Kieff's counsel to persuade DOJ to intervene in the case. In

---

[2] Vezina & Gattuso, LLC and Boone & Stone had been discharged in January 2008 and February 2008, respectively. *See* Decl. of Sherif K. Sakla, M.D., J.D. in Supp. Of Relator William St. John LaCorte's Mot. for Attorneys' Fees and Costs ¶ 39 n.1 ("Sakla Decl.) (filed herewith). On several occasions, Dr. LaCorte requested attorneys' fees information from his discharged counsel, but to date has received only limited records reflecting minimal costs incurred by those firms.

particular, the parties proceeded by filing amended complaints that provided even greater detail regarding their claims.

Dr. LaCorte set out his allegations in a meticulously researched 177-page Consolidated Complaint, written by Dr. Sakla, Stephanie Reuther, and The Sakla Law Firm, his only remaining counsel, which he filed on August 26, 2008, and which was supported by 480 pages of exhibits.  Although the United States had previously declined to intervene to prosecute the fraud alleged by Dr. LaCorte, the Amended Complaint prompted the United States to intervene and ultimately prevail in this case.  On April 23, 2009, just months after Dr. LaCorte filed his detailed Consolidated Complaint, the United States intervened in the case, alleging that Wyeth violated the Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8.  *See* ECF No. 65.  Two months later, 15 intervening States and the District of Columbia filed their complaint-in-intervention. *See* ECF No. 93.

After the United States and the intervening States joined the case, Dr. LaCorte's counsel, Dr. Sakla, continued to play an indispensable role in prosecuting the case.  Wyeth fought Dr. LaCorte's allegations vigorously, beginning by filing a lengthy motion to dismiss.  Dr. Sakla participated in defeating Wyeth's motion to dismiss.  *See* ECF No. 130.  After the Court denied Wyeth's motion to dismiss, Dr. Sakla and his colleagues played a critical role in discovery, including by serving discovery requests, reviewing produced documents and privilege logs, preparing exhibits and questions for depositions, and participating in more than 27 depositions, and attending more than a dozen Court conferences and hearings.  At one deposition, under withering examination by Dr. Sakla, Wyeth's vice president and general counsel, John Alivernini, was so shaken that he abruptly terminated his own deposition and left the building

immediately.  *See* Decl. of Gary L. Azorsky ¶ 6 ("Azorsky Decl.") (filed herewith).[3]

All told, Wyeth produced millions of pages of documents, which were catalogued, categorized, and reviewed by Dr. Sakla and his colleagues.  *See id.* ¶ 5.  Dr. Sakla maintained a sophisticated electronic database to house and analyze the documents, and that database allowed them to provide "invaluable assistance" in the run-up to trial.  *Id.* ¶ 7.  It also allowed Dr. Sakla to locate "hot documents" that proved instrumental in the case.  *See* Decl. of Jeanne A. Markey ¶ 6 ("Markey Decl.") (filed herewith).

After the close of discovery, Wyeth moved for summary judgment with respect to all of Dr. LaCorte's claims.  *See* ECF No. 234.  Dr. Sakla filed a 41-page opposition, supported by 36 exhibits comprising 940 pages.  *See* ECF Nos. 271-280.  Dr. Sakla presented valuable expert testimony and summarized reams of evidence to defeat Wyeth's motion for summary judgment.  After the Court denied Wyeth's motions for summary judgment, Dr. LaCorte and Sakla began preparing for trial by preparing examination questions and notes, cataloguing documents to be introduced into evidence, and sifting through deposition transcripts.

Just three weeks before trial, Wyeth and Pfizer agreed to settle the substance of the claims against them in exchange for a payment of $784,600,000.  *See* ECF Nos. 528; Stipulation; Sakla Decl. Ex. 1, at 2 (Settlement Agreement).  In settling the claims against them, Wyeth and Pfizer agreed to pay Dr. LaCorte's reasonable attorneys' fees and costs.  *See* Stipulation at 2.  Dr. LaCorte now petitions this Court for those attorneys' fees and costs, which he incurred during the course of his successful 14-year effort.

---

[3] In support of this position, Dr. LaCorte submits declarations from the two lead attorneys for his Co-Relator, Ms. Kieff:  Gary L. Azorsky and Jeanne A. Markey.

**ARGUMENT**

The FCA provides that when the government intervenes in a civil action brought by a private person, that "person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." 31 U.S.C. § 3730(d)(1). Those fees are mandatory. *See id.*; *United States ex rel. Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538, 544 (10th Cir. 2000) ("The only significant difference between the FCA and the attorney's fees provisions in [Section 1988 & The Clean Air Act] is that the FCA provisions are mandatory on their face."). In any event, there is no dispute that Wyeth has agreed to pay Dr. LaCorte's reasonable attorneys' fees and costs. *See* Stipulation; *see also* Settlement Agreement at 3 ("Wyeth agrees to pay Relator LaCorte and Relator Kieff's reasonable attorneys' fees and costs as contemplated by 31 U.S.C. § 3730(d).").

## I.   RELATOR'S REQUESTED ATTORNEYS' FEES ARE REASONABLE

Relator is entitled to "reasonable attorneys' fees." 31 U.S.C. § 3730(d)(l). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This Court uses this "lodestar" methodology to set reasonable attorneys' fees. *See*, *e.g.*, *Ferraro v. Kelley*, No. 08-CV-11065-DPW, 2011 WL 576074, at *3 (D. Mass. Feb. 8, 2011).

Calculating the lodestar amount is not the end of the Court's inquiry, however. "There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434. The First Circuit has advised district courts to adjust the lodestar for: (1) the contingent nature of the fee; (2) any delay in payment due to protracted litigation; (3) the quality of representation;

and (4) exceptional and unexpected results, including the amount of the recovery. *See Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir. 1980). For each factor, the circumstances of this litigation support an upward adjustment of lodestar amount. But above all, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435.

### A.   Relator's Requested Hourly Rates Are Reasonable Because They Reflect the Prevailing Market Rate in the Relevant Community

"Reasonable fees" are to be calculated according to the prevailing market rates in the relevant community. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984). That prevailing rate must reflect the rate for similar services by lawyers of reasonably comparable skill, experience, and reputation. *See id.* at 895 n.11. The fee applicant bears the burden of coming forward with evidence of the prevailing rate. *See id.*

### 1.   Relator's Counsel Are of Exceptional Skill, Experience, and Reputation

Dr. LaCorte's counsel at The Sakla Law Firm are both skilled and experienced in *qui tam* litigation. For example, Dr. Sakla was a Board-certified physician for 30 years and is a licensed attorney. He has 19 years of legal experience, all of it focused on healthcare law. *See* Sakla Decl. ¶¶ 7-8. He also has experience practicing emergency medicine for 20 years, serving in hospital administration, and teaching emergency medicine residents and medical students. *See id.* ¶¶ 4-6. That combination of skills and experience renders Dr. Sakla uniquely qualified to pursue *qui tam* litigation aimed at combatting healthcare fraud. *See* Decl. of William St. John LaCorte ¶ 2 ("LaCorte Decl.") (filed herewith). Co-Relator Kieff's counsel notes that Dr. Sakla's medical background rendered him especially well-equipped to analyze and respond to medical literature relied on by Defendants in support of their motion for summary judgment. *See* Markey Decl. ¶ 8.

Dr. Sakla also has significant experience in *qui tam* litigation.  He represented Dr. LaCorte in *United States ex rel. LaCorte v. Merck & Co., Inc.*, No. 99-3807 (E.D. La.) for the nine-year course of that litigation, which resulted in a $250 million settlement.  *See* Sakla Decl. ¶ 11.  Through these experiences, Dr. Sakla has not only developed expertise in the FCA and healthcare law, but he has also developed relationships among the key parties and attorneys involved.

Dr. LaCorte's other primary counsel in this case, Stephanie C. Reuther, has similarly extensive experience litigating healthcare cases.  Ms. Reuther has 19 years of experience litigating healthcare cases from filing through trial.  *See id.* ¶ 13.  She assisted The Sakla Law Firm and Dr. LaCorte in the *Merck* action, where she made significant contributions prior to settlement.  *See id.* ¶ 14.

Dr. LaCorte was also aided in this litigation by primary paralegal Scott N. Nolan.  Mr. Nolan holds a master's degree in political science from the University of New Orleans, where he is currently a Ph.D. candidate in political science.  *See id.* ¶ 15; Decl. of Scott N. Nolan ¶ 7 ("Nolan Decl.") (filed herewith).  He also completed one year of law school before his hiring by The Sakla Law Firm.  *See* Sakla Decl. ¶ 15.  Dr. LaCorte's requested rate of $175 per hour is modest in light of Mr. Nolan's training and experience.  Although other paralegals assisted Dr. LaCorte before and after Mr. Nolan's tenure with The Sakla Law Firm, the vast majority of paralegal hours in this case were expended by Mr. Nolan.

## 2. The Requested Billing Rates Are Within the Range of Rates Charged By Comparable Attorneys

Dr. LaCorte's requested hourly rates reflect prevailing rates for complex *qui tam* litigation in the Boston area.  As set out in the supporting Declaration of Suzanne E. Durrell in Support of Relator's Application for Attorneys' Fees and Costs ("Durrell Decl.") (filed

herewith), the requested rates of $875 per hour for Dr. Sherif K. Sakla and $775 per hour for Stephanie C. Reuther are "commensurate with their level of seniority and experience" and are within the prevailing range of rates charged both by lawyers maintaining national FCA practices and *qui tam* specialists based in Boston.[4]  Durrell Decl. ¶ 21 (comparing Dr. LaCorte's counsel's hourly rates to her own firm's).

The hourly rates sought by Dr. LaCorte's counsel also are commensurate with the rates charged by counsel for Wyeth, Ropes & Gray LLP ("Ropes & Gray").  Bankruptcy filings shed light on those rates.  For example, Ropes & Gray represents the official committee of unsecured creditors in *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y.).  In that capacity, they submit periodic hours reports in support of attorneys' fees they seek from the Bankruptcy Court.  *See*, *e.g.*, Sixth Monthly Statement of Ropes & Gray LLP of Fees For Professional Services Rendered and Disbursements Incurred as Counsel for the Official Committee of Unsecured Creditors for the Period From January 1, 2016 Through January 31, 2016, *id.*, ECF No. 841 ("Sixth *Sabine* Application").  Similar filings in other cases include information about Ropes & Gray attorneys in the Boston office.  *See* Application of Ropes & Gray LLP, Corporate and Special Counsel for the Debtors, For Interim Allowance of Compensation and For the Reimbursement of Expenses for Services Rendered During the Period From October 1, 2015, Through January 31, 2016, *In re GT Advanced Techs., Inc.*, No. 1:14-bk-11916, (Bankr. D.N.H.), ECF No. 3349 ("*GTAT* Application").

---

[4] In the context of the *Merck* suit, Dr. Sakla obtained an expert report stating that his former law partner, with only four years of legal experience, was entitled to an hourly rate of $330 per hour during the period of 1999-2000 in the New Orleans area.  That opinion is not relevant to the issues of the reasonableness of Dr. Sakla's and Ms. Reuther's billing rates, billing rates in Boston, billing rates in 2016, or the reasonable rate for this matter, given the intensity and complexity of this case, which was heavily litigated until the eve of trial.

For partners who graduated from law school between 1995 and 1999 – the period most comparable to Dr. Sakla and Ms. Reuther, both of whom graduated from law school in 1996 – Ropes & Gray bills between $1,040 and $1,170 per hour, well above the $875 and $775 rates sought by Dr. LaCorte. *See* Sixth *Sabine* Application at 10. Indeed, Ropes & Gray bills for *associate* time at rates in excess of those sought by Dr. LaCorte's counsel here. The same report reveals that Ropes & Gray bills time for an associate who graduated from law school in 2007, more than a decade after Dr. Sakla and Ms. Reuther, at a rate of $895 per hour. *See id.* Similarly, Ropes & Gray bills the work of a 2011 law school graduate at an hourly rate of $775, the same rate requested by Ms. Reuther, who has more than triple that experience. *See* Ninth Monthly Statement of Ropes & Gray LLP of Fees For Professional Services Rendered and Disbursements Incurred as Counsel for the Official Committee of Unsecured Creditors for the Period From April 1, 2016 Through April 31, 2016 at [10], *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y.), ECF No. 1120.

Other filings show that Ropes & Gray's Boston-specific rates are comparable. For example, one Boston partner who graduated from law school in 1996 and became a partner in 2009 bills at an hourly rate of $1,050 in 2016. *See GTAT* Application, Ex. E at 1. Similarly, a Boston associate who graduated from law school in 2009 bills at an hourly rate of $865 per hour, while Boston Ropes & Gray associates from the class of 2011 bill at rates between $695 and $765 per hour. *See id.* at 2.

The table below summarizes hourly rates between the two firms.

| Law School Class | The Sakla Law Firm | Ropes & Gray |
|---|---|---|
| 1996 | $775-875 | $1,040-$1,170 |
| 2011 | n/a | $695-$775 |

Just as Wyeth considered Ropes & Gray's billing rates reasonable and necessary given the novelty and complexity of this case, so too should the Court recognize the reasonableness of the substantially lower hourly rates sought by Dr. LaCorte's counsel.

### 3.  Current Hourly Rates Are Applicable

The First Circuit has noted that in protracted and attenuated cases, "current . . . hourly rates should be awarded to compensate for the delay in payment of attorneys' fees." *Rogers v. Okin*, 821 F.2d 22, 26 (1st Cir. 1987) (characterizing district court's decision to apply current hourly rates, as opposed to historical ones, as "very sensibl[e]").  The Supreme Court has also recognized "that an appropriate adjustment for delay in payment – whether by the application of current rather than historic hourly rates or otherwise" is appropriate in statutory attorneys' fees determinations. *Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 283-84 (1989).

Here, application of current rates is the easiest means to account for the 14 years that have passed since Dr. LaCorte's counsel first began work on this case.  Rather than undertake laborious calculation of interest accrued on attorneys' fees amounts calculated historical rates – which would invariable lead to the kind of "second major litigation" the First Circuit criticized in *Rogers*, 812 F.2d at 28 (internal quotation marks omitted) – this Court should follow the approach blessed by the First Circuit in *Rogers* and calculate the lodestar amount based on current rates.

### B.    The Number of Hours Requested by Relator Is Reasonable

Relator seeks compensation for a reasonable number of hours expended in pursuing this lengthy case.  Relator "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434.  Relator

has not only exercised appropriate billing judgment in his requested time, but also reduced the number of hours requested in the interest of avoiding protracted litigation over fees.

While it is appropriate for a court to ensure that the number of hours requested is reasonable, Defendants should not engage in "indiscriminate targeting of manifold alleged errors" in billing records.  *Rogers*, 821 F.2d at 30.  Compounded reductions for hours expended "places a palpable strain on [judicial] credulity."  *Id.*  Thus, so long as different claims "'involve a common core of facts or [are] based on related legal theories,'" any hours expended on them are reasonable, even if not all of the different claims are specifically vindicated.  *Id.* at 25 (quoting *Hensley*, 461 U.S. at 434-35).

Here, the three theories asserted by Dr. LaCorte were based on a common core of facts. Those facts were alleged in detail in the Consolidated Complaint and developed through extensive discovery.  Each of the bundling, kickback, and off-label theories was based on the core allegations about Wyeth's attempts to grow Protonix's market share through the manipulation of hospital prescriptions.  Although the "Covered Conduct" in the parties' settlement agreement specifically addressed the bundling allegations in the United States Amended Complaint, those claims are inextricably linked to the other claims alleged in the Consolidated Complaint, and Wyeth and Pfizer obtained a full release from all the Relators on all claims.  Indeed, the United States filed a statement of interest in support of the Relators' oppositions to Wyeth's motion for summary judgment against Relators stating its view that the discount exception of the Anti-Kickback Statute would not apply to Wyeth's Protonix discounts. *See* ECF No. 387.  Thus, while not all of Dr. LaCorte's theories were intervened on by the United States or the intervening States, those theories are interrelated, and Dr. LaCorte agreed to dismiss all of those theories in the settlement agreement.

## 1. The Length and Complexity of the Case Required a Substantial Investment of Attorney Time

This Court is certainly aware of the 14-year history of this protracted and intensive litigation.  The time spent by Relator's attorneys is large, but it is commensurate with the lengthy and involved nature of the case.  Given the long history of this case, the grueling discovery schedule, and the extensive motion practice, the number of hours requested is reasonable.  In the 14 years that this case has been pending, Dr. LaCorte and The Sakla Law Firm have been involved in every stage of the investigation into, and litigation regarding, the claims made in the Consolidated Complaint.  Dr. LaCorte, with the assistance of Dr. Sakla, vigorously pursued his allegations, and Wyeth vigorously defended the claim, resulting in the need to expend substantial hours on the case.

Dr. LaCorte notes that his litigation team was small yet effective.  Dr. LaCorte did not employ dozens of attorneys to prosecute the case – even though the amount of work required and the scope of the recovery merited it, even after accounting for the contributions of the United States and the intervening States after they ultimately intervened.  Moreover, in computing total time, The Sakla Law Firm made efforts to exclude a claim for any time that might be questionable, so as to provide the Court with a conservative request for fees to avoid unnecessary litigation.

## 2. The Number of Hours Claimed Is Supported by Contemporaneous Records

Attorneys' fee requests must be supported by contemporaneous records of hours worked, or the number of hours may be reduced.  *See Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001).  That obligation is satisfied by providing the Court with "an accurate representation of the hours worked."  *Awuah v. Coverall N. Am., Inc.*, 791 F. Supp. 2d 284, 289 (D. Mass. 2011).  So long as the Court has before it enough information about the case

to determine the reasonableness of the hours spent, calculation of hours based on contemporaneous records kept is sufficient. *See id.* (declining to reduce the number of hours spent where attorney reconstructed billing records from contemporaneous records).

Here, because its cases are handled on a contingency basis, The Sakla Law Firm did not prepare typical billing invoices. Rather, the personnel employed on this matter, and the firm, maintained records of tasks performed that were supported by records of case correspondence, meetings, depositions, hearings, conferences, as well as the number of documents reviewed and documents drafted. These records were maintained by paralegals at The Sakla Law Firm. *See* Nolan Decl. ¶¶ 13-14. Dr. Sakla compiled these records into individual summaries of hours expended by timekeeper. *See* Sakla Decl. ¶ 81. Those summaries have been attached as exhibits to his declaration. *See id.*, Exs. 3-5.

In that regard, the records in this case are even stronger than those in *Awuah*, which held that reports of hours based on contemporaneous records, but not billed in the ordinary course, were nevertheless sufficiently detailed as to be reasonable. *See Awuah*, 791 F. Supp. 2d at 289. And here, just as in *Awuah*, the expenditure of time by another plaintiff's attorney in the case is directly comparable. *See id.* ("Accordingly, Attorney Schwab's time log can be used in place of a contemporaneous record of the time Attorney Liss–Riordan worked during the arbitration proceedings."). Ms. Kieff's two lead attorneys, Gary Azorsky and Jeanne Markey, have both submitted declarations in support of Dr. LaCorte's petition for attorneys' fees and costs. *See generally* Azorsky Decl.; Markey Decl. Relator Kieff's counsel expended over 18,290 hours on this case. *See* Azorsky Decl. ¶ 5; Markey Decl. ¶ 5. By contrast, Dr. LaCorte's counsel seek fees for less than half that amount of time.

Based on the Court's familiarity with this long-running litigation, the presence of directly comparable Co-Relator's counsel, and the detailed nature of the records submitted, the number of hours requested is reasonable and well supported.

### 3.   Based on the Complexity of the Case and the Risk Involved, The Number of Hours Requested Is Reasonable

Expert testimony confirms that the number of hours requested by Dr. LaCorte's counsel is both conservative and reasonable.  Based on a review of the docket, the filings in the case, and the hours summaries submitted, Suzanne Durrell – an expert in complex *qui tam* litigation – concludes that the number of hours spent is "both reasonable and customary for a case of this complexity and length."  Durrell Decl. ¶ 18.  In particular, the periods from 2008-2012 and 2015-2016 were "especially grueling" and required The Sakla Law Firm to dedicate substantial resources to the case.  *Id.*  That time spent is doubly important because of its opportunity cost: The Sakla Law Firm had to forgo work on other cases in order to pursue this matter, even as this case offered no guarantee of success.  Moreover, the risk of failure came with the potential for heavy penalties in the form of Wyeth's attorneys' fees and costs, which they might very well have demanded from Dr. LaCorte had the litigation not been successful.

The time Dr. Sakla and Ms. Reuther spent working on this case was well spent.  They devoted hundreds of hours to the difficult but necessary work of document collection and review; such discovery is "essential" in a case like this.  Durrell Decl. ¶ 19; *see also* Azorsky Decl. ¶¶ 6-7; Markey Decl. ¶¶ 6-7 (describing the contributions of Dr. Sakla and Ms. Reuther to the litigation).  Moreover, the coordination between Co-Relators' counsel described in the declarations of Mr. Azorsky and Ms. Markey is "instrumental to a successful outcome" in a complex *qui tam* case such as this one.  Durrell Decl. ¶ 19.

**C.     The Facts of This Case Merit an Upward Adjustment to the Lodestar Amount**

Once it has calculated the lodestar amount, the Court may adjust it upward or downward, based on any of several different factors, including the results obtained and the time and labor actually required for the efficacious handling of the matter.  *See Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 336 (1st Cir. 2008).  The Supreme Court has explained:  "When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained."  *Hensley*, 461 U.S. at 437.

Dr. LaCorte's requested attorneys' fees represent less than 1% of the total settlement amount, a small fraction of the amount recovered on behalf of taxpayers.  For that reason, Dr. LaCorte asks the Court to enhance the lodestar upward by 25% to reflect each of:  (1) the contingent nature of the fee; (2) the 14-year delay in payment; (3) the quality of representation; and (4) the size of the recovery.  *See Furtado*, 635 F.2d at 920.

This was a risky case.  There was no guarantee of recovery, and Dr. LaCorte's attorneys were not compensated for their work on this case during its 14-year duration.  That risk and uncertainty came at the direct cost of other cases The Sakla Law Firm could have undertaken in lieu of continuing this case, particularly after the United States declined to intervene.  *See* Durrell Decl. ¶ 15 (describing the significant risk undertaken by Dr. LaCorte's counsel while the United States declined to intervene).

Furthermore, the contributions of Dr. LaCorte and his counsel were substantial.  The United States declined to intervene in this matter until after Dr. LaCorte filed his meticulously documented Consolidated Complaint.  Counsel to Co-Relator Kieff testify that Dr. LaCorte's attorneys were "invaluable" and "provided him with exceptional representation throughout the

course of this litigation."  Markey Decl. ¶¶ 6, 10; Azorsky Decl. ¶¶ 6, 8.  Dr. LaCorte's personal

counsel characterizes The Sakla Law Firm's contributions as "critical" and notes that Dr. Sakla

and Ms. Reuther provided Dr. LaCorte with "excellent representation throughout the course of

this litigation."  Decl. of Normand F. Pizza ¶¶ 8-9 (filed herewith).  Likewise, Dr. LaCorte

believes that The Sakla Law Firm is directly responsible for the United States' decision to

intervene.  *See* LaCorte Decl. ¶ 4.

> **D.    An Award of Fully Compensatory Attorneys' Fees Satisfies the FCA's Remedial Goals**

The legislative history of 31 U.S.C. § 3730 confirms that the current fee-shifting

provision was enacted with the express purpose of creating an incentive to private individuals to

bring suits on behalf of the government to help vindicate the interests of the United States:

"Unavailability of attorneys' fees inhibits and precludes many private individuals, as well as

their attorneys, from bringing civil fraud suits."  S. Rep. 99-345, at 29 (1986), *reprinted in* 1986

U.S.C.C.A.N. 5266, 5294; *see also id.* at 2, *reprinted in* 1986 U.S.C.C.A.N. 5267; *Galvan v.

Federal Prison Indus., Inc.*, 199 F.3d 461, 462 (D.C. Cir. 1999) ("The False Claims Act

encourages private parties to help fight fraud on the United States by giving them the power to

bring civil actions in its name, and by providing both the government and the private party . . . a

share of any financial recovery *and reimbursement for their costs, including attorneys' fees*.")

(emphasis added); *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 963 (9th Cir.

1995) (listing attorneys' fees as part of the FCA's "incentive effect").

The incentives created through the provision of attorneys' fees are crucial to ensuring that

fraud against the United States is fully exposed and litigated.  Moreover, because recovery under

the FCA flows directly to the public fisc, unlike in the context of other fee-shifting provisions,

the FCA must provide an especially strong incentive to potential private attorneys general

through the full award of attorneys' fees.  The maintenance of those incentives provides an

independent reason to grant in full Dr. LaCorte's petition for attorneys' fees and costs.

## II.    RELATOR'S REQUESTED COSTS AND EXPENSES ARE REASONABLE

Fee-shifting statutes also authorize courts to award reasonable out-of-pocket attorney

expenses and costs.  *See Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir. 1983).  Those

expenses and costs are recoupable so long as they are reasonable and necessary.  *Id.*

The costs incurred by Dr. LaCorte's counsel in this case fall into the following general

categories:  database and computerized research, photocopying, filing fees, courier services,

postage, air freight, publications, long-distance telephone service, travel and lodging expenses,

supplies, facsimiles, court services, professional and witness fees, electronic housing of the

Wyeth database and research materials, telephone services, outside vendors, local and personal

counsel expenses, and transcripts.  The requested costs are more fully detailed in Exhibit 2

appended to the Sakla Declaration.

The costs incurred are reasonable given the complexity of the case.  *See* Durrell Decl.

¶ 26.  For example, The Sakla Law Firm created an electronic database containing the more than

eight million pages of documents produced by Wyeth during the course of the litigation.  That

database allowed Dr. LaCorte's attorneys to provide "invaluable assistance" to Dr. LaCorte and

the United States as the parties prepared for trial.  Azorsky Decl. ¶ 8.  Other routine costs, such

as for travel, lodging, and photocopying, are entirely reasonable given the length and document-

intensive nature of the case.  *See* Durrell Dec. ¶ 26.  In all cases, the requested costs and

expenses are supported by invoices and other records.

### SUMMARY OF ATTORNEYS' FEES AND COSTS

Dr. LaCorte respectfully moves this Court grant his petition for attorneys' fees and costs in the amounts detailed in the exhibits to the Sakla Declaration, filed herewith.  Dr. Sakla has already exercised considerable billing judgment in preparing the attached hours summaries, excluding any excessive or vague entries.  For example, Dr. Sakla has not included hundreds of hours of documented telephone calls with Dr. LaCorte in an attempt to present a conservative estimate of his hours.  *See* Sakla Decl. ¶ 82.

**1.      Dr. Sherif Sakla**

Relator's counsel, Dr. Sherif Sakla expended 5,261.6 hours of attorney time in prosecuting this matter between 2002 and May 3, 2016 (including 528.5 hours of travel time billed at a 50% rate).  Sakla's hourly rate is $875.  Dr. Sakla's hours are detailed in Exhibit 3 to the Sakla Declaration.

**2.      Stephanie Reuther**

Relator's counsel, Stephanie Reuther expended 1796.8 hours of attorney time (including 290 hours of travel time billed at a 50% rate) in prosecuting this matter between July 2004 and May 3, 2016.  Reuther's hourly rate is $775.  Ms. Reuther's hours are detailed in Exhibit 4 to the Sakla Declaration.

**3.      Paralegal**

Relator's paralegals, most notably Scott Nolan, expended 3085.5 hours of paralegal time in prosecuting this matter.  The Sakla Law Firm's paralegal hourly rate is $175.  Paralegal hours are detailed in Exhibit 5 to the Sakla Declaration.

Accordingly, Dr. LaCorte moves the Court to award attorneys' fees in the amount of $7,740,985.94, calculated as follows:

| | |
|---|---|
| Dr. Sherif K. Sakla fees: | $4,372,681.25 |
| Stephanie C. Reuther fees: | $1,280,145.00 |
| Paralegal fees: | $539,962.50 |
| Subtotal | $6,192,788.75 |
| Lodestar enhancement (25%) | $1,548,197.19 |
| **TOTAL**[5] | **$7,740,985.94** |

Additionally, Dr. LaCorte moves the Court to award costs and expenses in the amount of $321,236.43.

## CONCLUSION

Dr. LaCorte accordingly moves the Court to enter judgment in his favor and against Wyeth for attorneys' fees in the amount of $7,740,985.94, and litigation expenses and costs in the amount of $321,236.43.

Dated:  June 29, 2016                          Respectfully submitted,


                                              /s/ Silvija A. Strikis
                                              _____

William F. York, BBO # 537260          Silvija A. Strikis (*pro hac vice*)
John G. Hofmann, BBO # 653989          Thomas B. Bennett (*pro hac vice*)
Gilman, McLaughlin & Hanrahan LLP      KELLOGG, HUBER, HANSEN,
101 Merrimac Street, P.O. Box 9601        TODD, EVANS & FIGEL, P.L.L.C.
Boston, MA 02114-9601                  1615 M St., NW, Suite 400
Tel: 617-227-9999                      Washington, D.C. 20036
wyork@gilmac.com                       (202) 326-7900
jhofmann@gilmac.com                    sstrikis@khhte.com
                                       tbennett@khhte.com

*Attorneys for Relator William St. John LaCorte*

---

[5] To the extent Dr. LaCorte is successful in recovering any attorneys' fees, he will submit a supplemental petition to recover his fees and expenses incurred in pursuing those fees.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of June, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all CM/ECF participants.

/s/ Silvija A. Strikis
Silvija A. Strikis (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
sstrikis@khhte.com

*Attorney for Relator William St. John LaCorte*