# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
UNITED STATES OF AMERICA, THE STATE   )
OF CALIFORNIA, THE DISTRICT OF   )
COLUMBIA, THE STATE OF FLORIDA,   )
THE STATE OF HAWAII, THE STATE OF   )
ILLINOIS, THE COMMONWEALTH OF   )
MASSACHUSETTS, THE STATE OF NEW   )
MEXICO, THE STATE OF TENNESSEE,   )
THE STATE OF TEXAS, AND THE   )
COMMONWEALTH OF VIRGINIA ex rel.   )
LAUREN KIEFF,   )
)
Plaintiffs,   )
)
v.   ) Civil Action No. 03-12366-DPW
)
WYETH PHARMACEUTICALS, INC.,   )
)
Defendant.   )
_____)
)
UNITED STATES OF AMERICA ex rel.   )
WILLIAM LACORTE,   )
)
Plaintiff,   )
)
v.   ) Civil Action No. 06-11724-DPW
)
WYETH,   )
)
Defendant.   )
_____)

## PRE-TRIAL MEMORANDUM

NOW INTO COURT come SHERIF K. SAKLA, M.D., J.D. and the SAKLA LAW FIRM, APLC ("the Sakla Parties") who respectfully submit this Pre-Trial Memorandum pursuant to Court order.

## TABLE OF CONTENTS

Table of Authorities .................................................................................................................. iii

Introduction ............................................................................................................................... 1

Undisputed Facts ...................................................................................................................... 2

Law and Argument ................................................................................................................... 3

    I.   The claims of Discharged Counsel are prescribed .............................................. 3

    II.  The contingency fee agreement cannot be enforced by discharged counsel ...................... 4

    III. Discharged counsel cannot recover a share of the contingency fee under a "joint venture theory or for breach of fiduciary duty ................................................................ 9

    IV. Judicial estoppel is not applicable ..................................................................... 11

    V.  The attorneys' fee should be divided according to the Rule 1.5 factors ........................... 12

        a.  The Sakla Parties' contributions to the client's cause were substantial and merit an award of substantially all of the contingency fee at issue ..................................... 13

        b.  Discharged Counsel have refused to provide evidence necessary for an award of attorney's fees under *quantum meruit* or the Rule 1.5 factors .............................. 16

        c.  Vezina & Gattuso, LLC should be debarred from any fee ..................................... 17

Conclusion ............................................................................................................................... 18

Certificate of Service ............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Medforce*, 682 So. 2d 323 (La. App. 4th Cir. 1996) ........................................9

*AFLAC v. Williams*, 444 S.E.2d 314 (Ga.1994).............................................................. 5-6

*Amstead v. McFarland*, 650 S.E.2d 737, 287 Ga. App. 135 (Ga. App. 2007) ................................8

*Brown v. Seimers*, 726 So.2d 1018, 1022–23 (La. App. 5 Cir. 1999) .........................................6, 8

*Chimneywood Homeowners, Ass'n, Inc. v. Eagan Ins. Agency, Inc.*, 57 So. 3d 1142, 1149 (La. App. 1st Cir. 2011) ..............................................................................9

*City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014) .......................................... 5-6, 19

*Dukes v. Matheny*, 878 So. 2d 517 (La. App. 1st Cir. 2004).............................................................9

*Eichholz Law Firm, P.C. v. Jeff Martin & Assocs. P.C.*, Case No. CV414-172, 2016 WL 4492855, *4 (S.D. Ga. Aug. 25, 2016) ...................................................................10

*Eichholz Law Firm v. Tate Law Grp.*, 714 S.E.2d 413, 417 (Ga. App. 2011).........................10, 19

*Gamm, Greenberg & Kaplan v. Butts*, 508 So.2d 633, 635-6 (La. App. 2 Cir. 1987) ................ 3-4

*Gillio v. Hanover Ins. Co.*, 2017 WL 432932 (La.App. 1 Cir. 1/31/2017) ................................. 5-6

*Greenspoon Marder, P.A. v. Andry Law Firm*, LLC, Civ. A. No. 13- 5509, 2013 WL 6004054, at *4 (E.D. La. Nov. 13, 2004)..............................................................................9

*Greer, Klosik and Daugherty v. Yetman*, 496 S.E.2d 693 (Ga.1998) ...............................................6

*In re P & E Boat Rentals*, 928 F.2d 662, 665 (5th Cir. 1991).........................................................9

*Kirschner & Venker v. Taylor & Martino*, 627 S.E.2d 112, 113 (Ga. App. 2006) .................... 9-10

*Luther v. John W. Stone Oil Distrib.*, 607 Fed. Appx. 367, 370-1 (5th Cir. 2015).......................6-8

*Matter of P & E Boat Rentals*, 928 F.2d 662, 664-665 (5th Cir. 1991) ...........................................6

*McAnespy-Smith v. Hartford Ins. Co. of the Midwest*, 2016 WL 5349806, *2-3 (E.D.La. 9/2/2016)...........................................................................................6

*Melancon v. Great S. Dredging, Inc.*, 2015 WL 3851585 (E.D. La. 6/22/2015) ............................6

*O'Rourke v. Cairns*, 683 So. 2d 697 (La. 1996) ......................................................... 5-6, 8

*Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010)...........................................................................11

*Rivet v. State*, 680 So.2d 1154 (La.1996)....................................................................................5

*Saucier v. Hayes Dairy Prods., Inc.*, 373 So. 2d 102, 116 (La. 1978) ...........................5-6, 12, 19

*Scott v. Kemper Ins. Co.*, 377 So.2d 66 (La. 1979)......................................................................6

*Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 652 (La. 2007)........................................10, 18

*Seal v. Pipeline, Inc.*, 731 F.2d 1194, 1196 (5th Cir. 1984) ........................................................5

*Succession of Wallace*, 574 So. 2d 348, 351 (La. 1991) ........................................................17-18

*Tolson v. Sistrunk*, 772 S.E.2d 416, 423-4 (Ga. App. 2015) ........................................................6

*United States ex rel LaCorte v. Wyeth*, 2017 WL 279701, *2 (E.D.La. 1/13/2017)
     (Roby, M.J.) ...........................................................................................................................7

*W. Carl Reynolds, P.C. v. McKeithen*, 2015 WL 2165786 (La. App. 1 Cir.), *rev'd on other*
     *grounds*, 176 So.3d 399 (2015)...........................................................................................6, 10

*Webb v. Dolgencorp, LLC*, 2016 WL 7157078 (E.D.La. 10/25/2016)...........................................6

*Woods v. Jones*, 305 Ga. App. 349, 699 S.E.2d 567 (Ga. App. 2010) ........................................4


**Statutes**
La. Civ. Code art. 3494 ........................................................................................................... 3-4

La. Civ. Code art. 3495 ........................................................................................................... 3-4

OCGA §9-3-25...............................................................................................................................4

**Other Authorities**
Georgia State Bar Rules, Rule 4-102, Rules of Professional Conduct, Rule 1.5.......................1, 5

Louisiana R. Prof'l Conduct, Rule 1.5(a) ................................................................. 1, 5, 12-13, 19

Louisiana R. Prof'l Conduct, Rule 1.7 .......................................................................................18

Louisiana R. Prof'l Conduct, Rule 1.16(a)(3) .......................................................................17-18

## **INTRODUCTION**

The core of this matter is a division of a contingency fee when some counsel are terminated prior to completion of the case. Clients frequently terminate counsel before the conclusion of a matter, often when counsel have been retained under a contingency fee agreement. It is a legal axiom that attorneys receive a fee which bears a reasonable relationship to the work performed prior to termination by a client, as authorized by a client, which benefits the client and the client's cause. Uncommon issues have arisen in this matter due to the extreme lengths which Vezina & Gattuso and Boone & Stone (collectively "Discharged Counsel") have gone in their attempts to obtain an unearned 2/3rds of the contingency fee despite their termination eight years before any recovery in the case.

The parties' undisputed findings of facts and conclusions of law serve to clarify and have resolved many of the uncommon issues before the Court. The Sakla Parties' proposed findings of fact which have not been disputed support the dismissal of Discharged Counsel's claims for breach of contract, joint venture, and breach of fiduciary duty. (R. Doc. 686-1, Sakla Parties Proposed Findings of Fact, "SFOF" ¶¶ 368-371). Additionally, Discharged Counsel do not dispute that the Louisiana prescriptive period for the assertion of an attorney fee claim begins to run when counsel is terminated and turns over his file. (SFOF ¶ 350). This admission strongly suggests that Vezina & Gattuso's fee claim prescribed in 2011.

What remains is the Court's determination of a reasonable fee for Discharged Counsel under Louisiana and Georgia's Rules of Professional Conduct, Rule 1.5. Discharged Counsel have not disputed the Sakla Parties' proposed findings of fact which set forth the Sakla Law Firm's immense and critical efforts in bringing about a recovery. (*See* SFOF ¶¶124-142 and 158-178). However, evidence supporting the amount and impact of Discharged Counsel's services

1

remains questionable, primarily due to their failure to produce evidence addressing a reasonable earned fee under Rule 1.5 of the Georgia and Louisiana Rules of Professional Conduct.

## UNDISPUTED FACTS

The *Wyeth* case was filed in New Orleans in 2002, and then transferred to Boston in 2006. (SFOF ¶¶ 10-16, 49). Between the filing of Dr. LaCorte's case on March 21, 2002, in the Eastern District of Louisiana and its transfer to the District of Massachusetts only 18 documents were filed on the docket. (SFOF ¶¶ 50). No additional filings were made with this Court in Dr. LaCorte's case against Wyeth between September 2006 and August 2008. (SFOF ¶51).

Dr. Sakla was the originating attorney in the case against Wyeth. (SFOF ¶ 9). On June 24, 2004, Dr. LaCorte signed a Representation Contract (the "June 24, 2004 RC" or "2004 RC") with the Sakla Law Firm, Vezina & Gattuso, LLC and Boone & Stone (collectively, the "Trial Lawyers"). The June 24, 2004 RC was intended to govern the Trial Lawyers' representation of Dr. LaCorte in the *Wyeth* case, and it expressly superseded all prior agreements between Dr. LaCorte and the Trial Lawyers. Paragraph 20 of that agreement contains a merger clause, stating "This agreement constitutes the entire agreement between Trial Lawyers and Client and the terms hereof shall not be modified except in writing, signed by both Trial Lawyers and Client." The 2004 RC did not contain any provision specifying the division of legal fees among the firms. (SFOF ¶¶ 20-25).

Significant difficulties arose between Dr. LaCorte and Discharged Counsel. Dr. LaCorte terminated Vezina & Gattuso, LLC by facsimile on January 23, 2008. (SFOF ¶68). Dr. LaCorte terminated Boone & Stone by email on February 7, 2008. (SFOF ¶74). At the time of counsel's termination, this Court had not yet made any substantive rulings in the *Wyeth* matter, Wyeth had not filed any substantive pleadings or motions and had not made any admission of liability. Wy-

eth was still attempting to convince the government that the case lacked merit and that the government should not invest any resources in it. (SFOF ¶¶ 79, 83, 85, 86).

In August 2008, Dr. Sakla, on behalf of Dr. LaCorte, filed his First Supplemental and Amended Consolidated Complaint ("Operative Complaint"). (SFOF ¶94).

The United States filed its notice of intervention on April 23, 2009. (SFOF ¶100). Despite the intervention by the United States, Wyeth chose to litigate instead of trying to settle the matter. (SFOF ¶102). This case was intensely litigated by Wyeth, who employed a platoon of attorneys to defend against the claims brought by Dr. LaCorte, the USA, and the individual states. In response to Dr. LaCorte and Ms. Kieff's discovery requests, Wyeth produced over six million pages of documents, which the Sakla Parties OCR'd and stored electronically in a custom-designed searchable litigation database. This system allowed counsel for relators to call up material documents and deposition testimony and produce the documents expeditiously, which proved extremely valuable to the prosecution of the case. (SFOF ¶160).

Wyeth made its first offer to settle in March 2011, after extensive discovery in which the Sakla Parties had participated fully and in which discharged counsel took no part. (SFOF ¶82). Wyeth settled with the United States on April 27, 2016. Wyeth agreed to pay the United States $413,248,820.00 and the Participating States $371,351,180.00. (SFOF ¶150). Shortly after the settlement was reached on June 21, 2016, Discharged Counsel filed a  motion for leave to file their Complaint in Intervention. (SFOF ¶157).

## LAW AND ARGUMENT

### I.     The claims of Discharged Counsel are prescribed.

Any action by Vezina & Gattuso for attorney's fees is time-barred under Louisiana law if it was not judicially asserted within three years of the date that firm was discharged. La. Civ.

Code arts. 3494 and 3495; *Gamm, Greenberg & Kaplan v. Butts,* 508 So.2d 633, 637 (La. App. 2 Cir. 1987).

Similarly, Georgia has a four-year statute of limitations for recovery of attorneys' fees. OCGA § 9-3-25. While the Georgia case of *Woods v. Jones*, 305 Ga. App. 349, 699 S.E.2d 567 (Ga. App. 2010), holds that a terminated contingency fee attorney may wait until the former client makes a recovery before liquidating his fee claim, that case was based upon an agreement between the client and discharged counsel to toll the limitation period pending the outcome of the case. Unlike *Woods*, there was never an agreement between Dr. LaCorte and Discharged Counsel to defer filing any attorney's fee claim.

Discharged Counsel do not dispute that when an attorney has been terminated from a contingency fee representation, the prescription accrues, that is the time period begins to run, when the discharged firm ceases work and forwards its file to any new counsel. *Gamm, Greenberg & Kaplan v. Butts*, 508 So.2d 633, 635-6 (La. App. 2 Cir. 1987). (SFOF ¶350).

The undisputed and non-objected to findings of fact submitted by the Sakla Parties are sufficient to prove that Discharged Counsel's post-termination fee claims are time barred. Discharged Counsel neither disputed nor objected to the fact that Dr. LaCorte terminated Vezina & Gattuso by facsimile on January 23, 2008. (SFOF ¶68). Similarly, there is now neither an issue of fact nor objection to the fact that Dr. LaCorte terminated Boone & Stone on February 7, 2008. (SFOF ¶74). The first judicial assertion of any fee claim by Discharged Counsel was the June 21, 2016 filing of the Motion of Vezina & Gattuso, LLC and Boone & Stone for Leave to Intervene to Assert Their Claim of Attorney's Lien and Security Interest Against the Relator Share of William St. John LaCorte Only. (R. Doc. 565 and SFOF ¶¶78, 157). Thus, only relying on undisputed and non-objected to facts and conclusions of law, they waited more than eight (8) years after

their discharge to assert their claims, and therefore their claims should be dismissed as time barred pursuant to both Louisiana and Georgia law.

## II.     The contingency fee agreement cannot be enforced by discharged counsel.

The now undisputed proposed findings of fact preclude Discharged Counsel from enforcing the contingency fee agreement. As noted above, there is now no dispute that Vezina & Gattuso was terminated by Dr. LaCorte on January 23, 2008 and Boone & Stone was terminated by Dr. LaCorte on February 7, 2008. (SFOF ¶¶68, 74).

For counsel to earn a fee, the fee must be earned and reasonable, and no contract can alter that ethical rule. See Louisiana R. Prof'l Conduct, Rule 1.5(a); Georgia State Bar Rules, Rule 4-102, Rules of Professional Conduct, Rule 1.5; *O'Rourke v. Cairns*, 683 So. 2d 697 (La. 1996); *Saucier v. Hayes Dairy Prods., Inc.*, 373 So. 2d 102, 116 (La. 1978). As a result, "a lawyer cannot use contractual liability to circumvent the requirement that a lawyer can only charge a reasonable fee for services rendered." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014) (Louisiana law). (SFOF ¶345).

General rules of contract law and commercial law yield to the applicable ethical rules and concepts of equity in apportioning attorneys' fees because "niceties of contractual interpretation and technical words of conveyances may not impede or prevent the achieving of that just result." *Seal v. Pipeline, Inc.*, 731 F.2d 1194, 1196 (5th Cir. 1984) (applying Louisiana law); see also *AFLAC, Inc. v. Williams*, 264 Ga. 351, 353 (1994) ("To force all attorney-client agreements into the conventional status of commercial contracts ignores the special fiduciary relationship created when an attorney represents a client."). (SFOF ¶346).

Both Louisiana law and Georgia law adhere to the rule that terminated counsel do not receive a contingency fee, but receive a fee apportioned to them through application of the *Saucier* factors drawn from Louisiana Rules of Professional Conduct, Rule 1.5(a) or *quantum meruit* un-

der Georgia law. *Saucier v. Hayes Dairy Prods., Inc.*, 373 So.2d 102, 116 (La.1978); *Rivet v. State*, 680 So.2d 1154 (La.1996); *O'Rourke v. Cairns*, 683 So.2d 697 (La.1996); *Gillio v. Hanover Ins. Co.*, 2017 WL 432932 (La.App. 1 Cir. 1/31/2017); *Luther v. John W. Stone Oil Distrib.*, 607 Fed. Appx. 367, 370-1 (5th Cir. 2015); *City of Alexandria v. Brown*, 740 F.3d 339, 353-354 (5th Cir. 2014); *Melancon v. Great S. Dredging, Inc.*, 2015 WL 3851585 (E.D. La. 6/22/2015); *McAnespy-Smith v. Hartford Ins. Co. of the Midwest*, 2016 WL 5349806, *2-3 (E.D.La. 9/2/2016); *Webb v. Dolgencorp, LLC*, 2016 WL 7157078 (E.D.La. 10/25/2016); *AFLAC v. Williams*, 444 S.E.2d 314 (Ga.1994); *Greer, Klosik and Daugherty v. Yetman*, 496 S.E.2d 693 (Ga.1998)(Counsel terminated after $2.1 million judgment at trial, case settled for $1.8 million on appeal, awarded *quantum meruit* fee.). Both the Georgia and Louisiana Supreme Courts have rejected damages clauses by which an attorney would force a client to pay more than one full fee in a matter or financially penalize the client for terminating their counsel. *Saucier*, 373 So.2d at 116; *Scott v. Kemper Ins. Co.*, 377 So.2d 66 (La. 1979) (Contract cannot give attorney proprietary interest in claim which would allow attorney to control claim over client's desire to discharge counsel); *AFLAC v. Williams*, 444 S.E.2d 314 (Ga.1994). Also, the *Saucier* analysis and *quantum meruit* analysis are applicable not only to cases in which one counsel replaces a terminated prior counsel, but also to situations in which one or more co-counsel are terminated and a remaining counsel continues the case to completion. *Matter of P & E Boat Rentals*, 928 F.2d 662, 664-665 (5th Cir. 1991); *Brown v. Seimers*, 726 So.2d 1018, 1022–23 (La. App. 5 Cir. 1999); *W. Carl Reynolds, P.C. v. McKeithen*, 2015 WL 2165786 (La. App. 1 Cir.), *rev'd on other grounds*, 176 So.3d 399 (2015); *Tolson v. Sistrunk*, 772 S.E.2d 416, 423-4 (Ga. App. 2015). Finally, the Fifth Circuit has held that application of *quantum meruit* principles can satisfy the *Saucier* analysis because both *Saucier* and general prevailing *quantum meruit* principles are concerned at heart with an application of the Rule 1.5 factors to determine the appropriate fee for the

6

work performed and value provided to the client during the representation. *Brown*, 740 F.3d at 352; *see also*, *O'Rourke,* 683 So.2d at 702 (Recognized that primary change in *Saucier* was elimination of risk of double fee and that *quantum meruit* factors remained largely unchanged.).

That *Saucier* provides the substantive rule of law for the determination of any fees due to Vezina & Gattuso has already been determined in this matter. In the case *sub judice*, Magistrate Judge Roby cited *Saucier* as the prevailing and applicable law in sustaining Mr. Vezina's Motion to Quash the subpoena seeking his LSU Medical School transcript. *United States ex rel LaCorte v. Wyeth*, 2017 WL 279701, *2 (E.D.La. 1/13/2017) (Roby, M.J.).

In *Luther v. John W. Stone Oil Distributor*, the United States Fifth Circuit succinctly summarized the state of Louisiana law with regard to *Saucier* as follows:

> Under Louisiana law, when two attorneys provide legal services to the same client on a contingency-fee basis and one attorney is discharged before the case is resolved, the client is obligated to pay only one contingency fee that the court allocates between the attorneys. The amount of the fee is "determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed." And the apportionment of the fee between the attorneys is based on the factors listed in Rule 1.5 of the Louisiana Rules of Professional Conduct, which together are directed at assessing the reasonableness of a fee. The factors (commonly known as "the *Saucier* factors") include, *inter alia*, "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"; "the amount involved and the results obtained"; and "the nature and length of the professional relationship with the client." The purpose of applying these factors is to ensure that the fee is divided "according to the respective services and contributions of the attorneys for work performed and other relevant factors."
>
> If the first attorney was discharged without cause, then the application of the *Saucier* factors marks the end of the analysis. If, however, the first attorney was discharged for cause, then the court must next "consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel would receive after the *Saucier* allocation." A finding that the *Saucier* factors entitle the first attorney to no part of the contingency fee renders irrelevant the remainder of the analysis. The apportionment of contingency fees is a factual determination reviewed for clear error.

> As this court has interpreted *Saucier* and *Osborne*, an attorney's representation must "advance [the] client's case" and have some "productive value to [the] client" in order for the attorney to recover any part of the applicable contingency fee.

*Luther*, 607 Fed. Appx. at 370-1 (internal citations omitted).

Under both Louisiana and Georgia law the *Saucier* or *quantum meruit* recovery is limited to the value of work performed **prior to** termination. *Luther*, 607 Fed. Appx. at 370-1; *Brown*, 740 F.3d at 353-354; *Amstead v. McFarland*, 650 S.E.2d 737, 287 Ga. App. 135 (Ga. App. 2007). Despite the protestations to the contrary by the Discharged Counsel in the present matter, the Louisiana Supreme Court made it clear that a client can discharge attorneys "for cause" when they are rude to clients or non-responsive to the client, without the client having to prove a breach of the standard of care**.** *O'Rourke, 683 So.2d at 704.* That a discharge for cause does not require an ethical breach was confirmed in the testimony of Discharged Counsel's ethics expert, Professor Dane Ciolino. (SFOF  at ¶¶333-334, 340).

Even limiting the evidence to that which was neither disputed nor objected to by Discharged Counsel, it is clear that cause existed for Dr. LaCorte to terminate Discharged Counsel. Mr. Vezina entered into a document sharing agreement with Delaware, in which he certified he had authority from his client, yet Discharged Counsel does not dispute that Mr. Vezina did not obtain Dr. LaCorte's consent prior to executing the agreement. (SFOF ¶¶267-271). Separately, as acknowledged by Mr. Stone, so long as there was a dispute between Discharged Counsel and Dr. LaCorte whether the appropriate legal fee was 33 1/3% or 40%, Discharged Counsel could not represent Dr. LaCorte. (SFOF at ¶298). The dispute over the appropriate percentage of the fee actually came to a head, including the transmission of an email from Mr. Stone to Mr. Bhambhani on February 6, 2008 objecting to any action by Judge Africk in the *Merck* case other

8

than a joint dismissal of the main claim due to Discharged Counsel's plan to serve lien notices for

their fees. (SFOF at ¶¶71-72).

In sum, Discharged Counsel, once terminated, can only seek a reasonable *quantum meruit*

fees, regardless of any contract terms to the contrary. For Vezina & Gattuso the applicable rule is

stated in *Saucier,* and for Boone & Stone it is the equitable law of *quantum meruit*.

## III. Discharged counsel cannot recover a share of the contingency fee under a "joint venture" theory or for breach of fiduciary duty.

Considering that the Sakla Parties' Conclusions of Law ¶¶368-371 were not disputed,

Discharged counsel have abandoned their claims under theories of joint venture or breach of fi-

duciary duty. The following undisputed conclusions of law should be adopted by the Court:

> Just as attorneys may not contract out of their ethical obligations to accept
> only reasonable fees, attorneys may not rely on theories of implied "joint
> ventures" to avoid those obligations. In *In re P & E Boat Rentals*, the Fifth
> Circuit, applying Louisiana law, specifically rejected the notion that a
> "joint venture" agreement could supersede the Louisiana Rules of Profes-
> sional Conduct: "No [joint venture] agreement validly could have been
> made under the Code of Professional Responsibility unless the attorneys
> equally assumed responsibility for the matter and performed essentially
> equal services. . . . No contract between counsel which is in conflict with
> controlling ethical standards should be recognized and enforced by the
> court." 928 F.2d 662, 665 (5th Cir. 1991); see also *Dukes v. Matheny*, 878
> So. 2d 517 (La. App. 1st Cir. 2004) ("[Louisiana] courts have declined to
> apply the joint venture theory to support an equal division of the fee when
> the attorneys have not been jointly involved in the representation of the
> client. Rather, the apportionment of the fee in those types of cases has
> been based on quantum meruit." (citations omitted)); *Greenspoon Marder,*
> *P.A. v. Andry Law Firm*, LLC, Civ. A. No. 13- 5509, 2013 WL 6004054, at
> *4 (E.D. La. Nov. 13, 2004) ("The finding of a joint involvement requires
> that both were actively involved in the case and remained responsible to
> their client. In the absence of a joint venture, the courts have apportioned
> the fee based on quantum meruit." (citations omitted)); *Chimneywood*
> *Homeowners, Ass'n, Inc. v. Eagan Ins. Agency, Inc.*, 57 So. 3d 1142, 1149
> (La. App. 1st Cir. 2011) (applying rule that in joint venture situation attor-
> neys must be actively involved in representation to claim joint venture fee
> share. Id. at 1149.); *Adams v. Medforce*, 682 So. 2d 323 (La. App. 4th Cir.
> 1996) (similar). (SFOF ¶368).

Georgia law similarly bars discharged lawyers from relying on an implied joint venture to avoid the ethical requirement that all fees be both earned and reasonable. In *Kirschner & Venker v. Taylor & Martino*, 627 S.E.2d 112, 113 (Ga. App. 2006), the court rejected a claim for equal apportionment of fees based on a theory of joint venture because the plaintiff firm "was fired by the client before any fee became payable." Because of its discharge, the firm "was not entitled to a cause of action against its former co-counsel for an equal share of the contingency fee" but rather entitled to quantum meruit." Id. The court reasoned that "[t]o allow a discharged attorney to collect an equal share of a contingency fee as if the attorney were still involved in a case would render the discharge meaningless. In effect, the discharged attorney would be rewarded with a potential windfall of additional fees without doing any additional work on the case. We decline to adopt a holding that would authorize such a result." *Id.*; see also *Eichholz Law Firm v. Tate Law Grp.*, 714 S.E.2d 413, 417 (Ga. App. 2011) ("[Plaintiffs] seek to enforce the fee-splitting agreements in a manner that would contravene public policy, by allowing the Eichholz firm to receive a portion of legal fees even though its clients terminated the Eichholz firm's representation before any contingency giving rise to the fees occurred."); *Eichholz Law Firm, P.C. v. Jeff Martin & Assocs. P.C.*, Case No. CV414-172, 2016 WL 4492855, *4 (S.D. Ga. Aug. 25, 2016) ("[T]he fee cannot be split with Plaintiffs under Kirschner because the clients have objected to Plaintiffs' participation. Similarly, the agreement does not comport with Rule 1.5 because Plaintiffs were fired as attorneys in the OSP cases."). (SFOF ¶369).

In any event, to the extent Louisiana and Georgia law allow an implied joint venture to exist, it is deemed terminated the moment the client terminates one of its members. See *W. Carl Reynolds, P.C. v. McKeithen*, No. 2014-0171 (La. App. 1 Cir. 5/6/15), 2015 WL 2165786, rev'd on other grounds, 176 So.3d 399 (2015) ("Once the Reynolds firm was terminated by the Phareses, the joint venture ceased."). (SFOF ¶370).

Nor can there be any claim of fiduciary duty among co-counsel, because "[i]t is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his or her client," and thus no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to one another to protect each other's interest in a fee. *Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 652 (La. 2007). (SFOF ¶371).

A direct application of the undisputed law to the undisputed facts results in the conclusion that Discharged Counsel's "joint venture" claim for 2/3rds of the attorney's fees under should be dismissed, as Discharged Counsel did not remain actively involved in the representation of Dr.

10

LaCorte after February 2008. More importantly, Georgia and Louisiana law hold that even if there is a joint venture, the termination of Discharged Counsel also terminated any joint venture.

The Sakla Parties deny that any joint venture was ever created. Mr. Vezina is unaware of any document executed by the attorneys for Dr. LaCorte that contains the term "joint venture." SFOF ¶308. Indeed, the only document in which the term "joint venture" is ever found is in the *Merck* fee-dispute settlement agreement, which was executed in August 2008. In the *Merck* settlement, Discharged Counsel explicitly abandoned any claims against the Sakla Parties for "*joint venture funds or damages for breach of fiduciary duty or breach of contract* arising out of the alleged acts, omissions, transactions or occurrences up to and including the date of this Agreement." (SFOF at ¶291 (Italics original)).

## IV.    Judicial estoppel is not applicable.

As with the joint venture issue, Discharged Counsel neither objected to nor marked as disputed any of the Sakla Parties' proposed conclusions of law concerning judicial estoppel. (SFOF ¶¶372-380). Thus, the detailed legal requirements for judicial estoppel, including inconsistency of earlier and later positions, reliance on the earlier position by a court in ruling in favor of the party advancing the argument, and an unfair advantage by virtue of the change in position in the later litigation are now undisputed. *See*, *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010). (SFOF at ¶372-374). Most importantly for the present matter, a plaintiff cannot use judicial estoppel as affirmative proof and judicial estoppel cannot be used to prevent application of otherwise binding law. (SFOF ¶¶379-380).

First, there is nothing "inconsistent" about the Sakla Parties' position that, unlike in *Merck*, an equal fee division is inappropriate here. The *Merck* case settled before Dr. LaCorte's termination of Discharged Counsel, and each of the three firms had rendered **substantially all of the legal services necessary** to accomplish the settlement. In the case *sub judice*, Discharged

Counsel were terminated before they even made a *pro hac vice* appearance in the District of Massachusetts. They were terminated before USA intervened, before Wyeth filed responsive pleadings, and before this Court heard a single substantive motion. (SFOF ¶¶89, 93, 95, 96). This case was heavily litigated for eight years after Mr. Vezina and Boone & Stone were terminated, and it settled weeks before trial. (SFOF ¶¶82). By no reasonable measure did Discharged Counsel perform "all or substantially all the legal services necessary to accomplish settlement." Dr. Sakla has been consistent in arguing for the application of the *Saucier* case before Judge Africk eight years ago, just as he does before this Court today. There will be no inconsistency caused by this Court's application of *Saucier* here. Second, the party proposing an application of judicial estoppel must show that the relevant court actually accepted the other party's earlier representation. The *Merck* fee dispute was settled before Judge Africk made a single substantive ruling. Third, in order for judicial estoppel to apply, "the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." Even assuming the Sakla Parties' current position is inconsistent with the position taken eight years ago in *Merck,* Discharged Counsel have not shown how this would give rise to any "unfair advantage" for the Sakla Parties. To put it simply, what is unfair about arguing for a reasonable fee according to Rule 1.5?

## V.       The attorneys' fee should be divided according to the Rule 1.5 factors.

Discharged Counsel did not object to the application of the *Saucier* factors, as set forth in SFOF ¶356: "Where an attorney has been discharged prior to rendition of substantially all ser-vices, the court should apportion a fee among the attorneys, "on the basis of factors which are set forth in the Code of Professional Responsibility."" The Rule 1.5 factors are also undisputed:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

12

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

### A.     The Sakla Parties' contributions to the client's cause were substantial and merit an award of substantially all of the contingency fee at issue.

The Sakla Parties' Findings of Fact pertaining to the Rule 1.5 factors are almost entirely undisputed by Discharged Counsel. (See SFOF ¶¶158-178). It is undisputed that the *Wyeth* matter was unique, noteworthy, involved specialized areas of law, and required an immense investment of time and effort by the attorneys involved, including the Sakla Law Firm. (SFOF ¶158 (undisputed portion)). Wyeth intensely litigated the matter, resulting in the production of over six million pages of discovery, and in prosecuting the matter the Sakla Firm also worked in close collaboration with the counsel for co-relator, Lauren Kieff. (SFOF ¶¶160-161, 340). Discharged Counsel do not dispute that litigation of the Wyeth matter by the Sakla Parties required substantial resources and long and grueling work hours, extensive travel, constant client communication, dedication of the majority of the Sakla Parties resources, and required the deferral or refusal of other work by the Sakla Parties. (SFOF ¶¶165 (undisputed portion)-166, 169-170, 171 (undisputed portion)). Discharged counsel did not dispute Dr. Sakla's 30 years of medical training and experience and 20 years of healthcare law experience or Ms. Reuther's 20 years of healthcare law experience. (R. Doc. 686-1 at ¶¶176-177(undisputed portions).)

The proposed findings of fact detailing the extensive efforts of the Sakla Parties in pursuing the claims through discovery and motion practice are also undisputed. (See SFOF ¶¶125-142). The Sakla Parties drafted and propounded discovery to Wyeth, responded to discovery

13

from Wyeth to Dr. LaCorte, obtained the Wyeth white paper outlining its defenses and tailored discovery to seek information to defeat those defenses. (SFOF ¶¶109). The Sakla Parties reviewed millions of pages of documents received in response to discovery requests and catalogued those documents by topic. Those efforts led to the Sakla Parties' identifying critical documents for use in the *Wyeth* case. (SFOF ¶111). Mr. Azorsky, counsel for the co-relator, averred that the discovery in the *Wyeth* matter produced documents and testimony essential to proving the claims, and the Sakla Law Firm provided meaningful contributions "[t]hroughout the entire period of discovery." (SFOF ¶114).

Among the documents uncovered by the Sakla Parties in discovery was the "smoking gun" internal Wyeth email draft. The draft email was for transmission from Wyeth counsel Frank Rapoport to Veterans Administration counsel Mel Noel. It specifically referenced that "Wyeth's plan was to use the launch of the kit as a way to increase oral sales by establishing a bundling arrangement with this kit." [WYETH786635]. (SFOF ¶115). The Government relied on the Attorney Rapoport email demonstrate that Wyeth was intentionally bundling to increase oral Protonix sales. (SFOF ¶116). Dr. Sakla also discovered Wyeth's Policy 511 "Field Sales Promotional Policy." (SFOF ¶125). The information obtained from Wyeth Policy 511 was the initial and primary line of questioning by Mr. Bhambhani for Wyeth CEO Joe Mahady. Following the deposition, Mr. Mahady was added as a witness by the United States. (SFOF ¶127).

Discharged Counsel did not dispute that Dr. Sakla's questioning of Dr. Truex, Wyeth's head of U.S. pricing, succeeded in defeating the defense that bundling referred only to product physically packaged together. (SFOF ¶123). Additionally, Dr. Sakla obtained an expert, Dr. Moussa, to successfully defeat Wyeth's defense that its actions were legal based on drug indications in certain pharmaceutical compendia. (SFOF at ¶136). Other activities by the Sakla Parties neither disputed nor objected to by Discharged Counsel include the Sakla Parties preparing for

14

and attending hearings, conferring with government counsel before and after hearings, analyzing and preparing challenges to Wyeth's privilege log, drafting substantive briefs on behalf of Dr. LaCorte, arguing against Wyeth's Motion for Summary Judgment, discussions with the government concerning pretrial preparation and trial witness strategy, and completion of extensive pretrial preparation prior to settlement occurring. (SFOF ¶¶128-134 and 137-139). Ultimately, at the conclusion of the Wyeth matter The Sakla Parties sought statutory attorney's fees based on the 10,144 hours of Sakla Parties' work, which resulted in Wyeth paying $3.95 million in statutory attorney's fees. (SFOF ¶144 (disputed fact)).

Dr. Sakla was the originating attorney in the case against Wyeth. Dr. LaCorte retained Dr. Sakla because of his expertise in the intricate inner workings of hospitals and pharmacies; the organization of and issues involving medical staff and medical staff committees; the pharmaceutical background of drugs; drug interactions; drug detailing and distribution, both inpatient and outpatient; the rules and regulations of medical licensing boards, pharmaceutical licensing boards, and nursing licensing boards; the structure and formation of organized medicine (medical societies on the local level, and the AMA); hospital billing; federal rules and regulations regarding inpatient and outpatient billing. Dr. Sakla was uniquely positioned to provide valuable counsel to Dr. LaCorte in this matter, not only as a result of his training as a physician and his relationship with Dr. LaCorte, but also through his expertise in the successful prosecution of similar lawsuits (e.g. Merck). Dr. Sakla and Dr. LaCorte worked together to collect and analyze data in the *Wyeth* case. Dr. Sakla met extensively with Dr. LaCorte after hours and on weekends to gather documents and analyze information about Wyeth's discounting schemes at Baptist Memorial Hospital. Dr. Sakla and Dr. LaCorte also met with New Orleans area physicians, pharmacists, and hospital administrators to further develop their understanding of the impact of these schemes on prescribing of Protonix to hospital patients. (SFOF ¶¶9, 10, 159, 163 (undisputed portion)).

15

**B.**     **Discharged Counsel have refused to provide evidence necessary for an award of attorney's fees under *quantum meruit* or the Rule 1.5 factors**.

The time expended by Dr. LaCorte's lawyers in the case from 2002 through February 2008 (i.e., the period when Vezina & Gattuso and B&S were involved) amounted to only a small fraction of the total time spent on the case. (SFOF ¶206). At time of Discharged Counsel's termination in January and February of 2008, no discovery had been undertaken in the *Wyeth* matter. (SFOF ¶80 and 86). Moreover, Wyeth had not yet filed any substantive pleadings, had offered nothing in settlement, and was still trying to convince the government to not pursue the matter. (SFOF ¶¶79-81). The *Wyeth* case did not settle until February of 2016, eight years after Discharged Counsel were terminated. (SFOF at ¶89). Critically, "In February 2008, Dr. LaCorte had not made any recovery in the *Wyeth* matter." (SFOF ¶¶83 and 85). The *Wyeth* matter was not actively litigated until April 2009 and later, including the United States' intervention, Wyeth's Motion to Dismiss, and discovery. (SFOF ¶¶100-106). Wyeth made its first offer to settle in March 2011, after extensive discovery in which the Sakla Parties participated. (SFOF ¶¶82).

Discharged Counsel have asserted that once the DOJ line attorneys "expressed an interest" in intervening, the relator's work was finished, and the full contingency fee was earned. According to Discharged Counsel and their experts, these emanations of interest from the DOJ attorneys so fully determined the outcome of the *Wyeth* matter that the contingency was fully earned before Wyeth even knew about the claim, before any discovery, and before this Court made a single substantive ruling. Nevertheless, the formal intervention took place fifteen months after termination of Discharged Counsel and approximately eight months after an extensive amendment of Dr. LaCorte's pleadings in August of 2008. Eight years of litigation were yet to come, fought tooth and nail by a determined, resolute, and well-financed defendant. The record evidence will show that the actions of Discharged Counsel had little impact on the actual inter-

vention, much less the ultimate resolution of this matter, which was remote in both time and substantive litigation events from their discharge.

The now undisputed facts demonstrate the limited nature of the contribution by Discharged Counsel. Vezina & Gattuso purportedly spent 700-750 hours working on behalf of Dr. LaCorte pre-termination in the Wyeth matter. (SFOF ¶179). Curiously, Vezina & Gattuso kept at least partial time and billing records, but Mr. Vezina refuses to produce such documents substantiating his work when despite multiple requests.

The work performed by Boone & Stone was similarly limited according to the now undisputed facts. Boone & Stone claims to have worked 400-450 hours of attorney time on the Wyeth matter, but no contemporaneous records of the work were maintained. (SFOF ¶¶188-189). Boone & Stone were never lead counsel, a fact that was clarified in writing by Dr. LaCorte in an email to all counsel on May 3, 2007. (SFOF ¶206).

While disputed by Discharged Counsel, the record will show that Discharged Counsel had a very contentious relationship with the client, Dr. LaCorte. Eventually, the relationship devolved into name-calling, conflicts of interest, and frequent threats of litigation resulting in Discharged Counsel's termination.

### C.     Vezina & Gattuso, LLC should be debarred from any fee.

After they were terminated, Discharged Counsel acted only in their own interests, and more importantly, contrary to the interests of their former client, Dr. LaCorte. It is undisputed that Discharged Counsel had no authority to act on behalf of Dr. LaCorte once they were terminated. (SFOF ¶¶180 (undisputed portion) and 192). A lawyer representing a client in any matter is required to withdraw from employment if he is discharged by his client." *Succession of Wallace*, 574 So. 2d 348, 351 (La. 1991) (citing La. R. Prof'l Conduct 1.16(a)(3)). Rule 1.16(a)(3), like various other Louisiana Rules of Professional Conduct, is "designed to give the client the

right to control and direct the assertion and protection of his legal rights as fully as practicable." Id. Accordingly, the Louisiana Supreme Court has made clear that Rule 1.16(a)(3) "giv[es] the client the absolute right to fire a lawyer in whom he has lost faith or confidence." Id. at 355 (emphasis added). (SFOF ¶384). Nonetheless, Mr. Vezina stayed in communication with the DOJ and individual states after his termination, and he used these back channels to influence the government attorneys to pressure Dr. LaCorte into rehiring Discharged Counsel. Mr. Vezina emailed Mr. Bhambhani at his private email address on May 28, 2009 asking Mr. Bhambhani to make it known to Dr. LaCorte that DOJ would prefer to work with Mr. Vezina. (SFOF ¶¶302 (undisputed portion)). On August 7, 2009, Vezina wrote to Bhambhani that "absent some personal jeopardy for lacorte [sic] he won't act even if it is in his best interest." (SFOF ¶303). Mr. Vezina also wrote to Mr. Bhambhani claiming that Dr. Sakla was not keeping Dr. LaCorte fully informed in the litigation and not supporting the government effort, and therefore Dr. LaCorte should have some "edification" on the history of the *King* case. (SFOF ¶305).

Mr. Vezina's "behind the scenes" conduct was a breach of his continuing fiduciary duty to Dr. LaCorte. Louisiana Rules of Professional Conduct, Rule 1.7 recognizes that loyalty is essential to the attorney-client relationship, as it "generally prohibits a lawyer from representing a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." *Scheffler v. Adams & Reese, LLP*, 06-1774, p. 13 (La.2/22/07), 950 So.2d 641 at 651. Mr. Vezina's active interference with a former client's claim, including working directly against his client's interest in violation of his continuing duty of loyalty, should preclude Vezina & Gattuso from even a *quantum meruit* fee.

## CONCLUSION

Throughout this fee dispute, Dr. Sakla has proved his claim for attorney's fees from the ground up – by documenting sixteen years of continuous effort on behalf of the client from in-

vestigation to successful conclusion of the claim. At no point during this matter did Dr. Sakla forget his duty of loyalty to his client. The Sakla Parties have submitted extensive evidence of the time spent, the value of his firm's services, and the other applicable factors to be weighed under Rule 1.5.

In contrast, Discharged Counsel seek to claim 2/3rds of the attorney's fees through a top down approach. Discharged Counsel rely on numerous contract and legal theories that (according to them) make their efforts on behalf Dr. LaCorte immaterial and irrelevant. Indeed, for nearly two years they have refused to produce any timekeeping records at all. By treating the Rule 1.5 factors as an afterthought, Discharged Counsel has failed to lay a foundation for an award of a fee under *quantum meruit*.

The law is clear, and it permits terminated attorneys to recover only the fair value of the services they actually provided. See *Saucier v. Hayes Dairy Products, Inc.,* 373 So.2d 102, 117 (La.1978*); City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014). The failure to produce any meaningful evidence of the work allegedly performed by the Discharged Counsel, including more than a mere guess as to total hours, is fatal to any claim for *quantum meruit* recovery. *Eichholz Law Firm, P.C. v. Tate Law Grp., LLC*, 783 S.E.2d 466, 468-9 (Ga. App. 2016) (Failure to produce sufficient evidence of the time worked, hourly rate, and reasonable value of services supported summary judgment disposing of *quantum meruit* claim by Eichholz.). Because Discharged Counsel have offered scant evidence of the value of their services, any award they receive from the funds in the court's registry should be minimal.

Respectfully submitted,

/S/ Isaac H. Ryan
ISAAC H. RYAN (23925)
DEUTSCH, KERRIGAN L.L.P.
755 Magazine Street
New Orleans, Louisiana 70130

Telephone: (504) 581-5141
Fax: (504) 566-1201

And,

Richard C. Stanley
William M. Ross
STANLEY, REUTER, ROSS,
 THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, LA 70112
(504) 523-1580 telephone
(504) 524-0069 facsimile

And,

Lisa G. Arrowood (BBO #022330)
ARROWWOOD LLP
10 Post Office Square, 7th Floor S
Boston, MA 02109
(617) 849-6200 telephone
(617) 849-6201 facsimile

*Attorneys for Sherif K. Sakla, M.D., J.D.,*
*and the Sakla Law Firm, APLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent elec-

tronically to the registered participants as identified on the Notice of Electronic Filing and paper

copies will be sent to those indicated as non-registered participants on January 8, 2017.

*/s/ Isaac H. Ryan*