UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al, *ex rel.* LAUREN KIEFF, Plaintiffs, v. WYETH PHARMACEUTICALS, INC., Defendant. | ) ) ) ) ) ) ) ) ) |
| UNITED STATES OF AMERICA et al, *ex rel.* WILLIAM LACORTE, Plaintiff, v. WYETH, Defendant. | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 06-11724-DPW

## PLAINTIFFS/INTERVENORS VEZINA & GATTUSO, LLC AND BOONE & STONE'S TRIAL MEMORANDUM

**VEZINA & GATTUSSO, LLC and BOONE & STONE**

By their attorneys,

/s/ Christopher R. O'Hara
Christopher R. O'Hara (BBO# 548611)
cohara@toddweld.com
Jennifer Scully (BBO# 688292)
jscully@toddweld.com
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

January 8, 2018

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Brief Synopsis of the Wyeth Litigation ...................................................... 2

      (i)      Negotiations of Qui Tam Contingency Fee Agreements
              with Relator Dr. LaCorte ................................................................ 2

      (ii)     V&G and B&S's Work in the Wyeth Qui Tam Case ..................................... 4

      (iii)    The Negotiations of the Co-Relator Agreement ............................................. 5

      (iv)    The Transfer of the Wyeth Case to Boston ....................................................... 6

      (v)     USDOJ Expressed Interest and Was Preparing Authorization
              to Intervene and Litigate or Settle the Wyeth Action ...................................... 7

      (vi)    Even if Dr. Sakla Has Standing to Raise the Issue, Which
              He Does Not, Dr. LaCorte's Discharge of V&G and B&S
              Was Without Cause........................................................................................... 7

      (vii)   The Government's Intervention and Prosecution of the
              FCA Claims Against Wyeth ......................................................................... 10

      (viii)  V&G and B&S Offered to Return to Represent Dr. LaCorte
              Notwithstanding Yet Another Dr. LaCorte's Termination
              Without Cause................................................................................................. 11

      (ix)    The Sakla Parties Failed to Effectively Assist Government
              Attorneys and Did Not Add Value to the Case on
              Dr. LaCorte's Behalf on Peripheral Matters ................................................. 11

      (x)     V&G and B&S Materially Assisted the Government Attorneys and
              Assisted in the Successful Outcome of the Wyeth Qui Tam Action ............. 12

III.    Argument ................................................................................................. 14

      A.     The June 24, 2004 Representation Contract is a Valid and Binding
              Contingency Fee Agreement That Creates a Joint Venture Among
              the Three Law Firms and is Presumed to Divide the Contingency
              Attorneys' Fees Evenly.................................................................................. 14

B.  In the Alternative, V&G and B&S are Entitled to *Quantum Meruit* Recovery Where, as Here, They Provided the Substantial and Meaningful Legal Services ...................................................................... 16

C.  Principles of Judicial Estoppel Apply to Bar Dr. Sakla and TSLF from Recanting Their Binding Interpretation of the June 24, 2004 CFA ............................................................................. 19

D.  Dr. LaCorte's Claims Against Former Counsel Were Dismissed with Prejudice in October 2008 and Attempts to Resurrect Such Issues in this Litigation are Barred by the Doctrine of Res Judicata/Claim and Issue Preclusion ................................... 20

IV.  Conclusion .............................................................................................. 20

# **TABLE OF AUTHORITIES**

## *Louisiana Cases*

*Bailey v. Martin Brower Co.*, 94-1179 p. 3 (La. App. 1st Cir. 1995)..........................................20

*City of Alexandria v. Brown,* 740 F.3d 339 (5th Cir. 2014) ........................................................16

*Defrancesch v. Hardin*, 510 So. 2d 42, 46 (La. Ct. App. 1987) *writ denied*,
513 So. 2d 819 (La. 1987) .....................................................................................................2, 15

*Fox v. Heisler*, 2003-1964 (La. App. 4 Cir. 5/12/04), 874 So. 2d 932 (La. Ct. App. 2004)
*cert denied*, 2004-1748 (La. 10/29/04), 885 So. 2d 588 ...........................................................14

*Jumonville v. Cardenas*, 2013 WL 6506205 (Unpublished, Case No.
2013-0037 La. App. 1st Cir. 12/10/13) *rehearing denied* (3/24/2014) (Under La.
Code Civ. Proc. Ann. Art 2168 citation of this unpublished Opinion
is authorized)..................................................................................................................2, 14, 15

*McCann v. Todd*, 203 La. 631, 14 So. 2d 469 (1943)............................................................2, 15

*O'Rourke v. Cairns*, 683 So.2d 697, 703 (La. 1996)  ................................................................16

*Ortego v. State, Dep't of Transp. & Dev.*, 96-1322 (La. 2/25/97), 689 So.2d 1358,
1997 WL 76820 .........................................................................................................................20

*Rodriguez v. Louisiana Tank, Inc.*, 94-0200 p. 9 (La. App. 1st Cir. 6/23/95),
657 So. 2d 1363, *writ denied*, 95-2268 (La. 11/27/95), 663 So.2d 739......................................20

*Saucier v. Hayes Dairy Products, Inc.*, 373 So. 2d 102 (La. 1978) .....................................15, 16

*Scurto v. Siegrist*, 598 So. 2d 507 (La. Ct. App. 1992) *writ denied*,
600 So. 2d 683 (La. 1992) ...................................................................................................2, 14, 15

*Smith v. Westside Transit Lines, Inc.*, 313 So.2d 371 (La. App. 3d Cir. 1974).........................16

*State Dep't of Transp. & Dev. v. Williamson*, 597 So. 2d 439 (La. 1992) .................................16

*Tolliver v. Naor*, 2003 WL 21241837 (E.D. La.), 7 (E.D. La. 2003) ...................................14, 15

## *Georgia Cases*

*Buford-Clairmont Company, Ltd. v. Cato Corporation*, 241 Ga. App. 50,
526 S.E.2d. 104 (1999) ...............................................................................................................20

*Glover v. Maddox*, 98 Ga. App. 548, 106 S.E.2d 288 (1958).................................................2, 15

*Hill v. Centennial/Ashton Properties Corp.*, 254 Ga. App. 176,
561 S.E.2d 853 (2002) ...........................................................................................2, 14

*Kilgore v. Sheetz*, 268 Ga. App. 761, 603 S.E.2d 24 (2004) ..................................................2, 15

*McIver v. Jones*, 209 Ga. App. 670, 434 S.E.2d 504 (1993) ......................................................20

*Morrow v. Stewart*, 197 Ga. App. 689, 399 S.E.2d 280 (1990) ............................................2, 14

*Nickerson v. Holloway*, 220 Ga. App. 553, 469 S.E.2d 209 (1996) ...........................................15

## <u>Other Authorities</u>

La. Civ. Code Ann. Art. 1772 ......................................................................................................15

La. Code Div. Proc. Ann Art. 2168 .............................................................................................15

Louisiana Rules of Professional Conduct 1.5(a) ..........................................................................16

LSA–C.C. art. 3078 .....................................................................................................................20

LSA R.S. 13:4231 .........................................................................................................................20

O.C.G.A. § 9-12-40.......................................................................................................................20

O.C.G.A. § 13-4-23.......................................................................................................................15

## I.   **Introduction**

Plaintiffs/Intervenors Vezina & Gattuso, LLC ("V&G") and Boone & Stone ("B&S")
respectfully suggest that they have rendered substantial and meaningful legal services in
connection with their representation of the Relator Dr. William St. John LaCorte ("Dr. LaCorte")
and that their remedy may be determined by the June 24, 2004 Representation Contract for the
Wyeth matter that Dr. LaCorte, with advice of his own counsel, voluntarily entered into and that
permits the allocation of the contingency attorneys' fees on a 1/3, 1/3, 1/3 basis among V&G,
B&S and the Sakla parties, for at least the following reasons: (i) V&G and B&S rendered
substantial and meaningful legal services that assisted in the successful outcome of this Wyeth
*qui tam* matter; (ii) Dr. LaCorte has stipulated and agreed in a binding and judicially enforced
settlement agreement in this action that the funds remaining in the registry of the court are
contingency attorneys' fees to be allocated among the three firms,[1] (iii) Dr. LaCorte has
dismissed, *with prejudice*, his motion to quash V&G and B&S's attorneys' lien,[2] and the Sakla
parties lack standing to challenge the validity of the June 24, 2004 Representation Contract; (iv)
Dr. LaCorte has acknowledged in a binding representation to the U.S. District Court for the
Eastern District of Louisiana and in an executed settlement agreement that V&G and B&S had
complied with all applicable standards of care and all applicable rules of professional ethics in
their representation of Dr. LaCorte in <u>all</u> of his five qui tam case (which included the *Wyeth*
case),[3] and (v) Dr. Sherif K. Sakla ("Sakla") and The Sakla Law Firm, APLC ("TSLF")
(collectively "the Sakla parties") can and should be judicially estopped from denying Sakla's

---

[1] <u>See</u> ECF Nos. 621 and 623.
[2] <u>See</u> ECF No. 621 and 623.
[3] <u>See</u> V&G and B&S Proposed Additional Findings of Fact and Conclusions of Law, Additional Findings ¶¶172-176
(ECF No. 691) (hereinafter "V&G/B&S's Additional Proposed Findings/Conclusions, Additional
Findings/Conclusions ¶__")(ECF No. 691); <u>see also</u> *Plaintiffs' Exhibit No. 145* (August 11, 2008 Hearing Transcript
of Settlement before The Honorable Lance M. Africk, pp. 7:20-8:1; p. 21:13-18), and *Plaintiffs' Ex. No. 146* (Dr.
LaCorte Settlement Agreement and Release in Merck, Section V, ¶3).

binding admissions that the June 24, 2004 Representation Contract -- the very contract at issue here -- irrevocably assigned a 1/3, 1/3, 1/3 interest to each of the three law firms.

This dispute exists solely because the Sakla parties are refusing to honor their agreement with V&G and B&S.  This case is not about whether a client has the right to terminate one or more of his lawyers, but rather about the proper remedy under the contract and, if necessary, the principles of *quantum meruit* at issue here.  Specifically, V&G and B&S respectfully suggest that there is a contract remedy available under the laws of Louisiana and Georgia permitting the equitable division of 1/3, 1/3, 1/3 where, as here, the termination of V&G and B&S was without cause (which the Sakla parties do not have standing to raise or challenge), and there was no successor counsel engaged by Dr. LaCorte to represent him prospectively in the *Wyeth* matter.[4]  Moreover, even if the court were to determine that *quantum meruit* is the alternative remedy for V&G and B&S, the value at issue is the value to the recipient (*i.e.* LaCorte, not Sakla).  LaCorte has already agreed that the overall value of the services of all three law firms is 38% of his relator's share.  All that is at issue, therefore, is the division of those fees.

## II.      Brief Synopsis of the *Wyeth* Litigation

(i)      Negotiations of Qui Tam Contingency Fee Agreements with Relator Dr. LaCorte[5]

In December of 1999, the Sakla Parties and V&G commenced representing Dr. LaCorte

---

[4] **Louisiana law**:  *Jumonville v. Cardenas*, 2013 WL 6506205 (Unpublished, Case No. 2013-0037 La. App. 1st Cir. 12/10/13), *rehearing denied* (3/24/2014)("Where a client agrees to a contingency fee to be paid to more than one attorney jointly, there is a joint venture and each is entitled to share equally in any attorney's fees generated."); *Scurto v. Siegrist*, 598 So. 2d 507, 509-10 (La. Ct. App. 1992) *writ denied*, 600 So. 2d 683 (La. 1992); *Defrancesch v. Hardin*, 510 So. 2d at 46; *McCann v. Todd*, 203 La. 631, 638, 14 So.2d 469, 471 (1943).
**Georgia law:** *Kilgore v. Sheetz*, 268 Ga. App. 761, 769, 603 S.E.2d 24, 30 (2004) (Equal division of fees rule applies in the case of joint representation even though settlement occurs after one of the attorneys has died); *Morrow v. Stewart*, 197 Ga. App. 689, 690, 399 S.E.2d 280, 281 (1990); *Hill v. Centennial/Ashton Properties Corp.*, 254 Ga. App. 176, 177, 561 S.E.2d 853, 855 (2002) (same, citing *Morrow*); *Glover v. Maddox*, 106 S.E.2d 288, 295 (Ga. App. 1958).
[5] See V&G and B&S Proposed Findings of Fact and Conclusions of Law, Section IV, ¶¶35-55 (ECF No. 685-1)(hereinafter "V&G/B&S Proposed Findings/Conclusions, Section__, ¶__ (ECF No. 685-1).

in the first group of his qui tam cases.[6]  TSLF associated with V&G as co-counsel in each of Dr.

LaCorte's five *qui tam* cases, with Dr. LaCorte's consent.[7]  On April 4, 2000, Dr. LaCorte

executed an agreement with Mr. Vezina and Dr. Sakla of TSLF[8] in which V&G and TSLF were

entitled to 33 1/3% of all of Dr. LaCorte's recovery if the USDOJ intervened and 40% if USDOJ

declined.[9]

In or around the spring of 2003, TSLF and V&G associated B&S as their co-counsel in

each of Dr. LaCorte's *qui tam* cases, including *Wyeth* and *Merck*, with Dr. LaCorte's consent,[10]

because Dr. LaCorte needed to associate a law firm with experience litigating complex cases in

the federal courts.  On July 10, 2003, V&G's Mr. Vezina wrote a letter to B&S (copying TSLF)

stating:

> As you will note from the contract, we are specifically authorized by the
> client to engage and retain additional counsel, as needed, to successfully
> prosecute this action.  *Dr. LaCorte has been consulted with regard to this
> decision and concurs with same.  As we have further discussed, with
> regard to the division of fees allowable under this agreement, it is
> specifically agreed to that my firm, the Sakla Law Firm, and the law firm
> of Boone & Stone will share equally in any attorneys' fees generated in
> this case.*

The July 10, 2003 letter included a copy of the 2000 Fee Agreement.[11]

On August 21, 2003, B&S sent a letter to TSLF and V&G, which memorialized the

attorneys' understanding of the division of contingency attorneys' fees (1/3 to B&S, 1/3 to V&G,

and 1/3 to TSLF) on the first of Dr. LaCorte's *qui tam* cases.[12]  On April 24, 2004, Dr. LaCorte,

---

[6] Id., Section IV, ¶35 (ECF No. 685-1).
[7] Id., Section IV, ¶35, third sentence (ECF No. 685-1).
[8] Id., Section IV, ¶36 (ECF 685-1).  This fee agreement is referred to as the 2000 Fee Agreement.
[9] The 2000 Fee Agreement also stated that V&G and TSLF were authorized to employ additional attorneys in the enforcement of and prosecution of the claims.
[10] Id., Section IV, ¶38 (ECF No. 685-1).  Prior to representing Dr. LaCorte, Dr. Sakla had never handled a *qui tam* case.  Dr. Sakla has never tried a *qui tam* case through trial in his career.  V&G/B&S's Additional Proposed Findings, ¶161 and fns. 1, 2 (ECF No. 691).
[11] Id., Section IV, ¶40 (ECF No. 685-1); see *Plaintiffs' Ex. 4*.
[12] V&G/B&S's Proposed Findings/Conclusions, Section IV, ¶40 (ECF No. 685-1).

V&G and TSLF executed another Fee Agreement and Authority to Request, which mirrored the 2000 Fee Agreement, stating that V&G and TSLF were entitled to 33 1/3% of all of Dr. LaCorte's recovery if USDOJ intervened and 40% if USDOJ declined.[13]

On June 24, 2004, with advice of his own counsel (Mr. Malcolm Meyer), Dr. LaCorte entered into the Fee Agreement with V&G, B&S, and TSLF (the "June 2004 CFA") jointly representing him concerning all his FCA claims against Wyeth,[14] Merck & Company, Inc., Omnicare, Inc., Pharmerica, Inc., and Tap Pharmaceuticals, Inc.[15]  The June 2004 CFA re-affirms the equal division of attorney's fees in this pool of cases, rather than provide for the division of attorneys' fees on a case-by-case basis depending on the amount of work or services provided by each law firm.[16]  Much of the handwriting that appears on the 2004 CFA is from Dr. LaCorte's independent counsel, Malcolm Meyer.[17]

(ii)    V&G and B&S's Work in The *Wyeth Qui Tam* Case[18]

On March 21, 2002, Relator LaCorte, through his *qui tam* counsel, V&G and the Sakla Parties filed a *qui tam* False Claims Act ("FCA") case under seal against Wyeth in an action initially known as *U.S. ex rel. Dr. LaCorte v. Wyeth*, Civil Action No. 02-0851 (USDC E.D. LA.)("*LaCorte/Wyeth EDLA*") in the United States District Court for the Eastern District of Louisiana.[19]  In June 2003, on behalf of the federal government, the USDOJ declined to

---

[13] Id., Section IV, ¶43 (ECF No. 685-1). This agreement is hereinafter referred to as the "April 2004 Fee Agreement." The 2004 Fee Agreement also authorized to V&G and TSLF to employ additional attorneys in the enforcement of and prosecution of the claim.

[14] See June 24, 2004 Representation Agreement (*Plaintiffs' Ex. 19*).

[15] See generally V&G/B&S's Proposed Findings/Conclusions, Section IV, ¶47 (and fns. 28-31).

[16] V&G/B&S's Proposed Findings/Conclusions, Section IV, ¶47 (ECF No. 685-1).  V&G and B&S contend that under the June 2004 CFA, attorneys' fees were to be divided equally among V&G, B&S, and TSLF, 1/3 to each law firm.

[17] Id., Section IV, ¶49.

[18] Id., Sections VI, ¶¶61-65, VII, ¶¶66-79, VIII, ¶¶80-87, and IX, ¶¶88-94 (ECF No. 685-1).

[19] Id., Section II, ¶4 (ECF No. 685-1); see *Plaintiffs' Ex. 1*.

intervene and take over the *LaCorte/Wyeth EDLA* case.[20]

In what has been described by Dr. Sakla as the "eureka moment,"[21] Mr. Vezina developed the critical theory of liability of bundling/best price that was the foundation of the LaCorte *qui tam* cases and was the lead counsel and principal drafter of the first amended complaint that more fully detailed these claims/theories and attached the Wyeth Protonix Performance Agreement.[22]  Mr. Vezina also was the principal drafter of the second amended complaint that added states to the Relator LaCorte's *qui tam* claims against Wyeth.[23]  Both the first amended complaint and second amended complaint, which were filed in the U.S. District Court for the Eastern District of Louisiana, related back to the original date of filing.[24]  As Dr. LaCorte and Dr. Sakla acknowledged, the First Amended Complaint, which was principally drafted by Mr. Vezina, raised bundling/best price claims which were the claims of interest to the government and were the claims that the government and Wyeth ultimately determined were the covered conduct under the settlement agreement.[25]

(iii)    The Negotiations of the Co-Relator Agreement[26]

Another Relator, Lauren Kieff ("Ms. Kieff"), filed a *qui tam* FCA case against Wyeth under seal in an action initially known as *U.S. ex rel. Lauren Kieff  v. Wyeth*, USDC Civil Action

---

[20] V&G/B&S's Proposed Findings, Section II, ¶5 (ECF No. 685-1).

[21] Id., Section II, ¶6 (ECF 685-1); see also S. Sakla Depo., pp. 43:19-44:5 (ECF No. 686-10)("And Marc was the one who came up with – actually, it was a eureka moment in my office when he came up with the fact that the government gets the best price.  Because we were talking nominal price, and then he had a – he was reading [voraciously], and he came up with that eureka moment that the government gets the best price.  And that's when we started the cause celeb").

[22] Id., Section II, ¶6 (ECF No. 685-1).

[23] Id., Section II, ¶7 (ECF No. 685-1).

[24] Id.

[25] Id., Section VII, ¶¶66-75, Section VIII, ¶ 83, Section IX, ¶¶88- 94 (ECF No. 685-1); id., Proposed Ultimate Findings of Fact and Conclusions of Law,  ¶¶2, 3 (ECF No. 685-1); see also Dr. LaCorte Depo., pp. 26:1-27:20 (ECF No. 691-10); S. Sakla Depo., pp. 45:10-15, 19-21 ("When the government intervened, clearly they were interested in the bundling theory"); 46:17-18 ("The Covered Conduct was the best price bundling, yes")(ECF No. 686-10).

[26] Id., Section VIII, ¶¶80-87 (ECF No. 685-1).

No. 03-12366-DPW ("*Kieff/Wyeth*") <u>after</u> Dr. LaCorte filed his original complaint and after Dr.

LaCorte filed the first amended complaint that contained the bundling/best price allegations.

Between April/May of 2004 and March of 2006, B&S attorneys Mr. Boone & Mr. Stone were

the lead negotiators on Relator LaCorte's team involved in negotiating and securing a co-relator

agreement with the other relator, Ms. Kieff, that fixed the relator shares on the *Wyeth qui tam*

action on a 60/40 split on the federal claims and a 40/60 split on the state qui tam claims between

Relator LaCorte and Relator Kieff respectively.[27]  Other than attending a meeting or two, Dr.

Sakla was not involved in those negotiations and was actually precluded by Dr. LaCorte from

attending a scheduled meeting in August of 2005 as per Dr. LaCorte's observation that Dr. Sakla

would cause "confusion" in any settlement talks.  Securing this co-relator agreement was

essential to moving the case towards intervention by the federal government because it resolved

any dispute among the two relators, Dr. LaCorte and Ms. Kieff, as to who was "first to file" the

bundling/best price claims in which the federal government had expressed interest in pursuing.

    (iv)   <u>The Transfer of the Wyeth Case to Boston</u>[28]

       In September 2006, upon the request of USDOJ and with the consent of Dr. LaCorte, the

*LaCorte/Wyeth EDLA* was transferred to the United States District Court in Boston, MA, in an

action known as *U.S. ex rel. Dr. LaCorte v. Wyeth*, USDC Civil Action No. 06-11724-DPW

("*LaCorte/Wyeth*") and subsequently consolidated with the *Kieff/Wyeth* action (collectively the

"*Wyeth Qui Tam Consolidated Action*.").[29]  USDOJ also requested that Dr. LaCorte voluntarily

dismiss all of Dr. LaCorte's claims, except for bundling/best price claims in which the

---

[27] <u>Id</u>, Section VIII, ¶¶80-87 (ECF No. 685-1); <u>see</u> <u>also</u> Co-Relator Agreement, *Plaintiffs' Ex. 57*.
[28] V&G/B&S's Proposed Findings/Conclusions, Section IX, ¶¶88-91 (ECF No. 685-1).
[29] <u>Id</u>., Section IX, ¶91 (ECF No. 685-1).  Dr. LaCorte agreed that the transfer of the case and consolidation with the *Kieff/Wyeth* case was a good sign of the government's likely intervention.  <u>See</u> Dr. LaCorte Depo, p. 228:6-15 (ECF No. 686-10).

government had indicated an interest in intervening.[30]  Dr. LaCorte agreed to dismiss the non-bundling/best price claims to simplify and streamline the case once it was transferred to United States District Court in Boston, MA.[31]

(v)    USDOJ Expressed Interest in and Was Preparing Authorization to Intervene and Litigate or Settle the Wyeth Action[32]

In his role as the point person for interacting with the government lawyers, Mr. Vezina learned that USDOJ's client agency, namely CMS, was on board with the USDOJ recommendation to intervene in the Medicaid rebate claims.[33]  During fall of 2006, Mr. Vezina learned that USDOJ was seeking the authority of CMS to approve the intervention with regard to the bundling claims and that USDOJ was preparing its complaint of intervention.[34]  Mr. Vezina informed Dr. LaCorte and his co-counsel of these significant developments.[35]  V&G and B&S were integrally involved in turning the government's decision to decline the *Wyeth* case into one where the government had decided to intervene (intervention being the proverbial holy grail of success in qui tam litigation).[36]

(vi)    Even If Dr. Sakla Has Standing to Raise the Issue, Which He Does Not, Dr. LaCorte's Discharge of V&G and B&S Was Without Cause

On January 23, 2008 and February 7, 2008, Relator LaCorte discharged V&G and B&S[37] respectively without case at a time when Dr. LaCorte and Dr. Sakla knew that the government had not only reached a settlement in the Merck *qui tam* action in Louisiana, but had further

---

[30] Id., Section IX, ¶89 (ECF No. 685-1).  The partially dismissed claims included anti-kickback claims, Prescription Drug Marketing Act claims, Food Drug and Cosmetic Act claims, and other related non-bundling/non-best price matters contained in his second amended complaint.  These claims were later added back into the Relator LaCorte's case in August 2008, but were not part of covered conduct in the Wyeth settlement agreement and added no economic value to the settlement amount.  Id., Section II, ¶¶2, 14; Section XIII ¶¶126, 127.

[31] Id., Section IX, ¶89.

[32] Id., Section IX, ¶¶88-94.

[33] Id., Section IX, ¶92.

[34] Id.

[35] Id., Section IX, ¶93.  A criminal grand jury proceeding against Wyeth was ongoing in the District of Massachusetts over several years, including between 2006 and 2009.  This delayed the government's intervention.

[36] Id., Sections VI, ¶¶61-65, VII, ¶¶66-79, VIII, ¶¶80-87, and IX, ¶¶88-94.

[37] Dr. LaCorte was a serial terminator.  Id., Section X, ¶¶ 97-104 (ECF No. 685-1).

decided to intervene on bundling/best price claims in the *LaCorte/Wyeth qui tam* action in

Boston.[38]  As stipulated by his lawyer in the U.S. District Court for the Eastern District of

Louisiana, Dr. LaCorte agreed that:

> … Boone & Stone and Vezina & Gattuso and the Sakla Law Firm and all
> of the attorneys in those firms, provided him with adequate legal
> representation within the standard of care for attorneys generally under
> similar circumstances and conditions within applicable professional
> standards **in all his *qui tam* cases** and in particular Merck.[39]

To justify the without cause discharge, Dr. Sakla falsely suggested to Dr. LaCorte that

V&G and B&S had "conflicts of interest."  However, there was no conflict of interest by either

V&G or B&S.  V&G's work as the point person for Dr. LaCorte with the government attorneys

benefitted Dr. LaCorte.[40]  Delaware's assistant attorney general, Dan Miller, granted access to

V&G, but not to B&S or the Sakla parties, because he knew Mr. Vezina and trusted him.[41]

Opportunistically, Dr. Sakla relied on the foregoing to spin Dr. LaCorte into thinking that Mr.

---

[38] Id., Section IX, ¶¶88-94 (ECF No. 685-1); see also Dr. LaCorte Deposition, pp. 231:1–233:2 (ECF No. 686-10); S. Sakla Deposition, pp. 83:2-9 (Q. Prior to January 23, 2008, when Mr. Vezina was discharged by Dr. LaCorte, had the government expressed any interest in intervening in the Wyeth matter? A. Yes, The government, through Mr. Vezina, and probably - - you know, I think it was primarily through Mr. Vezina, expressed that they're interested in intervening…"); 84:16-20("Q. So they had expressed an interest in intervening prior to the time of discharge of Mr. Vezina by Dr. LaCorte, correct? A. That was my understanding, that they had expressed interest in intervening") (ECF No. 686-10).

[39] See V&G/B&S's Additional Proposed Findings/Conclusions, ¶172 (ECF No. 691); see also *Plaintiffs' Ex. 145*, pp. 7:20-8:1, 21:13-18.

[40] To the extent  Dr. Sakla attempts to raise his inability to access the Wyeth documents in the possession of the Delaware states attorneys, he has only himself to blame.  See V&G and B&S's Proposed Findings/Conclusions, Section XI, ¶¶108-118 (ECF No. 685-1); see also S. Sakla e-mail, dated Jan. 17, 2008, to D. Miller and others (*Plaintiffs' Ex. No. 130*)("I fail to understand your assertion that the fact of Mr. Vezina being counsel of record obviates the conflict of interest raised by Dr. LaCorte.  You might want to elaborate on that assertion.  However, you must admit that the interest of the State of Delaware and that of Dr. LaCorte are not mutually aligned.  Therefore, if Mr. Vezina is working strictly for your benefit, without the express authorization of his client, that in and of itself would raise questions of loyalty, duty and conflict of interest"); ("Mr. Vezina is not authorized by Dr. LaCorte to work with you on his behalf.  Any other work with you causes a conflict of interest which Dr. LaCorte does not waive").

[41] See Daniel Miller Declaration, ¶ ¶14, 17 (ECF No. 686-9); see also *Plaintiffs' Ex. No. 129* ("Moving on to your concerns, there are two clear reasons I agreed to share the Wyeth documents with Mr. Vezina:  1) I have met Mr. Vezina on numerous occasions and we have an established relationship within which I trust him to keep information confidential, and 2) Mr. Vezina's work on the Pepcid documents with Texas, the U.S. and Delaware was the driving force behind the Merck settlement.  Accordingly, when Mr. Vezina offered to set up a secure Wyeth website to review the documents, both I and the federal government prosecutors working the case were delighted.  **As is my normal practice**, I specifically excluded the relator from the confidentiality agreement.")(emphasis in original).

Vezina was somehow not acting in the best interest of Dr. LaCorte and had a conflict of interest in working as the point person with the government which is the primary objective in False Claims Act cases to benefit the Governments' claims and therefore the Relator's bounty.[42]

Additionally, despite Dr. Sakla's knowingly false prompting to Dr. LaCorte to the contrary, there was no conflict with having Russ Herman represent V&G and B&S because of Mr. Herman's involvement in the *Merck* case. This again was a ploy by Sakla to foment Dr. LaCorte into acting against V&G and B&S due to claimed deficiencies in pleadings in Merck that even Dr. Sakla himself rejected.[43] Dr. Sakla knew that Dr. LaCorte had previously released Relator Steinke in the Merck case in October 2007 and had agreed to the Merck settlement agreement containing the release through Jan. 1, 2018. Yet Sakla so wanted to remove V&G and B&S and with unbridled avarice that defied reality as he continued to twist the truth for his own personal gain.

Given the foregoing, it is clear that Dr. LaCorte has already agreed that funds remaining in the registry of this court are for the court to allocate among the three law firms and he has released all of his three law firms engaged on the *Wyeth* matter from any claim by him to those proceeds.[44] Dr. LaCorte knowingly and voluntarily dismissed with prejudice his attempts to weigh in on the dispute presently before the Court.[45] Sakla tortiously fomented trust issues with

---

[42] See V&G/B&S's Proposed Findings/Conclusions, Section XI, ¶¶115-118 (ECF No. 685-1).

[43] Any claims that Dr. LaCorte could have asserted in the Merck case were released by LaCorte in October 2007 when he knowingly executed a mutual release with the other relator (Steinke) who asserted qui tam claims against Merck relating to Vioxx and Zocor drugs and had agreed to a Settlement Agreement and Release in Merck whereby he agreed to not assert any claims against Merck through January 1, 2018. Id., Section XI, ¶119 and fn. 43 (ECF No. 685-1).

[44] See Joint Motion to Enforce Settlement Agreement (ECF No. 621) and Court Order approving Settlement Agreement (ECF No. 623). Dr. Sakla lacks standing to raise the issue whether the termination was for cause or not for cause as that is a matter for the client to raise and he has dismissed, with prejudice, his prior motion to re-open case and to quash attorneys' lien. See ECF Nos. 621 and 623.

[45] See ECF No. 621 ("Relator also requests that Relator's Motion to Reopen Case and Quash Attorney's Lien, ECF No. 535, be dismissed with prejudice") and ECF No. 623 ("Motion to Reopen Case and Quash Attorney's Lien of Vezina & Gattuso, LLC and Boone & Stone by William St. John LaCorte [535] DISMISSED with

Dr. LaCorte in a deliberate attempt to interfere with V&G's and B&S's relationship with Dr. LaCorte and cause the termination of both V&G and B&S.[46]

> (vii)   <u>The Government's Intervention and Prosecution of the FCA Claims against Wyeth</u>

Within days of Wyeth disclosing the existence of the government's *qui tam* investigation and disclosure of *qui tam* claims under seal in an SEC filing, the U.S. government intervened in the *Wyeth Qui Tam Consolidated Action* in April, 2009 filing its own complaint on the bundling/best price claims conceived and developed by Mr. Vezina. Thirty–six (36) states also intervened in the *Wyeth Qui Tam Consolidated Action*.  Wyeth's motions to dismiss the federal government's FCA claims, the states' claims, and Relators' claims were denied from the bench by this Court in February, 2010, as were Wyeth's motions for summary judgment after a hearing in February, 2012 and subsequent order in October, 2015.

On April 16, 2016, USDOJ announced that the federal government and the intervening states had reached a settlement agreement with Wyeth in the amount of $784.6 million dollars to resolve the *Wyeth Qui Tam Consolidated Action* in which it was alleged that Wyeth underpaid drug rebates to Medicaid by failing to give the government the same discounts that it provided to private purchasers of drugs.  Under the terms of the announced settlement, Wyeth agreed to pay $413,248,820 to the federal government and $371,351,180 to the state Medicaid programs.

Under the terms of the announced settlement, the federal and state governments paid a combined relator share of $98,058,190 to relators Dr. LaCorte and Ms. Kieff.  Pursuant to a

---

Prejudice").
[46] <u>See</u> V&G/B&S's Proposed Findings/Conclusions, Section XI, ¶¶105-119 (ECF No. 685-1); <u>see also</u> V&G/B&S's Additional Proposed Findings/Conclusions, 177-184 (ECF No. 691); *Plaintiffs' Ex. 135*.

settlement agreement reported to[47] and approved by this Court,[48] sixty-two percent (62%) of Relator LaCorte's share, plus accrued interest, was paid to Dr. LaCorte from the funds in the registry of this Court in accordance with the Court's January 30, 2017 Order.[49] Pursuant to the same settlement agreement  reported to and approved by this Court, Dr. LaCorte acknowledged that the remaining thirty-eight percent (38%) of Relator LaCorte's share, plus accrued interest, are contingency attorneys' fees to be allocated by the Court among the three law firms, TSLF, V&G, and B&S.[50]

> (viii)   <u>V&G and B&S Offered to Return to Represent Dr. LaCorte, Notwithstanding Yet Another Dr. LaCorte's Termination Without Cause</u>[51]

As further proof of the contrived nature of Dr. LaCorte's termination encouraged by Dr. Sakla, Dr. LaCorte requested V&G and B&S to return to the case. V&G and B&S expressed a willingness to do so, provided that they did not have to work with Sakla in light of his procuring their termination. Ultimately, Dr. LaCorte, with Sakla's input, declined to do so.

> (ix)   <u>The Sakla Parties Failed to Effectively Assist Government Attorneys and Did Not Add Value to the Case on Dr. LaCorte's Behalf on Peripheral Matters</u>[52]

Dr. Sakla did not materially aid the states or federal government. [53]  Not only did he not support the states or federal government at critical junctures, but he did not expand the scope of recovery in any way. Remarkably, Dr. Sakla has argued he was responsible for the recovery on deposit.  In reality, he did nothing more than take a template that B&S had developed in the

---

[47] Joint Motion of Relator Dr. William St. Jean LaCorte, Vezina & Gattuso, LLC and Boone & Stone to Effectuate Settlement, p.1 (hereinafter "Jt. Mt. to Effectuate Settlement, p.__")(ECF No. 621).
[48] ECF Electronic notes of Order, dated November 29/20, 2016 allowing ECF Nos. 621 (ECF No. 623).
[49] Order, dated January 30, 2017 (ECF No. 647).
[50] Jt. Mt. to Effectuate Settlement, p. 1 (ECF Nos. 621 and 623).
[51] <u>See</u> V&G/B&S's Proposed Findings/Conclusions, Section XII, ¶¶120-124 (ECF No. 685-1).
[52] Id., Section XIII, ¶¶126-136.
[53] <u>See</u> Declarations of Kathleen Warner, ¶10 (ECF No. 686-6)("I did not interact much with Dr. Sherif Sakla. . . He had very little contact with me apart from the times I would see him at court hearings.  I did not get the support from Dr. Sakla that Mr Vezina provided throughout the <i>Wyeth</i> case, even after Mr. Vezina was terminated by Dr. LaCorte); Nicholas Diez Decl., ¶13 (ECF No. 686-7); and Daniel R. Miller Decl. ¶18 (ECF No. 686-9); <u>see also</u> Declarations of Frederick M. Morgan, Jr., ¶35 (ECF No. 686-11); Michael Sullivan, ¶¶38-40 (ECF No. 686-12).

*Merck* and *Pharmerica* actions and added back the non-bundling/non-best price claims that the government did not want and requested LaCorte to dismiss previously before the case was transferred to Boston.[54] Dr. Sakla's refiling of the Anti-Kickback Statute, the Food, Drug & Cosmetic Act claims, and the Prescription Drug Marketing Act claims as well as others added nothing to the case and were not part of covered conduct.[55]

      (x)    <u>V&G and B&S Materially Assisted the Government Attorneys and Assisted in the Successful Outcome of the Wyeth Qui Tam Action</u>.

In contrast, V&G and B&S materially aided the states' attorneys and federal government attorneys in persuading them to intervene in the Wyeth case and assisting them throughout the Wyeth litigation.[56] As to V&G, the firm rendered meaningful and substantial legal services as part of the joint venture representation of Dr. LaCorte in the *Wyeth* qui tam case, including without limitation, in its investigation of claims, drafting of pleadings including the original complaint, the first amended complaint, and the second amended complaint; developing the key legal theory in the case, the "eureka moment" of the bundling/best price Medicaid rebate claims, that was the subject of the government's intervention and the subject of the covered conduct under the Wyeth April 2016 settlement agreement; developing damages models; serving as the point person for relator Dr. LaCorte up to the date of termination in interactions with the federal

---

[54] <u>See</u> <u>id.</u>, Section XIII, ¶126 and fn. 41; Frederick M. Morgan, Jr., Decl. ¶35 (ECF No. 686-11).

[55] V&G/B&S's Proposed Findings/Conclusions, Section XIII, ¶126 (685-1).  Dr Sakla alleges that he incurred thousands of hours of document review on the Wyeth case, yet he was not given access to any of the Wyeth documents until November of 2010, at the earliest. As discussed above, he made some unsuccessful efforts in attempts to gain access to Wyeth's documents informally prior to November 2010, but was not given authority to do so. Accordingly, the Sakla Parties had access to Wyeth materials at most for review for a total of fourteen months, from December 2010 until February 2012, when the discovery period closed, to incur the proposed hours he presents to the Court to justify his contributions on this case. Most importantly, the time period when Dr. Sakla reported working the vast majority of those hours was during the months when the federal and state governments were responsible for and leading the prosecution of the Wyeth case.

[56] <u>See</u> Ann Ackil Decl., ¶¶5-18 (ECF No. 686-5); Kathleen Warner Decl., ¶¶11-14 (ECF No. 686-6); Nicholas Diez Decl., ¶¶5-11, 15 (ECF No. 686-7); Lelia Winget-Hernandez Decl., ¶¶4-8 (ECF No. 686-8); Daniel R. Miller Decl., ¶¶9-12, 18 (ECF No. 686-9); <u>see also</u> J. Marc Vezina Decl, ¶¶39-111 (ECF No. 683-3); William S. Stone Decl., ¶¶12-33, 38-40 (ECF No. 683-4); Frederick M. Morgan, Jr. Decl., ¶¶12-33, 38-40 (ECF No. 686-11);  Michael Sullivan Decl., ¶¶28-37, 45, 46, 47 (ECF No. 686-12).¶

government lawyers and states' attorneys; negotiating with the government lawyers to get their interest in the *LaCorte/Wyeth qui tam* action; advocating for and turning the government's declination on the *LaCorte/Wyeth* action into an eventual intervention by the federal government and 36 states; participating in the co-relator negotiations with Relator Kieff's counsel that fixed the percentages of the two relators' shares; drafting pleadings that resulted in the dismissal without prejudice of the non-bundling/non-best price claims that were not part of covered conduct in the settlement and the transfer and consolidation of the *Wyeth Qui Tam Consolidated Action*; and assisting and supporting the federal government and the states before the government intervention in this action.[57]

As to B&S, the firm rendered substantial and meaningful legal services for the client, including without limitation, in its investigation of the Wyeth claims; providing access to non-recourse financing for the relators' five *qui tam* actions; reviewing and providing input on the first and second amended complaints; taking the lead on the negotiations of the co-relator agreement with Relator Kieff's counsel that fixed the percentages of the two relators' shares, consistent relationship management with co-counsel and the client; negotiating with the government lawyers to stir interest in the *Wyeth Qui Tam Consolidated Action*; assisting V&G and the Government (Federal and State) during the litigation; and providing the experienced perspective of trial counsel to the strategies, theories of liability, and development of potential damages prior to their discharge.

---

[57] V&G/B&S's Proposed Findings, Section V, ¶¶56-60; Section VII, ¶¶66-69, 71-73, 76, 78; Section VIII, ¶¶ 80-87; Section IX, ¶¶88-94; Section X, ¶¶ 100, 102; Section XIV, ¶¶137-156; Ultimate Findings, ¶¶2, 3 (ECF No. 685-1).

The meaningful legal services rendered by V&G and B&S contributed to and culminated in the government intervening and succeeding in settling with Wyeth for $784.6 million dollars and that resulted in a very substantial Relator's recovery to Dr. LaCorte.[58]

### III.   Argument

####    A.   The June 24, 2004 Representation Contract is a Valid and Binding Contingency Fee Agreement That Creates a Joint Venture Among the Three Law Firms and is Presumed to Divide the Contingency Attorneys' Fees Evenly[59]

The June 2004 CFA is valid, binding and enforceable under the laws of (i) Louisiana and (ii) Georgia.  The June 2004 CFA expressly confirms in writing the client's consent to the contingent fee being shared among the three law firms, (i) TLSF; (ii) V&G and (iii) B&S in accordance with the Louisiana Rules of Professional Conduct and the Georgia Rules of Professional Conduct.[60]  The June 2004 CFA expressly confirms in writing with Dr. LaCorte, the client, that each lawyer assumed joint responsibility for Dr. LaCorte's representation, and Dr. LaCorte assented to the participation of all the lawyers involved in accordance with the Louisiana and Georgia Rules of Professional Conduct.[61] The Code of Professional Responsibility does not regulate such agreements among attorneys, does not prohibit enforcement of that agreement, and does not require apportioning of the fee on a *quantum meruit* basis.[62]

---

[58] Id., Section VI, ¶¶61-65; Section VII, ¶¶67, 71-74, 77; Section VIII, ¶¶80-87; Section IX, ¶¶88-89, Section X, ¶¶100, 102; Ultimate Conclusion, ¶¶2, 3.

[59] Id., Section IV, ¶¶35-55.

[60] Id., Proposed Conclusions, ¶9.

[61] Id., Proposed Conclusions, ¶¶12-13, 15-16.

[62] **Louisiana Law**: *Jumonville v. Cardenas*, 2013 WL 6506205 (Unpublished, Case No. 2013-0037 La. App. 1st Cir. 12/10/13), *rehearing denied* (3/24/2014); *Scurto v. Siegrist*, 598 So. 2d 507, 509-10 (La. Ct. App. 1992) *writ denied*, 600 So. 2d 683 (La. 1992); *Fox v. Heisler*, 2003-1964 (La. App. 4 Cir. 5/12/04), 874 So. 2d 932, 938 (La. Ct. App. 2004) *cert. denied*, 2004-1748 (La. 10/29/04), 885 So.2d 588; *Tolliver v. Naor*, *7 2003 WL 21241837 (E.D. LA May 23, 2003).
**Georgia Law:** *Quantum meruit* is not the applicable remedy where the contract (including a contingent fee contract with an attorney) expressly provides for a different remedy.  The parties are free to set by the contract the manner in which attorney's fees will be calculated.  *Morrow v. Stewart*, 197 Ga. App. 689, 690, 399 S.E.2d 280, 281 (1990); *Hill v. Centennial/Ashton Properties Corp.*, 254 Ga. App. 176, 177, 561 S.E.2d 853, 855 (2002) (same, citing *Morrow*).

The June 2004 CFA created a joint venture between Dr. LaCorte, TSLF, V&G and B&S in Dr. LaCorte's *Wyeth* case and the law of both Louisiana and Georgia provide that joint venturers are presumed to share equally in the contingency fee.[63]   The policy announced by the Louisiana Supreme Court in *Saucier v. Hayes Dairy Products, Inc.*, 373 So. 2d 102 (La. 1978) was to address concerns that the client might be exposed to separate, multiple fee claims where successor representation occurs.   *See*, *e.g.*, *Defrancesch v. Hardin*, 510 So. 2d 42, 46 (La. Ct. App. 1987) *writ denied,* 513 So. 2d 819 (La. 1987).   In the event that there is a discharge without cause, as was the case here, and there is no successor counsel hired following the discharge, as was also the case here, then there is no reason for the court to be concerned with the client being exposed to more than one contingency fee.   *See Saucier*, 373 So.2d at 118.[64]

The law is not different in Georgia in this respect.   As a matter of both Georgia and Louisiana law, V&G and B&S's inability to perform further services on Dr. LaCorte's behalf under the June 2004 CFA was excused after their bad faith discharge, and the condition of performance of further services was fulfilled, as a matter of law, because Dr. LaCorte and TSLF's wrongful conduct prevented V&G and B&S from performing such further services. O.C.G.A. § 13-4-23 and La.Civ.Code Ann. art. 1772.[65]

---

[63] V&G/B&S's Proposed Conclusions, ¶¶23-25 (ECF No. 685-1). **Louisiana Law**:  *Jumonville v. Cardenas*, 2013 WL 6506205 (Unpublished, Case No. 2013-0037 La. App. 1st Cir. 12/10/13), *rehearing denied* (3/24/2014) (Under La. Code Civ. Proc. Ann. Art. 2168 citation of this unpublished opinion is authorized.); *Scurto v. Siegrist*, 598 So. 2d 507, 509-10 (La. Ct. App. 1992) *writ denied,* 600 So. 2d 683 (La. 1992); *Defrancesch v. Hardin*, 510 So. 2d at 46; *McCann v. Todd*, 203 La. 631, 638, 14 So.2d 469, 471 (1943); *Tolliver v. Naor*, *7 2003 WL 21241837 (E.D. La. May 23, 2003).
V&G/B&S's Proposed Conclusions, ¶¶31-32 (ECF No. 685-1).   **Georgia Law**: *Glover v. Maddox*, 98 Ga. App. 548, 557, 106 S.E.2d 288, 295 (1958); *Nickerson v. Holloway*, 220 Ga. App. 553, 553, 469 S.E.2d 209, 210 (1996); *Kilgore v. Sheetz*, 268 Ga. App. 761, 769, 603 S.E.2d 24, 30 (2004) (Equal division of fees rule applies in the case of joint representation even though settlement occurs after one of the attorneys has died).
[64] See V&G/B&S's Proposed Conclusions, ¶29 (ECF No. 685-1).
[65] See id., ¶¶31-33 (and cases cited therein).

**B. In the Alternative, V&G and B&S are Entitled to a *Quantum Meruit* Recovery Where, as Here, They Provided the Substantial and Meaningful Legal Services.[66]**

Regarding *quantum meruit*, Louisiana law is clear that *quantum meruit* involves "more than simply the hours spent.... It involves the ultimate results obtained as well as the particular benefit to the case derived for each unit of time devoted to the case." *Smith v. Westside Transit Lines, Inc.*, 313 So.2d 371, 376 (La. App. 3d Cir. 1974).[67]   Further, "[t]he fact finder should look to the ultimate results obtained, the benefit to the case for each task undertaken by the attorney, and the quality and effectiveness of the services performed by both the discharged and subsequent counsel.   The number of hours an attorney has spent on the matter is not dispositive of the fee due to that attorney."   *Id.* at 378.[68]

V&G rendered meaningful legal services to the client in connection with a complex *LaCorte/Wyeth qui tam* action that turned a declined case into a case in which, with the substantial and meaningful work of developing the legal theory of bundling/best price for his client, persuaded the government to intervene in the claims that produced the recovery on deposit.   V&G assisted B&S in negotiating a co-relator agreement that was quite favorable to his

---

[66] Id., ¶¶37-46 (ECF No. 685-1).

[67] *Saucier*, 373 So.2d at 118 ("Focusing alone upon the attorney's investment of time, or even considering in addition such matters as counsel's skill, the importance of the case and other readily identifiable factors, does an injustice to the attorney. Such focus is at least at variance with the reality of the employment contract, for it is quite possible that the attorney would have been unwilling to undertake representation, fee contingent upon recovery, if told at the outset that the client would, or would be able to, discharge him and pay him on some basis other than the agreed upon percentage, and only if and when, with subsequent employed counsel (perhaps not as able as original counsel) the client were to win a settlement or judgment."); *O'Rourke v. Cairns*, 683 So.2d 697, 703 (La. 1996) ("A calculation based on hours alone is a bright-line rule which fails to consider the unique character of the contingency fee contract, including risks not encountered in hourly or fixed fee agreements, which Louisiana courts have recognized for many years. Therefore, we find that the lower courts erred in confining the *quantum meruit* analysis only to the actual hours spent by discharged counsel in this case").

[68] The Louisiana Supreme Court has instructed courts to consider factors inspired by Rule 1.5(a) of the Louisiana Rules of Professional Conduct in arriving at reasonable fee awards in *quantum meruit*. These include:
> (1) The ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

*City of Alexandria v. Brown*, 740 F.3d 339, 358 (5th Cir. 2014)(quoting *State Dep't of Transp. & Dev. v. Williamson*, 597 So. 2d 439, 441 (La. 1992)).

client.  V&G was also directly involved in the development of damage models and rendered extensive assistance and support to the federal government lawyers and states attorneys, which contributed to and culminated in the government intervening and succeeding in settling with Wyeth for 784.6 million dollars and that resulted in a very substantial relator's recovery to Relator LaCorte.

Likewise, B&S rendered meaningful legal services to Relator LaCorte in connection with the *LaCorte/Wyeth qui tam* action that turned a declined case into a case that culminated in the government intervening and succeeding in settling with Wyeth for $784.6 million dollars.  The meaningful legal services that B&S provided to Dr. LaCorte and the federal and state governments included investigation of the *Wyeth* claims; providing access to non-recourse financing for the relators' five *qui tam* actions; consultation with V&G; providing strategic assistance, planning, and advice in refining legal theories and strategies; meeting with the government to intervene on the bundling/best price claim; taking the lead in the negotiations of a co-relator agreement with the other relator (Kieff) that was quite favorable to Relator LaCorte; engaging in efforts to keep the Relator LaCorte from undermining his legal team; engaging in efforts to make sure the legal team collaborated in a coordinated manner; advising and persuading Relator LaCorte in 2006 to dismiss collateral claims in which the federal government was not interested and to which they requested dismissal instead of a declination; advising and persuading Relator LaCorte to cooperate with the federal government in transferring his *Wyeth* case to the U. S. District Court for the District of Massachusetts to be consolidated with Relator Kieff's case; and providing substantial assistance and support to the federal and state government lawyers.

The facts surrounding the government's prosecution of the *Wyeth* action, and the involvement of V&G, B&S and/or the Sakla Parties speaks directly to the lack of contribution by the Sakla Parties towards the ultimate outcome in the case after the government intervened.[69] The Sakla Parties have centered their *quantum meruit* argument, throughout the discovery and pleadings in this litigation, on the number of hours re-created or drummed up on the case from 2008-2016, but not at all as to the '*meruit*' in the number of hours of claimed work which was insignificant.  Indeed, the Sakla Parties offer no testimony from the government on the Sakla Parties' contribution to the overall success of the *Wyeth* case.  In contrast, V&G and B&S have declarations from five states' attorneys noting the support and assistance provided by V&G and/or B&S.  For the majority of the years as sole counsel for Dr. LaCorte, the Sakla Parties did nothing to assist the government in handling their case;[70] to the contrary, Sakla filed an amended complaint that conflicted with the government's prior requests to streamline Dr. LaCorte's claims to those in which the government intervened.[71]  The additional claims in the Sakla Parties' amended complaint that they claim justifies their attorneys' fees award were <u>never</u> part of the covered conduct settled for $784.6 million.  Wyeth's counsel pled to the covered conduct of the Wyeth *settlement* in their court filing, as follows: "Relator LaCorte's off-label marketing and kickback claims remained firmly in the periphery, and his attempts to re-write history with Dr. Sakla at the center of this litigation are far-fetched and plainly contradicted by the undisputed record."[72]  Further, the Sakla Parties offer no evidence that their hours spent allegedly reviewing documents on worthless claims and sitting in the governments' depositions contributed in any way toward the successful outcome of the *Wyeth* action.

---

[69] See V&G/B&S's Proposed Findings/Conclusions, Section XIII, ¶¶126-136.
[70] <u>Id</u>., Section XIII, ¶¶133-134.
[71] Id., Section XIII, ¶126.
[72] <u>See</u> ECF No. 580, Exhibit X, p.1.

**C. Principles of Judicial Estoppel Apply to Bar Dr. Sakla and TSLF from Recanting their Binding Interpretation of the June 24, 2004 CFA.[73]**

The Sakla parties have attempted to repudiate the admissions they made, in *U.S. ex rel. Dr. LaCorte v. Merck* case, including, but not limited to, admissions made in their Statement of Uncontested Material Fact, regarding the contract at issue in this case:

> In said June 2004 Representation Contract, Dr. LaCorte specified that all prior fee agreements were superseded, and Dr. LaCorte made an irrevocable assignment to the three law firms for each of them to divide the total attorney's contingency fee as follows: 1/3 to The Sakla Law Firm APLC, 1/3 to Boone & Stone and 1/3 to Vezina & Gattuso.[74]

Additional admissions to that effect were made in multiple separate filings in the United States District Court for the Eastern District of Louisiana. They are estopped as a matter of law from taking the opposite position in this litigation. Dr. Sakla and TSLF made numerous affirmative representations concerning the June 2004 CFA that are binding upon Dr. Sakla and TSLF in this action.[75]

---

[73] See V&G/B&S's Proposed Conclusions, Section XX, ¶¶47-53 (ECF No. 685-1).

[74] Id., Section XV, ¶160; Section XX, ¶47. This representation to the U.S. District Court for the Eastern District of Louisiana was directed to the June 24, 2004 CFA contract, not the case, and since the contract is five qui tam cases in one, including Wyeth, the representation is that the split is applicable to *all* of the LaCorte qui tam cases as the Sakla parties did not limit this declarative admission.

[75] Id., Section XV, ¶¶157-160; Section XX, ¶48. In Dr. Sakla and TSLF's Memorandum in Support of In Rem Motion (*U.S. ex rel. LaCorte v. Merck* ECF No. 334-3) filed in the *Merck* matter in the U.S. District Court for the Eastern District of Louisiana, the Sakla Parties expressly represented to the Court as follows:
In said June 2004 Representation Contract, Dr. LaCorte specified that all prior fee arrangements were superseded, and Dr. LaCorte made an irrevocable assignment to the three law firms for each of them to divide the total attorney's contingency fee as follows: 1/3 to The Sakla Law Firm, APLC, 1/3 to Boone & Stone, and 1/3 to Vezina & Gattuso. Here, the Sakla Parties have made repeated judicial statements regarding the contingency fee agreement at issue in this case and the joint venture created between the firms. The very lawyer who made the statements upholding the June 2004 CFA and the joint venture to share fees on behalf of TSLF and Dr. Sakla (Isaac Ryan) is counsel of record in this case now seeking to disavow or repudiate the agreement to share fees when it now suits his client's whims or avarice.

### D. **Dr. LaCorte's Claims against Former Counsel Were Dismissed with Prejudice in October 2008 and Attempts to Resurrect Such Issues in this Litigation are Barred by the Doctrine of Res Judicata/Claim and Issue Preclusion**

The Sakla parties lack standing to raise the termination as being "for cause," and even if they had standing, they are barred by the doctrines of res judicata/claim and issue preclusion inasmuch as (1) Dr. LaCorte and Dr. Sakla dismissed, with prejudice, their prior claims against V&G and B&S and those dismissals are entitled to preclusive effect.[76]

### IV. **Conclusion**[77]

For the foregoing reasons, the Court should enforce the June 24, 2004 contract at issue and allocate the thirty eight percent (38%) contingency attorneys' fees, plus accrued interest on the funds remaining in the registry of this Court. on a 1/3, 1/3 and 1/3 basis among V&G, B&S and the Sakla parties.   The Court should award V&G and B&S no less than that sum should the Court decide this dispute under a *quantum meruit* approach.

---

[76] In Part V, ¶7 of the Merck Settlement Agreement and Release (*Plaintiffs' Ex. 146*), Dr. LaCorte and Dr. Sakla both covenanted and warranted that they have would not file or assert "any legal, equitable, contractual or administrative rights or claims of any nature whatsoever. . . <u>arising out of the alleged acts, omissions, transactions or occurrences up to and including the date of [Merck Settlement] Agreement</u>." (emphasis added).  See W. Stone Decl., ¶¶203, 203, and 204 (ECF No. 686-4).
**Louisiana Law:**  Dismissal of all claims asserted is entitled to res judicata/issue prelusion effect under the law of Louisiana.  See LSA R.S. 13:4231 and *Ortego v. State, Dep't of Transp. & Dev.*, 96-1322 (La. 2/25/97), 689 So.2d 1358, 1363, 1997 WL 76820 ("While the doctrine of res judicata is ordinarily premised on a final judgment on the merits, it also applies where there is a transaction or settlement of a disputed or compromised matter that has been entered into by the parties); *Bailey v. Martin Brower Co.,* 94–1179 p. 3 (La. App. 1st Cir.1995); *see also* LSA–C.C. art. 3078;[3] *Rodriguez v. Louisiana Tank, Inc.,* 94–0200 p. 9 (La. App. 1st Cir. June 23, 1995); 657 So.2d 1363, 1369, *writ denied,* 95–2268 (La. Nov. 27, 1995), 663 So.2d 739.
**Georgia Law:**  Dismissal of all claims asserted is entitled to res judicata/issue prelusion effect under the law of Georgia.  O.C.G.A. § 9-12-40; *Buford-Clairmont Company, Ltd. V. Cato Corporation*, 241 Ga. App. 50, 526 S.E.2d at 108 (Applying res judicata to a court enforced settlement agreement); *McIver v. Jones*, 209 Ga. App. 670, 673, 434 S.E.2d 504, 507 (1993)(Applying *res judicata* in a second action as a result of the dismissal of a counterclaim in the first proceeding on the same subject).
[77] V&G and B&S incorporate their other legal arguments set forth in their Motion for Summary Judgment (ECF No. 652) and in their Proposed Rulings of Law (ECF No. 685-1) and Add'l Proposed Rulings of Law (ECF No. 691).

Respectfully submitted,

**VEZINA & GATTUSSO, LLC and**
**BOONE & STONE**

By their attorneys,


/s/ Christopher R. O'Hara
Christopher R. O'Hara (BBO# 548611)
cohara@toddweld.com
Jennifer Scully (BBO# 688292)
jscully@toddweld.com
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: January 8, 2018

## CERTIFICATE OF SERVICE

I, Christopher R. O'Hara, hereby certify that this document has been filed through the

ECF system, will be sent electronically to the registered participants as identified on the notice of

Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered

participants on this date.

/s/ Christopher R. O'Hara

Dated:  January 8, 2018

21