UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA et al.,   )
ex rel. WILLIAM LACORTE,           )
                                   )
      Plaintiffs,                  )
                                   )          CIVIL ACTION NO.
      v.                           )          06-11724-DPW
                                   )
WYETH PHARMACEUTICALS, INC.,       )
                                   )
      Defendant.                   )
--------------------------------   )
                                   )
VEZINA & GATTUSO, LLC,             )
BOONE & STONE,                     )
SAKLA LAW FIRM, APLC,              )
SHERIF K. SAKLA, M.D.,             )
                                   )
      Intervenor Claimants/        )
      Interested Parties.          )
```

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW
REGARDING ALLOCATION OF
EXPENSES, ATTORNEYS' FEES AND COSTS
AMONG QUONDOM CO-COUNSEL

December 14, 2023

TABLE OF CONTENTS

I. FINDINGS OF FACT........................................... 4

  A.  The Intervening Parties ................................ 4

  B.  Background of Underlying Qui Tam Action ................ 5

  C.  Representation Contracts ............................. 12

  D.  Terminations of the Trial Attorneys .................. 14

    1.  Document Sharing Dispute ............................ 15

    2.  Merck Fee Dispute ................................... 17

    3.  Timekeeping ......................................... 18

    4.  The Ultimate Terminations of V&G and B&S ............ 19

  E.  Post Termination ..................................... 20

  F.  The Intervenors' Involvement in the Wyeth Litigation ... 21

    1.  The Sakla Parties ................................... 21

    2.  V&G ................................................. 26

    3.  B&S ................................................. 28

II. CONCLUSIONS OF LAW....................................... 29

  A.  Motions in Limine .................................... 33

    1.  Motion in Limine to Exclude Summaries of Activities ... 34

      a.  Timeliness of Production ........................... 34

      b.  The Assertion of Privilege ......................... 36

      c.  Hearsay ............................................ 38

      d.  Reliability and Confusion .......................... 39

    2.  Motion in Limine to Exclude Evidence of Post-Termination
Activities ............................................. 40

      a.  Post-Termination Work .............................. 40

      b.  Work Performed in the Merck Case ................... 42

      c.  Debarment of All Fees .............................. 42

  B.  Motion to Strike ..................................... 44

    1.  Standing to Challenge the Enforceability of the ....... 44
June 2004 representation contract ........................ 44

    2.  Admissibility of Expert Opinion...................... 47

      a.  Opinions on Georgia and Louisiana Law .............. 47

      b.   Reliability of Factual Determinations ............... 52

C.   Conclusions Regarding Merits Raised at Threshold ....... 53

   1.   Timeliness of Claims ................................... 53

   2.   Enforceability of Contingency Fee Agreement ........... 56

   3.   Joint Venture ......................................... 60

   4.   Breach of Fiduciary Duty .............................. 62

   5.   Judicial Estoppel ..................................... 62

   6.   Termination of V&G and B&S – Cause .................... 64

D.   Division of Attorneys' Fees According to Rule 1.5 ...... 66

Factors ..................................................... 66

   1.   The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly ............................... 71

   2.   The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer ................................. 73

   3.   The fee customarily charged in the locality for similar legal services ......................................... 73

   4.   The amount involved, and the results obtained ......... 74

   5.   The time limitations imposed by the client or by the circumstances ........................................... 74

   6.   The nature and length of the professional relationship with the client ......................................... 75

   7.   The experience, reputation, and ability of the lawyer or lawyers performing the services .......................... 75

   8.   Whether the fee was fixed or contingent .............. 77

E.   Conclusion .......................................... 77

On April 16, 2016, the United States Department of Justice ("DOJ") announced that the federal government and intervening states had reached a settlement agreement with Wyeth Pharmaceuticals, Inc. ("*Wyeth*") in the amount of $784,600,000 dollars to resolve this consolidated *Wyeth qui tam* action in which it was alleged that *Wyeth* underpaid Medicaid by failing to give the government the same discounts that it provided to private purchasers of drugs.  Litigation continued to determine attorneys' fees for intervening attorneys — Vezina & Gattuso, LLC, the Boone & Stone law firm partnership, and the Sakla Law Firm, APLC — three law firms that represented one of the two relators in the *Wyeth* litigation, Dr. William LaCorte.  Dr. LaCorte terminated Vezina & Gattuso, LLC and Boone & Stone in 2008.  Despite earlier steps in that direction by Dr. LaCorte, the Sakla parties were never terminated.  Following a non-jury trial and based upon review of the entire record of this case and the evidence I find credible, I make these Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A.   *The Intervening Parties*

The **Sakla Law Firm, APLC** is a professional law corporation located in New Orleans, Louisiana; **Sherif K. Sakla, M.D.** is an attorney licensed to practice law in the state of Louisiana and

a principal of the Sakla Law Firm (together the **"Sakla Parties"**).

**Vezina & Gattuso, LLC ("V&G")** is a limited liability company engaged in law practice located in Gretna, Louisiana. J. Marc Vezina, Esq., the managing member of V&G, is an attorney licensed to practice in the state of Louisiana.

David Wm. Boone operated under his professional corporation, David Wm. Boone, P.C., and William S. Stone operated under his professional corporation, William S. Stone, P.C.  The two professional corporations engaged in the practice of law as the **Boone & Stone law firm partnership ("B&S")** during the period relevant to this matter.  B&S had offices in Atlanta, Georgia and Blakely, Georgia.

**B.    *Background of Underlying Qui Tam Action***

The *Wyeth* case was an outgrowth of a previously filed *qui tam* action against another pharmaceutical company, *Merck*, in the United States District Court for the Eastern District of Louisiana.  By 2001, Dr. LaCorte had become aware of possible similar misconduct concerning the sale and marketing of Protonix, a proton pump inhibitor manufactured by *Wyeth*.[1]  Dr.

---

[1] In an effort to focus this Memorandum on the *Wyeth* litigation and avoid digressing into discussion of similar sales and marketing False Claims Act matters in which the intervening parties were engaged together on behalf of Dr. LaCorte, I will refer to the remaining attorneys' fees dispute now before me as the *Wyeth* matter.

LaCorte believed that *Wyeth's* discounting schemes also violated federal law.  Dr. LaCorte began investigating with Dr. Sakla, a fellow physician who worked knowledgeably together with him regarding his concerns.  Dr. LaCorte retained the Sakla Parties to represent him in a *qui tam* False Claims Act ("FCA") action against *Wyeth* concerning Protonix.  Dr. Sakla may properly be characterized as the originating attorney in the case against *Wyeth*.  With Dr. LaCorte's permission, Dr. Sakla, as lead attorney, associated Mr. Vezina later in 2001 as counsel to assist with the *Wyeth* case.

As part of their preparation before the initiation of the *Wyeth qui tam* action, Dr. Sakla and Dr. LaCorte worked together to collect and analyze data.  Dr. Sakla met extensively with Dr. LaCorte after hours and on weekends at the Baptist Memorial Hospital and the East Jefferson Memorial Hospital to gather documents and analyze information about Wyeth's discounting schemes.  The two also met with New Orleans area physicians, pharmacists, and hospital administrators to develop their understanding of the impact of these schemes on prescribing Protonix to hospital patients further.  During this time of development in the *Wyeth* case, Dr. Sakla was also working as a doctor in the emergency room.

Meanwhile, in late 2001, Dr. LaCorte and Mr. Vezina had numerous meetings, by telephone as well as in-person, with

6

representatives from the DOJ to determine the government's interest in the *Merck* case in addition to what would become the *Wyeth* litigation

On March 21, 2002, Dr. LaCorte, as relator, filed his original complaint in the *Wyeth qui tam* FCA case in the United States District Court for the Eastern District of Louisiana. The original complaint was eight pages long with an additional seven pages of exhibits.  It was drafted by Dr. Sakla and Mr. Vezina.  B&S was not involved in the case at the time of the filing of the original complaint.  Mr. Boone and Mr. Stone were introduced to Mr. Vezina by Dr. Sakla roughly a year later in the spring of 2003.  In June 2003, the DOJ declined to intervene in Dr. LaCorte's case.

Meanwhile, in 2002, Mr. Vezina had developed a somewhat novel theory of the case that was later incorporated into a first amended complaint.  Dr. Sakla with a certain hyperbole described this novel theory as Mr. Vezina's "eureka moment." The theory's concept regarding the bundling of discounts under the anti-kickback program would be pled in the first amended complaint.  Wyeth's Protonix Performance Agreement laid out the actual bundle, with market share percentages and various terms and conditions for a hospital to receive the discounts that were a bundle.  Wyeth's Protonix Performance Agreement was ultimately attached to the first amended complaint.

On October 24, 2003, Dr. LaCorte filed the first amended complaint in the Eastern District of Louisiana.  The first amended complaint, as drafted by Dr. Sakla and Mr. Vezina, was ten pages long and included an additional nine pages of exhibits.

The following month, on November 24, 2003, Lauren Kieff, as relator, filed a *qui tam* action in the United States District Court for the District of Massachusetts arising out of Wyeth's marketing for Protonix.  Ms. Kieff's complaint included claims as relator for many individual states, in addition to the United States.  Dr. LaCorte did not learn of Ms. Kieff's *qui tam* case against *Wyeth* until April 2004 when the DOJ mailed a letter to V&G, as well as to counsel for Ms. Kieff, notifying each party of the existence of their respective complaints as well as the date of filing of those actions.

In May 2004, the two relators met in Boston with their legal teams to review each other's complaints.  After reviewing Ms. Kieff's complaint, Dr. LaCorte became concerned that his first amended complaint did not state causes of action under the individual states' *qui tam* statutes.  During their meetings, Gary Azorsky, counsel for Ms. Kieff, expressed his doubts to Dr. LaCorte's legal team as to whether the LaCorte first amended complaint pleaded its allegations with particularity sufficient to survive a motion to dismiss under Rule 9(b).  Consequently,

8

on January 10, 2006, Dr. LaCorte filed a second amended complaint in the Eastern District of Louisiana, which added state law *qui tam* claims on behalf of several states.  The second amended complaint was seventeen pages long and was drafted by Dr. Sakla, Mr. Vezina, and B&S.

The DOJ encouraged counsel for Dr. LaCorte and Ms. Kieff to enter into negotiations to execute a co-relator agreement.  On March 9, 2006, two years after Dr. LaCorte and Ms. Kieff learned of each other's *qui tam* lawsuits against *Wyeth*, the two relators entered into a co-relator agreement.  B&S, in particular Mr. Boone, was principally responsible for leading the negotiations on behalf of Dr. LaCorte's team to reach a co-relator agreement with Ms. Kieff.  The relator shares were split between Dr. LaCorte and Ms. Kieff 60/40 on the federal claims and 40/60 on the state claims respectively.

Reaching the co-relator agreement was a signal milestone in progress to the governments' subsequent intervention.  As a result of the co-relator agreement, the activities of the co-relators were transmuted from matters of potential conflict and diversion for the federal and state governments into an arrangement which could provide support for government intervention.  Within months of the execution of the co-relator agreement, Andy Mao from the DOJ informed the two relators that the federal government was preparing its intervention authority

9

memorandum regarding *Wyeth*, although it did not actually undertake to intervene for another several years.

On September 18, 2006, in the wake of the co-relator agreement, Dr. LaCorte's case against *Wyeth* was transferred to the United States District Court for the District of Massachusetts and consolidated with Ms. Kieff's case. Between the original filing of Dr. LaCorte's case on March 21, 2002, and its transfer to the United States District Court for the District of Massachusetts, only eighteen documents had been filed in Dr. LaCorte's case on the docket in the Eastern District of Louisiana. No filings, apart from sealed filings concerning extensions of time to consider intervention, were made with this court in Dr. LaCorte's case against *Wyeth* between September 2006 and August 2008. In August 2008, Dr. LaCorte filed his first supplemental and amended consolidated complaint.

The *Wyeth qui tam* began to be litigated actively in April 2009, when the federal government finally intervened formally. The United States filed its notice of intervention on April 23, 2009. On May 18, 2009, the United States filed its complaint against *Wyeth*.

Wyeth made its first offer to settle in March 2011, after extensive discovery, but the *qui tam* did not settle until April 27, 2016. Wyeth agreed to pay the United States $413,248,820.00 and the participating States $371,351,180.00. The federal

10

government and the states offered a relator's share totaling $98,367,074.19.

The United States paid its relator's share totaling $64,000,000.00 to Dr. LaCorte and the participating States paid their relator's share totaling $34,367,074.19 to Dr. LaCorte.

The relator's share for Ms. Kieff and her relator's counsel has been fully paid pursuant to the co-relator agreement between her and Dr. LaCorte. Ms. Kieff's relator share is not at issue in the matter now pending before me.

Dr. LaCorte's relator's share, plus accrued interest, was paid to him from the funds in the registry of this court in accordance with a January 30, 2017 order. The settlement agreement provided that 38% of Dr. LaCorte's relator share, plus accrued interest, constituted contingency attorneys' fees potentially to be distributed among the three intervening law firms. The allocation of this remaining 38% of Dr. LaCorte's relator share is the only issue left to be decided in the *Wyeth* matter.

On December 5, 2016, the Sakla Parties filed a complaint in intervention in the consolidated *Wyeth qui tam* action to assert a claim for attorneys' fees as to Dr. LaCorte's relator's share of the *Wyeth* recovery. On December 21, 2016, intervenors V&G and B&S separately filed a complaint in intervention in the consolidated *Wyeth qui tam* action to continue to assert their

11

liens and claims for attorneys' fees as to Dr. LaCorte's relator's share of the recovery.

## C.   Representation Contracts

Near the outset of this litigation, Dr. LaCorte and the law firms he engaged set out to memorialize an agreement pertaining to a fee arrangement.  On April 24, 2004, Dr. LaCorte executed a representation contract with Dr. Sakla and Mr. Vezina.  That contract, however, did not include B&S.  Two months later, on June 24, 2004, Dr. LaCorte executed another representation contract with the Sakla Parties, V&G, and B&S (collectively the "Trial Lawyers").

Dr. LaCorte had independent counsel in negotiating the June 2004 representation contract with the Trial Lawyers.  The June 2004 representation contract was intended to govern the Trial Lawyers' representation of Dr. LaCorte as Client in the *Wyeth* and other False Claims Act Litigation and it expressly superseded all prior agreements between Dr. LaCorte and the Trial Lawyers.

The June 2004 representation contract provides that as compensation for their legal services

> [C]lient agrees to pay and hereby irrevocably assigns unto Trial Lawyers **33-1/3%** of all money and things of any value recovered by Client on the Claims by compromise, settlement, suit, arbitration, mediation or otherwise (the "Recovery") if the United States of America intervenes as plaintiff and **40%** of the Recovery

if the United States of America does not intervene as plaintiff.

The June 2004 representation contract further states, "This agreement constitutes the entire agreement between Trial Lawyers and Client and the terms hereof shall not be modified except in writing, signed by both Trial Lawyers and Client."  The June 2004 representation contract has never, after its execution, been modified by a written agreement signed by the parties.

The June 2004 representation contract does not contain any provision specifying the division of legal fees among the firms. It also does not contain any provision governing the apportionment of fees in the event that one or more of the three firms was terminated prior to the conclusion of the *Wyeth* matter.  The June 2004 representation contract does not contain any language by which the termination of one or more firms would result in the termination of any other firm that represented Dr. LaCorte pursuant to the June 2004 representation contract.

Section 6 of the June 2004 representation contract concerns the "Discharge of Trial Lawyers."  It provides that "Client shall retain the right to discharge Trial Lawyers, with or without cause. . . ."

Specifically, section 6(a) states:

If, prior to Recovery on the Claims, (1) Client discharges Trial Lawyers for any reason except Trial Lawyers' misconduct or neglect in investigating and prosecuting the Claims, or (2) Client employs additional

counsel to represent Client in prosecuting the Claims,
Client shall nevertheless remain obligated to Trial
Lawyers for the full Attorney's Fee provided herein as
damages. . . .

Section 6(b) further specifies:

If, prior to Recovery on the Claims, Trial Lawyers are
discharged for misconduct or neglect in investigating
and prosecuting the Claims, Trial Lawyers shall be
entitled to receive reasonable compensation based upon
the reasonable value of services rendered to Client,
which must be established as provided by law.

### D.   *Terminations of the Trial Attorneys*

At times, Dr. LaCorte's relationship with his attorneys was
acrimonious and heated.  For example, on January 19, 2007, a
year before his actual and enduring termination of V&G and B&S,
Dr. LaCorte sent all his counsel a letter stating that all three
firms would be terminated effective January 22, 2007, at 5:00
p.m., if certain issues related to Dr. LaCorte's *qui tam* cases
could not be resolved.

In response, Dr. Sakla, in an email, wrote, "I will, as I
have always done, . . . as your attorney since 2000, endeavor to
protect you from your demons."  Dr. Sakla continued, "I have and
I must take the position that this [termination] letter does not
truly represent the spirit of good faith, and it merely
represents a heavy-handed negotiating tactic that you have been
known to utilize in the past."  He added, "Ultimately, you
expressed your all around satisfaction with the current legal
team."

14

Dr. LaCorte, through separate counsel, emailed Dr. Sakla on January 22, 2007, stating that "[t]he letter from [Dr. LaCorte] dated January 19th [wa]s hereby withdrawn."

Similarly, nearly a year later on December 12, 2007, Dr. LaCorte purportedly terminated B&S.  Dr. LaCorte rescinded that inchoate termination of B&S shortly thereafter on December 17, 2007.

Mr. Vezina acknowledged that there were many times where there was friction between Dr. LaCorte and his lawyers and that Dr. Sakla used his personal relationship with Dr. LaCorte to "smooth the waters."  I find he did so as lead attorney among the Trial Lawyers.

<u>1.</u>   <u>Document Sharing Dispute</u>

Just before Dr. LaCorte's ultimate termination of V&G and B&S in 2008 as legal counsel, a dispute arose over documents Mr. Vezina obtained that were related to the lawsuit.  This document disclosure was accompanied by circumstances evidencing the preference of both state and federal government attorneys to work with Mr. Vezina rather than Dr. Sakla.

On December 26, 2007, Mr. Vezina executed a document-sharing agreement with Dan Miller, counsel for the State of Delaware, which allowed Mr. Vezina and V&G to review *Wyeth* documents produced to Delaware pursuant to a Civil Investigation Demand.  However, Mr. Vezina did not allow Dr. LaCorte's other

15

attorneys access to the documents, nor did Mr. Vezina obtain
consent from Dr. LaCorte before executing the Delaware document-
sharing agreement.  On January 9, 2008, Dr. Sakla sought to gain
access to the Delaware documents from Mr. Vezina.  Mr. Vezina
refused, telling Dr. Sakla that "I do not have an agreement for
your firm, nor for Boone and Stone."  Mr. Vezina then provided
Dr. Sakla with Mr. Miller's telephone number.  Mr. Miller
informed Dr. Sakla that Mr. Vezina was granted access to the
Delaware documents because he knew and trusted Mr. Vezina and
that, as a result, Dr. LaCorte was "gaining a huge benefit from
this arrangement."

Dr. Sakla responded to Mr. Miller's email on January 17,
2008, stating, in pertinent part:

> For your information, the *Wyeth* case, in its entirety,
> was developed by Dr. LaCorte, with assistance from my
> office.  Every single document and analysis of this case
> was done first by Dr. LaCorte and me, and was then sent
> to Mr. Vezina to disseminate it to the Department of
> Justice and the office of the U.S. Attorneys, since he
> had better e-mail skills than I.

He further wrote, "Please be advised that you may no longer
unilaterally work with Mr. Vezina, as Dr. LaCorte instructed him
to cease and desist from any further participation in the *Wyeth*
case, as of now, without my full participation as originating
and lead counsel."

That same day, Sanjay Bhambhani from the DOJ emailed Dr.
Sakla, stating, "I don't think you or your client can dictate

who the government can and cannot work with as part of its investigation."  Dr. LaCorte then responded to Mr. Bhambhani and indicated that he had concerns about Mr. Vezina representing his interests and told Mr. Bhambhani that Mr. Vezina "is therefore not representing me at this time on *Merck* or on *Wyeth*."

<u>2.   Merck Fee Dispute</u>

When Dr. LaCorte's separate *Merck qui tam* litigation settled, his legal team found themselves at odds over the percentage of Dr. LaCorte's relator share they were to receive for their work.  A settlement agreement between the United States, Dr. LaCorte, and *Merck* was executed on February 6, 2008. Following the termination of V&G and B&S and settlement of the *Merck* matter, there was litigation in the United States District Court for the Eastern District of Louisiana concerning the attorneys' fees in that matter.

At the time of the *Merck* settlement there was an open dispute between Dr. LaCorte and his attorneys over whether they should get 40% or a third of Dr. LaCorte's relator portion of the settlement.

In early 2007, Dr. LaCorte demanded each lawyer's file that was relevant to the issue of attorneys' fees.  Mr. Vezina gave Dr. LaCorte his legal files, including court pleadings and things of that nature, but did not provide him with documentation of the time he had put into the case.

17

On January 18, 2008, Mr. Stone threatened to sue Dr. LaCorte, writing in an email to the other lawyers:

> Unfortunately, it is beginning to appear that there will be an unavoidable fight with Dr. LaCorte over attorney's fees due in the *Merck* case per our contract with him. His position is forcing us [to] prepare to take the necessary actions to protect our interests, and that <u>may</u> include filing liens, moving for deposit if the entire relator's share into court for resolution, and potentially a civil action for damages.

In the same email, B&S demanded that Dr. Sakla communicate his position so that

> we will know which side of this dispute you are on and where you fit into any proceedings that may be necessary. You are either in agreement with me, David [Boone], and Marc [Vezina] that the attorneys are due a 40% fee on all amounts recovered, or against us on that issue. Which is it?  We need to know, since we can only presume from recent events that you are against us unless you confirm in writing that you are in agreement with us.

3.   Timekeeping

Dr. LaCorte's requests to review his attorneys' billing records reflected a more general point of contention and dissatisfaction between Dr. LaCorte and his attorneys.

Dr. LaCorte more than once had requested Mr. Vezina keep billing and expense records, and in December 2008, when Dr. LaCorte came to Mr. Vezina's office and asked for such records, Mr. Vezina refused to provide them, contending that the records were proprietary to his firm.  Dr. LaCorte frequently sent B&S letters requesting attorney timekeeping or attorney billing records.

Despite these numerous requests, V&G never produced any billing or timekeeping records.  Mr. Vezina acknowledged that he considers it best practice for attorneys who handle FCA cases to maintain contemporaneous time records but did not do so for substantial portions of the time he was engaged by Dr. LaCorte. In his termination letter to Mr. Vezina, Dr. LaCorte identified as one of his reasons a "failure to render timely and/or complete accounting for costs, expenses, and fees."

B&S did not keep any time records for the relevant time period.

Dr. Sakla himself also did not keep contemporaneous time records from 2002 until 2009, even after V&G and B&S were terminated on that basis in early 2008.

### 4.   The Ultimate Terminations of V&G and B&S

On January 23, 2008, Dr. LaCorte faxed a termination letter to V&G.  In the termination for cause letter to V&G, Dr. LaCorte stated:

> I must inform you that the causes underlying this termination for cause include, but are not limited to, failure to follow instructions, failure to provide accurate and timely advice, disclosure of confidential information without authority, repeated communications designed or calculated to pressure me into courses of action I considered to be against my interest, refusal to let me review my own file materials, failure to plead matters as directed to assert all claims available to me, failure to render timely and/or complete accounting for costs, expenses, and fees, and a general breakdown of communications between us in our respective roles as client and counsel.

On February 7, 2008, Dr. LaCorte terminated B&S through an email.  The termination email to B&S alleged that Mr. Stone was "represented in a conflict against [Dr. LaCorte] by the lead attorney in the Vioxx cases" as "[i]t appear[ed] that information concerning federal false claims suit ha[d] been provided to attorneys who [are] actively litigating multiple active civil suits against *Merck*."  Dr. LaCorte stated that Mr. Stone had "given [him] no choice but to terminate [B&S] for cause."

After February 7, 2008, Dr. LaCorte did not enter into a new representation contract with the Sakla Parties.  Rather, the Sakla Parties continued to provide legal services to Dr. LaCorte pursuant to the June 2004 representation contract.  Dr. LaCorte did not rehire V&G and B&S after their terminations on January 23, 2008 and February 7, 2008, respectively.

## E.   *Post Termination*

As of February 2008, no substantive rulings had been made in the *Wyeth* litigation, *Wyeth* had not filed any substantive pleadings or motions, and *Wyeth* had not made any admission of liability.  *Wyeth* was still attempting to convince the federal government that the case lacked merit and that the government should not invest any resources in it.  In fact, as noted, the government did not actually intervene until April 2009.

20

As of February 2008, *Wyeth* had not yet offered any money in settlement, Dr. LaCorte had not made any recovery in the matter, and no discovery had been undertaken in the *Wyeth* litigation.

The *Wyeth* litigation did not settle until February 2016, eight years after discharged counsel were terminated. Nonetheless, following his 2008 termination, Mr. Vezina continued to communicate with counsel for the DOJ and individual states.

**F.   *The Intervenors' Involvement in the Wyeth Litigation***

1.   The Sakla Parties

The Sakla Parties remained as counsel for Dr. LaCorte throughout the *Wyeth* case.  They were the long-term durable work horse for Dr. LaCorte in the litigation.  The Sakla Parties report having expended over 10,000 hours pursuing the case.[2]

In August 2008, the Sakla Parties drafted the first supplemental and amended consolidated complaint ("operative complaint"), which was 183 pages long and included 481 pages of exhibits.  Not all the claims the Sakla Parties asserted in the operative complaint were part of covered conduct in the ultimate *Wyeth* settlement agreement.  In an email, the DOJ stated that

---

[2] The parties have provided concededly rough estimates of the number of hours they claim for their work on the *Wyeth* matter. The estimates by the Sakla Parties appear to be the most carefully detailed, but they remain estimates given the Sakla Parties' record keeping practices.  *See also infra* notes 3 and 4.

21

the first amended complaint filed in October 2003 — in contrast
to the operative complaint — did not put the government on
notice as to a bundling claim.

After the governments intervened in April 2009 and
subsequently filed amended complaints in September 2009, Wyeth
filed a consolidated motion to dismiss the governments'
complaints.  The Sakla Parties, on behalf of Dr. LaCorte, filed
a consolidated memorandum joining in the governments'
oppositions to Wyeth's consolidated motion to dismiss.  Wyeth
never challenged the sufficiency of the pleading in the
"operative complaint" prepared by the Sakla Parties.

Additionally, the Sakla Parties drafted and propounded
discovery requests to Wyeth and responded to discovery requests
on behalf of Dr. LaCorte.  In 2008, the Sakla Parties had
obtained a copy of the white paper that Wyeth had submitted to
the government in an effort to avoid government intervention.
As part of the Sakla Parties' discovery preparation they
analyzed the defenses asserted by Wyeth in the white paper.
From September 2010 to January 2011, the Sakla Parties tailored
discovery propounded to Wyeth specifically seeking information
to defeat those defenses.

The Sakla Parties also attended motion hearings and status
conferences and conferred with government counsel after meetings
for hearings and status conferences.  Dr. Sakla attended 27

depositions but only asked questions at eight of those depositions.  There were over 40 depositions in the case. Nearly half (87) of the deposition pages involving Dr. Sakla came from the deposition of a single witness, an individual who was not significant enough to warrant inclusion on either the United States's or Wyeth's trial witness list.

The Sakla Parties reviewed millions of pages of documents received in response to discovery requests and catalogued those documents by topic.  Those efforts led to the Sakla Parties' identifying critical documents for use in the *Wyeth* case.

The Sakla Parties' efforts also included putting in place an extensive electronic document management system, which allowed rapid and accurate access to the millions of documents via a searchable database.  Mr. Azorsky, counsel for the co-relator, in testimony I find credible, testified that he "will never understand how Dr. Sakla's system was set up or how it could do what it could do.  But he was able to review and retrieve documents . . . very quickly when we were all looking for specific documents."

Among the documents uncovered by the Sakla Parties in discovery was a "smoking gun" internal Wyeth email draft.  The draft email was for transmission from Wyeth counsel Frank Rapoport to Veterans' Administration counsel Mel Noel.  It specifically referenced that "Wyeth's plan was to use the launch

of the kit as a way to increase oral sales by establishing a bundling arrangement with this kit."  This key document was discovered and circulated by Dr. Sakla in January of 2011.  The government relied on the Rapoport email discovered by Dr. Sakla to demonstrate that Wyeth was intentionally bundling to increase oral Protonix sales.  The Rapoport email was central evidence in support of the government's opposition to *Wyeth*'s motion for summary judgment and statement on uncontested facts, and was emphasized as evidence of Wyeth's scienter.

The Sakla Parties also analyzed and prepared challenges to Wyeth's privilege log.  This detailed and careful review of the privilege log by the Sakla Parties revealed inconsistencies which were used in the government's motion practice and pleadings.

The Sakla Parties similarly prepared a memorandum analyzing Wyeth's invocation of the "advice-of-counsel" privilege over various documents in its production.  Dr. Sakla provided the United States an analysis, in spreadsheet format, breaking down the 6,220 instances where Wyeth invoked the privilege in documents containing the key terms: "PPA, Bundling, Best Price, Medicaid Drug Rebate, and Nominal Price."  This analysis, which was 472 pages in total, was utilized by the United States in preparing the United States' response concerning Wyeth's proposed waiver of attorney client privilege.

24

The Sakla Parties drafted substantive briefs filed on behalf of Dr. LaCorte, including a 41-page opposition to Wyeth's motion for summary judgment regarding the relators' claims that was supported by 36 exhibits totaling 940 pages.  On September 25, 2015, the Sakla Parties drafted and filed on Dr. LaCorte's behalf a 16-page supplemental memorandum in opposition to Wyeth's motion for summary judgment on relators' claims.

Dr. Sakla also conducted medical research and consulted with and obtained the affidavit of a gastro-intestinal expert for use against Wyeth's motion for summary judgment as to the pharmaceutical compendia argument.  Dr. Sakla argued the motion for summary judgment on relators' claims when it came before the court for a hearing on October 21, 2015.

In preparation for trial on the merits, the Sakla Parties had extensive discussions with the government concerning the witnesses to be called at trial, the questioning of those witnesses, and the necessary and optimal information to be gained from both friendly and hostile witnesses.  Dr. Sakla, for example, was heavily involved in preparing arguments for a nationwide subpoena.  The Sakla Parties had discussions with the government and counsel for the co-relator concerning the form and content of the proposed jury interrogatories.  The Sakla Parties completed extensive preparation for trial in late 2015 and early 2016.

2.    V&G

Before termination, V&G relied upon professional relationships Mr. Vezina established with federal and state government attorneys as counsel for Dr. LaCorte.  V&G's work on behalf of Dr. LaCorte in the *Wyeth* matter totaled approximately 700-750 hours on the case.[3]

Mr. Vezina assisted and provided information to representatives from the DOJ and conducted basic research on National Drug Code numbers for the various formulations and iterations of Protonix and gathered basic utilization data from the Medicaid program.  Mr. Vezina reached out to representatives from the U.S. Attorney's Office in Boston and in the Eastern District of Pennsylvania regarding possible interest in *Merck* or *Wyeth* litigation.

Mr. Vezina researched Protonix's market share throughout the country as well as marketing efforts by Wyeth to promote Protonix.  In doing so, he located the full Protonix Performance Agreement ("PPA").  The PPA disclosed the contractual terms that Wyeth was extracting from member hospitals that enrolled in the program.  The PPA included significant evidence regarding the

---

[3] The V&G rough estimates are difficult to unbundle from their reports of activity which do not break out the compensable *Wyeth* matter work clearly from other non-compensable work.  *See also supra* note 2 and *infra* note 4.

ability of hospitals to exert influence over the prescribing preferences of Protonix at the hospitals.

Mr. Vezina's research had allowed him to formulate a theory to use Wyeth's bundling of Protonix Oral and IV formulations as a pricing theory that could trigger a responsibility of the manufacturer to "unbundle" the transactions and recompute rebate obligations.  As noted above, Dr. Sakla referred to this idea as Mr. Vezina's "eureka" moment and this theory was incorporated into the first amended complaint.

After its termination, V&G continued to provide assistance and support to state team members in the *Wyeth* matter by assisting in modifying the template from the *Merck* complaint in intervention.  Mr. Vezina provided both written and verbal support and assistance to the various team members who intended to join the DOJ in its *Wyeth* complaint.  Mr. Vezina also provided assistance and support to DOJ attorneys, both verbally and in writing, with documentation regarding the *Wyeth* case prior to its transfer from New Orleans to Boston.

In November 2009, Mr. Vezina began preparing and forwarding memos with pleadings from the *Merck* action and other matters to assist the intervened states in preparing a response to Wyeth's motion to dismiss.  During this time, Mr. Vezina also provided a list of questions to the DOJ attorneys in an effort to assist them in their preparation to oppose Wyeth's motion to dismiss at

oral argument.  His assistance consisted of regular conference calls, emails to and from the state team as well as the DOJ, and later question and answer sessions in a moot court fashion with government attorneys.

Mr. Vezina also provided assistance to the state team in drafting initial discovery requests to be sent to Wyeth.  He helped Mr. Bhambhani from the DOJ identify various expert witnesses who were able to assist regarding antitrust perspectives.  Mr. Vezina also conducted legal research regarding the possible assertion of attorney-client privilege by Wyeth's Chief Counsel, John Alivernini.

### 3.   B&S

Engaging and working with B&S, given their extensive trial experience in complex litigation matters — including False Claims Act litigation — throughout the country in which multiple firms were involved, was a major selling point for Dr. Sakla. That experience would provide notice to others interested in the *Wyeth* litigation that Dr. LaCorte's legal team had demonstrated ability to manage a large nationwide case and that they could try such a case successfully if trial were to ensue.  B&S put in roughly 400-450 hours of work on the *Wyeth* litigation.[4]

---

[4] The B&S rough estimate is least specific of all.  It is essentially conclusory without an effort to provide specific support.  *See also supra* notes 2 and 3.

There were various tasks that Dr. LaCorte assigned to B&S, one of which was negotiation of the co-relator agreement with Ms. Kieff.  B&S also contributed to drafting and editing pleadings filed in Dr. LaCorte's *qui tam* cases, including the *Wyeth* case.

Mr. Vezina caucused with and sought the insight of Mr. Boone and Mr. Stone before making strategy decisions that impacted any of Dr. LaCorte's *qui tam* cases.  Much of Mr. Vezina's reported work time came before and after meetings with federal or state government attorneys or other parties concerned with the *Wyeth* litigation and was spent consulting and updating B&S as to his interactions with government attorneys.

On March 2, 2006, Mr. Boone wrote an email to Dr. LaCorte's team confirming that a co-relator agreement had been reached with Ms. Kieff and congratulating Dr. LaCorte and the team.  Dr. Sakla sent an email congratulating Mr. Boone and Mr. Vezina on their accomplishments in facilitating the agreement.

## II. CONCLUSIONS OF LAW

Having previously determined that Louisiana law will apply to the Sakla Parties and V&G and that Georgia law will apply to B&S in this matter, I will call out in this section where the law of the two states diverge.  But in the absence of established divergence, I will employ the law of any implicated state which has developed guidance regarding an issue.

I now turn to the merits of the *Wyeth* matter.  As a gateway to my analysis, I begin discussion by providing a fuller explanation regarding my summary disposition on September 28, 2018 of several motions impacting the record on which my findings and conclusions are based.  In doing so, I adhere to the direction of the United States Supreme Court, that as a general proposition in fees litigation, it is important to be guided by the cautionary admonition that "the determination of fees 'should not result in a second major litigation.'"  *Fox* v. *Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley* v. *Eckerhart*, 461 U.S. 424, 437 (1983)).  To that end,

> [t]he fee applicant (whether a plaintiff or a defendant) must of course, submit appropriate documentation to meet 'the burden of establishing entitlement to an award.' *Ibid.*  But trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Id.*

It bears emphasizing that the *Wyeth* attorneys' fees matter, as a non-jury proceeding, comes before me within a separate justification for relying upon my general sense of the *Wyeth* litigation and a record which, as a result of the parties record keeping practices, necessarily requires estimates.

In this regard, the intervening Trial Lawyers are simultaneously the beneficiaries and victims of the business plan pursued, which required reporting rough estimates of their claimed hours with varying degrees of specificity. *See generally supra* notes 2, 3 and 4.  The parties are able to make their claims without the prospect of affording the court a meaningful basis for evaluation while also subject to the need of the court to conduct its evaluation by relying on rough justice based upon an overall sense of the litigation.

The First Circuit gave fair warning 35 years ago of the dangers for fee-seeking counsel using this approach: "We now . . . serve notice that henceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den, Inc.* v. *Larkin*, 749 F.2d 945, 952 (1st Cir. 1984).  I will apply such a reduction in this matter. *See Nkihtaqmikon* v. *Bureau of Indian Affairs*, 723 F. Supp. 2d 272, 294 (D. Me. 2010).

In order to put my approach specifically to evidentiary decision-making under these circumstances in

perspective, I offer some extended explanation to provide
assurance that in applying a practical approach to
contested evidentiary rulings, I have not, of course,
disregarded the principles which govern the balancing of
factors evidentiary rulings require.  This is especially
true with respect to important and complex challenges to
expert testimony under FED. R. EVID. 702, which was the
subject of amendments that went into effect on the first
day of this month.  I have briefly delayed finalizing these
Conclusions of Law pending full effectiveness of the
amendments.  Those amendments are described in the Rules
Advisory Committee notes as provided clarification and
emphasis that the proponent of such testimony must
demonstrate that it is more likely than not the testimony
meets the requisite admissibility standard requiring that
"the *expert's opinion reflects a reliable application of
the principles and methods to the facts of the case.*"  FED.
R. EVID. 702(d) (as amended Dec. 1, 2023) (clarifying
language of amendment in italics) WESTLAW FEDERAL RULES OF
EVIDENCE RULE 702, U.S.C.A., at 1 (*Rule as amended*) and at 6
(Advisory Committee Notes to 2023 Amendments).[5]  This

---

[5] Given the very recent adoption of the amendments to FED. R.
EVID. 702 and the somewhat confusing cross references to drafting
history necessary to provide context, I cite to the

amendment is designed generally to emphasize that judicial gatekeeping is essential because jurors may not be able to evaluate the threshold necessary to support reliably the expert's basis and methodology.  *Id.* at 7.  Although this is not a jury proceeding, I have applied this approach to assure that my own consideration has begun with an effort to ensure that any expert opinion has "stay[ed] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."  *Id.*  I have followed this approach with the same care in evaluating under settled principles of Fed. R. Evid. 1006 the receipt of summaries as chalks or demonstrative aids placed in dispute by the Sakla Parties' motions in limine.

## A.    *Motions in Limine*

The Sakla Parties filed two motions in limine before trial. In the first, they asked me to exclude from trial Exhibits A and B attached to Mr. Vezina's declaration, which are "summaries of activities" of V&G and, as related to V&G, by B&S in the investigation, filing, and prosecution of the *Wyeth* case.  In the second motion, they asked me to exclude "all references to post-termination work and/or work in the *Merck* matter by [V&G

---

"currentness" report in Westlaw which presents the relevant material in a single sequentially paginated form.

and B&S] because such references are irrelevant to the claims brought" by the two firms in the *Wyeth* matter before me.

    1.   Motion in Limine to Exclude Summaries of Activities

The Sakla Parties argue that the summaries should be excluded because (1) V&G "never produced the summaries of activities in response to discovery specifically directed at this type of document"; (2) V&G "refused to respond to questions about the summaries of activities, and claimed that the summaries were privileged because they were generated under the guidance and direction of counsel"; (3) the summaries of activities are inadmissible hearsay; and (4) they are "unreliable and confusing, because they are not based on available contemporaneous records, do not list the time spent, and incorporate work on other matters, especially *Merck*, for which [V&G and B&S] have been fully compensated."

    *a.*   *Timeliness of Production*

In response to the Sakla Parties' discovery request to "produce any and all exhibits that you intend to offer in evidence at any hearing or trial on the payment of, entitlement to, or division or attorney's fees," V&G asserted that they would "not disclose work product protected information."  When requested to "produce copies of all timesheets, billing records or logs, or any other document concerning the time you spent performing work in this Matter," V&G responded, "[V&G] has no

documents responsive to this request not already produced in repeated file productions. . . ."  The response further stated that V&G "did not keep contemporaneous time and billing records."  Nonetheless, V&G stated that "[a] summary of activities performed pursuant to the local rules regarding statutory [sic] can be produced by [V&G] if ordered to do so by the Court, and will be supplemented at a later date if necessary."

In *Graves* v. *Babin*, 147 So.3d 197, 201 n.4 (La. Ct. App. 2014), the appellate court noted that the attorney attempted "to introduce documentation reflecting work performed in this matter.  However, the trial court did not allow the introduction of the time management log because it was not produced in discovery, and, at a hearing on a motion to compel discovery, the court was told that no such documentation existed."  The appellate court found no abuse of the trial court's discretion in refusing to allow the introduction of the documentation into evidence.

Here, in contrast to *Graves*, Mr. Vezina indicated that a summary of activities could be produced if necessary. Furthermore, Federal Rule of Evidence "1006 provides that only the underlying documents, not the summaries themselves, must be produced to the opposing party."  *Colón-Fontánez* v. *Mun. of San Juan*, 660 F.3d 17, 30 (1st Cir. 2011); *see also Mitchell* v.

*Univ. of La. Sys.,* 154 F. Supp. 3d 364, 380 n.8 (M.D. La. 2015)

(quoting *Mack* v. *Benjamin*, No. 13-552, 2015 WL 7313869, at *2

(M.D. La. Nov. 20, 2015).  A Rule 1006 summary need not have

been produced during discovery.  V&G and B&S produced over

20,000 pages of discovery related to their contributions on the

*Wyeth* matter.  Therefore, V&G and B&S had no obligation to

provide the summaries to the Sakla Law Firm and consequently the

objection as to timeliness of production was effectively

overruled.

> b.  *The Assertion of Privilege*

During Mr. Vezina's deposition on November 15, 2016, he was

asked questions concerning the anticipated summary of

activities.  Mr. Vezina confirmed that a summary of his

activities and time spent on the *Wyeth* matter was "underway."

He indicated that the process included "a review of the file, a

review of the email logs, a review of the pleadings[,] . . . a

review of the documented history of this case, and from that,

the characterizations of the activities that were performed

since the beginning of this case back in 2002 until the day of

our termination . . . ."

When the Sakla Parties' counsel asked Mr. Vezina, "Are you

aware that there are currently outstanding discovery requests

asking for specifically this exact type of information?", Mr.

Vezina responded, "I don't know that I would use the term

exactly, but I do know that . . . a discovery request was made, and an appropriate objection was entered, and I do believe in that response I did say that to the extent it was reasonable to do, if it would be done, and the discovery responses would be seasonably supplemented." The Sakla Parties argued that the summaries of activities prepared were never produced prior to being filed on December 6, 2017 as attachments to Mr. Vezina's declaration, nor were they listed as a potential exhibit during the parties' exhibit exchange on November 28, 2017.

V&G and B&S, however, assert that the summaries were not being offered into evidence as an exhibit. V&G and B&S claim that the summaries "are offered to aid the court in assessing the offered evidence in the same manner that Dr. Sakla has attempted to summarize his activities."

The nub of the Sakla Parties' contention here, however, is that Mr. Vezina unfairly asserted his attorney-client privilege. In answering certain questions, Mr. Vezina's attorney cautioned that his response was limited due to the attorney-client privilege. The Sakla Parties complain that Mr. Vezina used the attorney-client privilege as a shield to avoid producing the document pre-trial, but that he then sought to waive that privilege and "use his 'summary of activities' as a sword" for trial purposes. Although at first glance such a tactic may seem unfair, that is not so here. The Sakla Parties were permitted

to submit billing summaries that had not been contemporaneously kept until 2008. I can discern no prejudice in allowing Mr. Vezina to do the same, so I have permitted V&G and B&S to submit their recreated summaries and have considered these summaries in my determination of the appropriate division of fees.

### c. Hearsay

The Sakla Parties further argue that "[t]he summaries prepared by Mr. Vezina are an attempt to submit an additional 100 pages of unsworn hearsay in lieu of a sworn declaration." They maintain that "writing something down and attaching it to a declaration does not make a document admissible evidence." As for any business records exception to hearsay, the Sakla Parties claim that "Mr. Vezina's declaration is devoid of any authentication statements whereby his summaries could be considered business records of [V&G]."

Rule 1006, in relevant part, provides: "The proponent may use a summary . . . to prove the content of voluminous writings . . . that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place . . . ." Those are the conditions the Federal Rules of Evidence establish for the admissibility of such a summary. V&G and B&S assert that the summaries are not being offered into evidence as a substantive exhibit. I have

treated the summaries as "chalks" and accordingly, I find the Sakla Parties' hearsay argument to be without merit.

> d.   *Reliability and Confusion*

Lastly, the Sakla Parties argue that the summaries of activities are unreliable and confusing because "they are not based on contemporaneous records, [they] do not list the actual hours spent, and they incorporate time spent on other matters, especially *Merck*, for which [V&G] and [B&S] were fully compensated."

In his deposition, Mr. Vezina was asked, "Do you feel that referring to the timekeeping records which were taken contemporaneously from 2002 to 2008, would assist you in recreating your summary of activities of the things that you did in the case?"  He responded, "No."

I will reserve addressing the issue that the summaries incorporated time spent on other matters, especially *Merck*, for section II.A.2 below.  The summaries, specifically Exhibit A, are intended to aid the court with a review of the voluminous documents produced to the Sakla Law Firm in this litigation. Although the question is not without difficulties, I discern no actionable unfair prejudice — especially in a non-jury matter — to proceeding by using such a routine process.

Accordingly, I denied the Sakla Parties' motion in limine with respect to Exhibit A.  As for Exhibit B, I reserve my

discussion regarding treatment of the Sakla Parties' second motion in limine to be addressed in section II.A.2. below.

> ### 2.   Motion in Limine to Exclude Evidence of Post-Termination Activities

The Sakla Parties argue that evidence of work performed after termination, for parties other than Dr. LaCorte or on other cases, is immaterial to the instant fee dispute and should be excluded from evidence.

> #### a.   Post-Termination Work

The Sakla Parties contend that the work allegedly done after termination should be excluded from this matter because it is irrelevant to the determination of what *quantum meruit* fee, if any, is due to V&G and B&S in the *Wyeth* matter.

"[A]n attorney's representation must 'advance [the] client's case' and have some 'productive value to [the] client' in order for the attorney to recover any part of the applicable contingency fee." *Luther* v. *John W. Stone Oil Distrib., L.L.C.,* 607 F. App'x 367, 371 (5th Cir. 2015) (per curiam) (citing *City of Alexandria* v. *Brown,* 740 F.3d 339, 351-52 (5th Cir. 2014)). "This is a 'threshold issue.'" *Id.* (quoting *City of Alexandria*, 740 F.3d at 352). In *Luther*, the intervening party who provided legal services to its client was unable to overcome the threshold issue because he "present[ed] no evidence that his pre-discharge work actually *contributed to the outcome* of [his

client's] suit."  *Id*. at 372 (emphasis in original).  "[E]ven where . . . the discharged attorney is entitled to seek recovery of his fees from former co-counsel under a theory of *quantum meruit*, the measurement of fees still must be tied to the services that were rendered by the discharged attorney to and for the benefit of the client."  *Tolson* v. *Sistrunk*, 772 S.E.2d 416, 423-24 (Ga. Ct. App. 2015).

V&G and B&S have admitted that Dr. LaCorte terminated them and that after their termination they were no longer authorized to represent him.  Although it is true that they cannot now seek to be paid for work after their termination as such when they clearly knew that they no longer had the authority to represent Dr. LaCorte, I find merit to their argument that they had a statutory right to intervene in the case and protect not only their attorneys' lien, but also their interest in the successful outcome in the matter.  To the degree the evidence presented indicates that post-discharge work actually contributed *to* the outcome of his client's suit, I find these summaries to be instructive.  Accordingly, I denied the Sakla Parties' motion in limine to exclude evidence of V&G's post-termination work in particular, to facilitate careful consideration of what percentage of the contingency fee is appropriate to assign under a *quantum meruit* theory.

### b.   *Work Performed in the Merck Case*

The Sakla Parties further maintain that Mr. Vezina's declaration, as well as Exhibit A to his declaration, are "peppered with references to work performed in the *Merck* matter."  It is undisputed that V&G and B&S were fully compensated at the end of the *Merck* matter, where they received their contingency fee from Dr. LaCorte.  The Sakla Parties argue the work performed in the *Merck* matter by V&G and B&S is irrelevant to the resolution of what they are presently owed in the *Wyeth* matter.  However, any statements made about the representation contract in the *Merck* action may remain relevant insofar as they relate to the June 2004 representation contract because the 2004 representation contract addressed a number of Dr. LaCorte's *qui tam* actions in addition to the *Wyeth* matter now before me.  Accordingly, I treated as admissible statements regarding the *Merck* matter, to the extent that those statements bear on construction of the June 2004 representation contract; otherwise, the work performed in the *Merck* matter is irrelevant to the resolution of the dispute at bar and I have treated such irrelevant statements as inadmissible.

### c.   *Debarment of All Fees*

The Sakla Parties make their broadest objection by arguing that <u>any</u> post-termination support and professional services rendered by V&G and B&S created a real and ongoing conflict of

interest with their prior client, Dr. LaCorte, in the very same
litigation in which they had previously represented him.

Under Rule 1.7 of the Louisiana Rules of Professional
Conduct, loyalty is recognized as an essential element of the
lawyer's relationship to a client. *Scheffler* v. *Adams & Reese,
LLP*, 950 So.2d 641, 651-52 (La. 2007); *see also Zloop, Inc.* v.
*Phelps Dunbar LLP,* No. 6:18-cv-00031, 2019 WL 1978357 at *8
(W.D. La. Mar. 27, 2019) (Hanna, M.J.), *report & recommendation
adopted by* 2019 WL 1941058 (W.D. La. Apr. 19, 2019) (Juneau,
J.).  The rule "generally prohibits a lawyer from representing a
client if the representation of that client may be materially
limited by the lawyer's responsibilities to another client or to
a third person, or by the lawyer's own interests." *Scheffler*,
950 So.2d at 651-52.  The "duty of loyalty continues even after
the termination of the attorney-client relationship." *Id*. at
652.

That said, the Sakla Parties' ongoing conflict of interest
argument is ultimately unpersuasive.  Although arguably not
identical, the interests of the United States, the various
States, and Dr. LaCorte, were at least very similar in that they
were all striving for a positive outcome in their favor in the
*Wyeth qui tam* action.  Consequently, I find V&G and B&S did not
breach their duty to their client.  Accordingly, I have denied
this portion of the Sakla Parties' motion in limine.

43

**B.**   ***Motion to Strike***

Intervenors V&G and B&S filed a motion to strike evidence offered by the Sakla Parties in the form of affidavits and deposition designations.  They specifically asked this court to strike the portions of the paragraphs within the affidavits of Douglas Chandler and Basile J. Uddo and the Sakla Parties' designated pages from the deposition of Dan Ciolino, and all designations within pages 68-69 of Mr. Ciolino's deposition. V&G and B&S argue that the Sakla Parties lack standing to challenge the terms of the June 2004 representation contract and that the expert witness affidavits contain inadmissible expert opinions on the law of Louisiana and of Georgia and present unreliable factual determinations.

### 1.   Standing to Challenge the Enforceability of the June 2004 representation contract

It is undisputed that the June 2004 representation contract remains the operative contingency fee agreement relevant to Dr. LaCorte's representation in the *Wyeth* matter.  It has never been modified by a written agreement signed by the parties after its execution.  Both Mr. Chandler and Mr. Uddo opine that terms in the June 2004 representation contract are unenforceable or void against public policy.  The crux of V&G and B&S's contention is that the Sakla Parties lack standing to address the enforceability of the June 2004 representation contract.

Moreover, they argue that "it is inappropriate for the Sakla Parties to attempt to invalidate the terms of the June 2004 representation contract, especially the conditions for payment of attorneys' fees, after they, along with V&G and B&S, drafted and negotiated those very agreement terms with Dr. LaCorte."

Standing requires three elements to be met.  *See Lujan* v. *Def. of Wildlife*, 504 U.S. 555, 560 (1992).  "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical[.]"'"  *Id*. (internal citation and additional quotation marks omitted).  "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Id*. (alterations in original) (internal citation omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id*. at 561 (internal citation omitted).

The argument that the Sakla Parties were a party to the June 2004 representation contract and, therefore, do not have standing to challenge its enforceability is counterintuitive. Rather, as a party to the June 2004 representation contract, the

Sakla Parties are in the best position to have standing. Depending on how much of the attorneys' fees are owed to V&G and B&S in this potentially zero-sum dispute, the Sakla Parties are bound to suffer an injury in fact.  Any money awarded to V&G and B&S is money that is not awarded to the Sakla Parties. Additionally, there is a causal connection between the injury and the determination of the June 2004 representation contract's enforceability.  Finally, the Sakla Parties' injury could be redressed by a favorable decision deeming the relevant terms unenforceable.  Accordingly, the Sakla Parties have standing to address the enforceability of the June 2004 representation contract.

V&G and B&S not only contend that the Sakla Parties do not have standing to challenge the June 2004 representation contract, but also contend that it is inappropriate for the Sakla Parties to do so.  In support of their argument, they cite to case law from several states, at least one of which appears no longer to be good law in a case like this one. *See* [Dkt. No. 696 at 4-5] (citing, *inter alia*, *Thomas v. B.J. Titan Servs. Co.*, 675 So.2d 747 (La. Ct. App. 1996), *distinguished by Adams v. Med-Force*, 682 So.2d 323 (La. Ct. App.1996).  In particular, V&G and B&S cite to *Foley & Lardner, L.L.P.* v. *Adlar Invs., Inc.*, 491 F. Supp. 2d 595, 606 (M.D. La. 2007), for the proposition that "[n]ullifying the . . . agreement would reward

the very party who made multiple misrepresentations and overreached."  That is not what is at issue here.  V&G and B&S are not contending that the Sakla Parties made misrepresentations or overreached, rather, they are arguing that the Sakla Parties should be barred from introducing evidence on the ground that it would be "inappropriate" to challenge the provisions of the June 2004 representation contract.

V&G and B&S's arguments based on "standing" and "inappropriateness" provide no grounds to exclude the relevant portions of Mr. Uddo and Mr. Chandler's affidavits.  Their arguments have nothing to do with the admissibility of evidence. Consequently, their motion to strike these particular portions of the affidavits is denied.

### 2.   Admissibility of Expert Opinion

V&G and B&S further argue that the affidavits submitted by the Sakla Parties' expert witnesses contain inadmissible expert opinion testimony under Rule 702 of the Federal Rules of Evidence.  They claim that the experts are "attempting to instruct the court on the law of Louisiana and/or Georgia" and are "includ[ing] inadmissible factual determinations which are intended for the trier of fact."

#### a.   *Opinions on Georgia and Louisiana Law*

V&G and B&S maintain that Mr. Chandler opines on the laws of Georgia and Mr. Uddo offers opinions on the laws of

47

Louisiana.  In addition, V&G and B&S assert that designated pages of Mr. Ciolino's deposition also contain testimony regarding his opinions on case law in Louisiana.  They contest the contents of these paragraphs as statements of "fact," and argue that the contents of the paragraphs are "ill-disguised attempts to assert legal opinions which are inadmissible under Fed. R. Evid. 702."

Rule 702 provides that a witness may be qualified as an expert if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect . . . ."  *Burkhart* v. *Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.D.C. 1997); *see also Fireman's Fund Ins. Co.* v. *Holder Const. Grp., LLC,* 868 S.E.2d 485, 491 (Ga. Ct. App. 2022) (An "expert witness may not testify as to his opinion regarding ultimate legal conclusions, but may testify to an ultimate issue of fact." (internal citation and punctuation omitted)).

Nonetheless, "the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Burkhart*, 112 F.3d at 1212.  "[A]n expert may offer his opinion as to facts that, if found, would support

a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Id.* at 1212-13.  Accordingly, "[o]pinions regarding the state of the law, interpretation of statutes or regulations, or the ultimate application of the facts to the law fall far outside the purview of expert testimony." *U.S. ex rel. Dyer* v. *Raytheon Co.*, No. 08-cv-10341-DPW, 2013 WL 5348571, at *13 (D. Mass. Sept. 23, 2013).  "It is well established that the law is the exclusive domain of the judge and is not a proper subject for expert testimony." *Id.* (citing *Nieves-Villanueva* v. *Soto-Rivera,* 133 F.3d 92, 99-100 (1st Cir. 1997)); *see also Marx & Co., Inc.* v. *Diners' Club Inc.,* 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.").  For that reason, expert testimony cannot "usurp the role of [the] judge." *U.S. ex rel. Dyer*, 2013 WL 5348571, at *13.

I have been careful to use the challenged legal expert opinions consistently with the clarification reinforced by the December 1, 2023 amendments to FED. R. EVID. 702 that were intended to assist me as "the trier of fact to understand the evidence" and there "determine a fact in issue." WESTLAW RULE 402 at 7.  Perhaps it is needless to say, except by way of emphasis, that I have jealously guarded the role of the judge in sifting

admissible evidence from usurpation by wider ranging expert opinions proffered by the parties.

Here, it is clear that all three experts discuss the laws of Georgia and Louisiana in respective affidavits and depositions.  Mr. Chandler is an attorney in Georgia retained by the Sakla Parties

> to express opinions, based on [his] law practice experience, education, training, and Georgia law, about whether the Georgia law firm [B&S] and the Louisiana law firm [V&G] are entitled to any type of fee under the contingency fee contract between relator, [Dr. LaCorte], B&S, and V&G for the representation B&S and V&G allegedly provided to [Dr.] LaCorte, when the representation of both B&S and V&G was terminated by [Dr.] LaCorte approximately 8 years before the occurrence of any contingency triggering a contingency fee, and the only work performed by B&S and V&G on behalf of [Dr.] LaCorte occurred prior to [Dr.] LaCorte terminating B&S and V&G approximately 8 years before the occurrence of any contingency triggering a contingency fee.

Mr. Uddo was retained by the Sakla Parties "to provide expert opinions and consultation with respect to matters related to the Louisiana Rules of Professional Conduct, the standard of care for Louisiana attorneys, and other ethics-related matters regarding fee disputes among attorneys generally and in this matter specifically."  Mr. Ciolino was retained by V&G and B&S as an expert regarding legal ethics.

I find that, to the extent that the witnesses are opining on the state of the law, those specific portions of

their affidavits and depositions should be disregarded.  I
decline to facilitate what is in essence extended backdoor
briefing.  The witnesses go beyond their scope as experts
when they testify about the satisfaction of the legal
standards they set out.  For example, the enforceability of
the representation contract on public policy grounds is a
question of law for the court, not one concerning which the
experts should be opining directly.  *See Inst. Labor
Advisors, LLC* v. *Allied Res., Inc.*, No. 4:12-cv-00044-JHM,
2014 WL 4211196, at *17 (W.D. Ky. Aug. 25, 2014).

Furthermore, I found the Sakla Parties' arguments
about counsel's objections being premature and
inappropriate under the court's "Order Regulating Non-Jury
Civil Trial" unconvincing.  V&G and B&S's objections
concern the potential admissibility of the affidavits and
depositions.  The court's order clearly indicates that
"[s]tatements that would be objectionable as conclusions,
or objectionable because of lack of essential foundation
evidence, should be avoided."  I do, however, discern a
need for parity in addressing the Sakla Parties' arguments
that V&G and B&S have also submitted their own expert
testimony purporting to establish the state of the law.
Those pertinent portions should also be disregarded.

b.   *Reliability of Factual Determinations*

V&G and B&S also argue that the Sakla Parties' experts' testimony contains factual determinations that "lack credibility."  In particular, they take issue with Mr. Uddo's statements that Dr. LaCorte's termination of V&G and B&S was for cause and with Mr. Chandler's statements that V&G and B&S do not have any claim for a contingency fee against Dr. LaCorte.  The gravamen of V&G and B&S's argument is that "Mr. Chandler and Mr. Uddo both have recognized that this case involves facts that require the court's determinations."

Although it is true that the court is the ultimate factfinder during a bench trial, this does not mean that expert witnesses are prohibited from offering opinions, which can be understood as an implicit reference to hypotheticals, that bear on factual determinations.  Rather, that is a proper use of expert witness testimony.  *See* FED. R. EVID. 702 ("the expert's scientific, technical, or other specialized knowledge will help the trier of fact . . . to determine a fact in issue"); *see also Fireman's Fund Ins. Co.*, 868 S.E.2d at 490 (citing OCGA § 24-7-704(a)).  Just as V&G and B&S's experts can claim that they were not discharged for cause, the Sakla Parties' experts can claim that V&G and B&S were.  It is up to me as the trier of fact to make credibility determinations and weigh the battling experts'

testimony.  Accordingly, V&G and B&S's motion to strike these particular portions of the affidavits was effectively denied.

Having provided further explanation for my threshold "pretrial" approach to consideration of contested evidence, I now address threshold legal arguments made at trial.

## C.   *Conclusions Regarding Merits Raised at Threshold*

### 1.   Timeliness of Claims

The Sakla Parties assert the evidence establishes that both V&G and B&S are time-barred from seeking attorney's fees under Louisiana and Georgia law.  Under Louisiana law, the statute of limitations is known as a "liberative prescription," and an "action for the recovery of compensation for services rendered" is subject to a liberative prescription of three years.  La. Civ. Code Ann. art. 3494.  The liberative prescription period begins to "run from the day payment is exigible."  La. Civ. Code Ann. art. 3495.  "Exigible" is defined as a liquidated and demandable debt or a mature claim.  *See Doan* v. *Tech. Eng'g Consultants, Inc.,* 942 So.2d 1145, 1146 (La. Ct. App. 2006) (citing Black's Law Dictionary).

The issue before the court in *Gamm, Greenberg & Kaplan* v. *Butts*, 508 So.2d 633, 635 (La. Ct. App. 1987), was the date upon which the three-year period of liberative prescription began to run on a suit to collect compensation for legal services.  The court held "that prescription on the plaintiff's claim to

collect compensation for legal services began to run, at the latest, on the date that the plaintiff relinquished the [client's] file to their new counsel." *Id.* at 636.  The court noted that when a contingency fee agreement is in play between an attorney and a client, "depending on the terms of that agreement, prescription for recovery of compensation for services rendered usually begins to run on the date that the judgment or settlement is reached and at that point the attorney is entitled to recover the percentage specified in the contract as his fee." *Id.*  Notwithstanding such a fee structure, "a client may discharge his attorney at any time as a matter of right." *Id.*  When such a discharge occurs, "the attorney is entitled to recover only for services actually rendered to the client." *Id.*  Furthermore, "[e]ven if the terms of the contingency fee contract did not provide a determinative date for the running of prescription, the jurisprudence indicates that prescription began to run on the date the [attorney] forwarded the [client's] file to new counsel." *Id.*

That said, the following year, in a certified question from the United States Court of Appeals for the Fifth Circuit, the Louisiana Supreme Court held that in "a suit by an attorney against another attorney to recover, pursuant to such an agreement, a portion of the fee collected by the latter party from the client is not one for the recovery of attorney's fees,

but rather is one for breach of the agreement to share in the fund resulting from the payment of the fee." *Duer & Taylor* v. *Blanchard, Walker, O'Quin & Roberts*, 354 So.2d 192, 195 (La. 1978).  As a result, "[t]he applicable prescription is not three years . . . but that of ten years as provided by La. Civ. Code art. 3544." *Id.*

I find and conclude that payment was not due to V&G until the time of settlement in February 2016 because that was when payment was "exigible," i.e., when it became a liquidated and demandable debt or a mature claim.   I have found and concluded as explained in *Duer & Taylor*, a case such as this one that presents a breach of contract claim which has a prescriptive period of ten years, that the prescriptive period would not run until well after V&G presented its claim for fees. Consequently, I find and conclude V&G's claims were timely under Louisiana law.

Under Georgia law, there is a four-year statute of limitations period for "[a]ll actions upon open account, or for the breach of any contract not under the hand of the party sought to be charged, or upon any implied promise or undertaking shall be brought within four years after the right of action accrues."  Ga. Code Ann. § 9-3-25 (West).  However, when "the facts show that the parties intended, either expressly or impliedly, that demand for repayment would not be made until

55

some future time, then the statute of limitation does not commence to run until the date of demand for repayment." *Woods* v. *Jones*, 699 S.E.2d 567, 570 (Ga. Ct. App. 2010), *reconsideration denied* (Ga. Ct. App. Jul. 26, 2010), *cert. denied* (Ga. Jan. 24, 2011) (internal punctuation and citations omitted).

Although there is no express agreement here, B&S, like V&G, did not have a claim to assert until the settlement was reached. And because the June 2004 representation contract was still in effect at the time of settlement due to the Sakla Parties' continued representation of Dr. LaCorte, I find that the B&S claims are timely as well because instinct in the June 2004 representation contract was the understanding that demand would not be made until the *Wyeth* settlement had ripened.

2.   Enforceability of Contingency Fee Agreement

Under the Louisiana Rules of Professional Conduct an attorney cannot "make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount of expenses." La. R. of Prof'l Conduct 1.5(a).  As a result, "under Louisiana law, a lawyer cannot use contractual liability to circumvent the requirement that a lawyer can only charge a reasonable fee for services rendered." *City of Alexandria*, 740 F.3d at 351.

Moreover, "the client's absolute right to discharge his attorney is stripped of effect if the client's exercise of that

right is conditioned upon his payment of the full amount

specified in the contract." *Saucier* v. *Hayes Dairy Prod., Inc.,*

373 So.2d 102, 116 (La. 1978), *on reh'g* (June 25, 1979).

> "[A]n attorney clearly may contract with a client to
> provide legal services for a fee contingent and
> calculated upon the amount recovered or preserved, so
> long as the contract does not restrict the client's right
> with or without cause to discharge the attorney, or grant
> as a fee to the attorney without requirement of
> commensurate services an immutable proprietary
> percentage of the client's claim, or result in an
> attorney collecting a 'clearly excessive' fee which has
> not been 'earned' as defined by the rules." *Id.* at 117
> (quoting dissent on original hearing).

The court in *Saucier* concluded "that only one contingency fee

should be paid by the client, the amount of the fee to be

determined according to the highest ethical contingency

percentage to which the client contractually agreed in any of

the contingency fee contracts which he executed." *Id.* at 118;

*see also Luther*, 607 F. App'x at 370 ("Under Louisiana law, when

two attorneys provide legal services to the same client on a

contingency-fee basis and one attorney is discharged before the

case is resolved, the client is obligated to pay only one

contingency fee that the court allocates between the

attorneys."). The court further noted that "that fee should in

turn be allocated between or among the various attorneys

involved in handling the claim in question, such fee

apportionment to be on the basis of factors which are set forth

in the Code of Professional Responsibility." *Saucier,* 373 So.2d

at 118; *see also Luther*, 607 F. App'x at 370 ("[T]he apportionment of the fee between the attorneys is based on the factors listed in Rule 1.5 of the Louisiana Rules of Professional Conduct, which together are directed at assessing the reasonableness of a fee.").  The *Saucier* factors include, among other things, "'the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly'; 'the amount involved and the results obtained'; and 'the nature and length of the professional relationship with the client.'" *Luther*, 607 F. App'x at 370 (quoting La. R. Prof'l Conduct 1.5); *accord Saucier,* 373 So.2d at 116.

If an "attorney was discharged without cause, then the application of the *Saucier* factors marks the end of the analysis."  *Luther*, 607 F. App'x at 370.  However, if the "attorney was discharged for cause, then the court must next 'consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel would receive after the *Saucier* allocation.'" *Id*. at 370-71 (quoting *O'Rourke* v. *Cairns,* 683 So.2d 697, 704 (La. 1996).

Under Georgia law, if a party is terminated before the contingency occurs, the discharged attorney is only entitled a *quantum meruit* fee.  *Eichholz Law Firm, P.C.* v. *Tate Law Grp.,*

*LLC*, 714 S.E.2d 413, 415-17 (Ga. Ct. App. 2011) (Phipps, J.). Specifically, the court stated that "allow[ing] a discharged attorney to collect an equal share of a contingent fee as if the attorney were still involved in the case would render the discharge meaningless." *Id.* at 415 (punctuation and citation omitted).  The court emphasized that "[t]he existence of [an express fee-splitting] agreement between the lawyers does not affect the underlying policy against allowing a discharged lawyer to collect contingent attorney fees."  *Id.* at 416.

Significantly, "the *Saucier* framework and *quantum meruit* analysis apply essentially the same factors to determine the contributions a lawyer made to a particular case." *City of Alexandria*, 740 F.3d at 352; *see also O'Rourke,* 683 So.2d at 702 ("[T]he *Saucier* factors are, to a degree, the same factors used in making a *quantum meruit* award . . . .").  "Under both *Saucier* analysis and *quantum meruit* analysis, a court [applying Louisiana law] is supposed to use the factors articulated by Louisiana Rule of Professional Conduct 1.5(a) to determine the contribution that a lawyer made to his client's case."  *City of Alexandria*, 740 F.3d at 352.  Similarly, an attorney seeking to collect *quantum meruit* damages under Georgia law "must show the reasonable number of hours the attorney worked on the matter, his hourly rate, or any other evidence sufficient to prove the 'reasonable value of the attorney's services'"—i.e., factors

like those laid out in Rule 1.5(a) of Louisiana's Rules of
Professional Conduct. *Eichholz Law Firm, P.C.* v. *Tate Law Grp.,
LLC*, 783 S.E.2d 466, 468 (Ga. Ct. App. 2016) (quoting *Overman* v.
*All Cities Transfer Co.*, 336 S.E. 2d 341, 343 (Ga. Ct. App.
1985)).

I credit that the June 2004 representation contract was the
result of negotiations between sophisticated parties — including
Dr. LaCorte who was represented by his personal attorney —
agreeing to a contract that was the product of arms-length
negotiations. Of course, enforcing the June 2004 representation
contract at issue here would as a practical matter amount to an
immaterial discharge of V&G and B&S by Dr. LaCorte. Under both
Louisiana and Georgia law, V&G and B&S are entitled to payment
in *quantum meruit*, and this must be determined by using the
factors in Rule 1.5 of the Louisiana Rules of Professional
Conduct. I will provide application of those factors in this
case later in my analysis.

### 3.   Joint Venture

Under Louisiana law, "[w]here an attorney retained in a
case employs or procures the employment of another attorney to
assist him, as regards the division of the fee, the agreement
constitutes a joint adventure or special partnership." *Duer &
Taylor*, 354 So.2d at 194-95; *see also Scurto* v. *Siegrist*, 598
So.2d 507, 509 (La. Ct. App. 1992) ("In the situation where a

retained attorney associates, employs or procures the employment of another attorney to assist him in handling a case involving a contingency fee, the agreement regarding division of the fee is a joint venture which gives the parties to the contract the right to participate in the fund resulting from the payment of the fee by the client."). This is exactly what happened in the case before the court — the Sakla Parties retained the assistance of V&G and then B&S in Dr. LaCorte's *qui tam* actions.

The joint venture theory is generally used to apportion an attorney fee equally between the attorneys when the attorneys fail to contract between themselves how the fee should be divided. *See McCann* v. *Todd,* 14 So.2d 469, 471 (La. 1943). Notwithstanding such authority, "courts have declined to apply the joint venture theory to support an equal division of the fee when the attorneys have not been jointly involved in the representation of the client." *Dukes* v. *Matheny*, 878 So.2d 517, 520 (La. Ct. App. 2004). "Rather, the apportionment of the fee in those types of cases has been based on *quantum meruit*." *Id*.

Moreover, to allow such a joint venture claim to go forward would be in effect, to disregard the requirement that attorneys' fees be reasonable. It would also deem Dr. LaCorte's discriminating discharge determination pointless. In *Matter of P & E Boat Rentals, Inc.*, 928 F.2d 662, 665 (5th Cir. 1991), the court noted that "[n]o contract between counsel which is in

61

conflict with controlling ethical standards should be recognized and enforced by the court."  Accordingly, I find that the presence of a joint venture cannot defeat the public policy concerns that attorneys' fees be reasonable.  Thus, I do not accept V&G and B&S's argument that the three law firms' work in the *Wyeth qui tam* litigation was a joint venture that requires the equal split of the attorney contingency fee.

### 4.   Breach of Fiduciary Duty

The Sakla Parties assert that there cannot be any claim of fiduciary duty among co-counsel, because "[i]t is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his or her client," and thus no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to one another to protect each other's interest in a fee.  In *Scheffler*, the court noted that an attorney's duty of loyalty to his or her client "should not be diluted by a fiduciary duty owed to some other person, such as co-counsel, to protect that person's interest in a prospective fee."  950 So.2d at 652.  V&G and B&S did not contest this argument and I accept the Sakla Parties' position.

### 5.   Judicial Estoppel

V&G and B&S argue that the Sakla Parties are "estoped as a matter of law from taking the opposite position in this [*Wyeth*] litigation" from their position in the *Merck* case.

Specifically, V&G and B&S maintain that the Sakla Parties, in their statement of uncontested material fact in the *Merck* matter, admitted that

> In said June 2004 Representation Contract, Dr. LaCorte specified that all prior fee agreements were superseded, and Dr. LaCorte made an <u>irrevocable</u> assignment to the three law firms for each of them to divide the total attorney's contingency fee as follows: 1/3 to The Sakla Law Firm APLC, 1/3 to Boone & Stone and 1/3 to Vezina & Gattuso.

V&G and B&S assert that these affirmative representations concerning the June 2004 representation contract are binding upon the Sakla Parties in this action.

Judicial estoppel is an equitable doctrine. *Perry* v. *Blum*, 629 F.3d 1, 8 (1st Cir. 2010). "It operates to prevent a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him in an earlier phase of the same case or in an earlier court proceeding." *Id*. Generally, the presence of three things is required before the doctrine can be brought into play — (1) "a party's earlier and later positions must be clearly inconsistent"; (2) "the party must have succeeded in persuading a court to accept the earlier position"; and (3) "the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." *Id.* at 8-9; (citing *New Hampshire* v. *State of Maine*,

532 U.S. 742, 750-51 (2001) and *Alt. Sys. Concepts, Inc.* v.
*Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004)).

Unlike the *Wyeth* matter, the *Merck* case was settled before
Dr. LaCorte's termination of V&G and B&S, and each of the three
law firms had rendered all the legal services necessary to reach
a settlement award.  The Sakla Parties are not contesting what
was written in the June 2004 representation contract.  There is
nothing inconsistent about their interpretation of the
agreement.  Rather, the different posture of the *Merck* case from
this case fully justifies a different interpretive approach.

6.   Termination of V&G and B&S – Cause

Having concluded that the three law firms are entitled to
payment in *quantum meruit*, I apply Rule 1.5 of the Louisiana
Rules of Professional Conduct for such a determination.
However, before doing so, I offer a determination whether V&G
and B&S's termination was with or without cause.

A client has the absolute right to discharge his attorney.
The distinctions between a "for cause" and a "without cause"
termination only become meaningful to consider when determining
the amount of fees owed.  If an attorney's termination was
without cause, then the court may end its analysis with the
*Saucier* factors.  *Luther*, 607 F. App'x at 370.  Only if the
attorney was terminated for cause does the court then go on to
analyze the "nature and gravity of the cause which contributed

64

to the dismissal" and reduce the *Saucier* allocation accordingly. *Id.* at 370-71 (quoting *O'Rourke,* 683 So.2d at 704).

There have been some sharp practices disclosed in the evidence, engaged in by all parties concerned in this matter, including Dr. LaCorte with his capricious termination practices. Despite some self-serving dimensions to conduct by the Trial Lawyers, such as those disclosed in the Delaware document exchange disagreement and the fee dispute in *Merck*, I cannot find that the circumstances here descended to the level of for cause termination as to V&G and B&S.

Contemporaneous timekeeping was an issue throughout the trial.  Surprisingly, all parties failed to keep such records. In any event, Dr. LaCorte was able to recover statutory attorneys' fees from Wyeth based on records produced later. Although it is the better practice to keep time records, I do not find that the lack of such records categorically justifies for cause termination of the discharged parties, especially considering that the Sakla Parties also failed to maintain time records.

It is true that Dr. LaCorte's termination letter for V&G included a non-exhaustive list of the reasons for V&G's for-cause termination.  The record, however, does not establish that what Dr. LaCorte wrote about actually happened.  For example, his termination email to B&S raised the issue of a conflict of

interest as a reason to support a for-cause termination.  I note, however, that the Vioxx cases that Dr. LaCorte mentions are personal injury cases and the attorney handling them was also on the plaintiff's side.  Accordingly, I find Dr. LaCorte's attempt to discharge V&G and B&S for cause in this regard pretextual and that the discharge was without cause.

My analysis now turns to the application of the *Saucier* factors.  *Luther*, 607 F. App'x. at 370.

### D. *Division of Attorneys' Fees According to Rule 1.5 Factors*

Under Rule 1.5(a) of the Louisiana Rules of Professional Conduct, the factors to be considered in determining the reasonableness of a fee include the following:

> (1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2)  the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3)  the fee customarily charged in the locality for similar legal services;
> (4)  the amount involved and the results obtained;
> (5)  the time limitations imposed by the client or by the circumstances;
> (6)  the nature and length of the professional relationship with the client;
> (7)  the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8)  whether the fee is fixed or contingent.

"The phrase, *quantum meruit*, means as much as he deserved." *Smith* v. *Westside Transit Lines, Inc.,* 313 So.2d 371, 378 (La. Ct. App. 1975), *rev. denied* 318 So.2d 43 (1975) (mem.).  "This

in turn encompasses far more than simply the hours spent by the attorney on his client's case." *Id.* "It involves the ultimate results obtained as well as the particular benefit to the case derived for each unit of time devoted to the case." *Id.; see also Eichholz*, 783 S.E.2d at 468 ("[A] plaintiff asserting a claim for quantum meruit must provide evidence of (1) his performance as agent of services valuable to the defendants; (2) either at the request of the defendants or knowingly accepted by the defendants; (3) the defendants' receipt of which without compensating claimant would be unjust; and (4) claimant's expectation of compensation at the time of the rendition of the services." (punctuation and internal citation omitted)).

As detailed extensively in the findings of fact section above, all three firms contributed to success for Dr. LaCorte in the *Wyeth* matter, a matter concerning some specialized and novel issues of law.  To locate the contributions of the respective firms in this context, it will be useful for purposes of allocation to the several Trial Lawyers *inter se* to restore the significant milestones in the travel of a *qui tam* action.

V&G and B&S were terminated eight years before the settlement of the *Wyeth* matter and at the time they were terminated, the United States had not yet formally intervened in the matter.  Nevertheless, I find that by 2006 the federal government was prepared to intervene.  Mr. Mao from the DOJ had

by then informed both relators' counsel that he was working on an intervention memo.

*Qui tam* cases typically are complex and difficult, and often require extensive resources that a single law firm is unable to devote to one case.  Expenses of litigating a *qui tam* case can also be extremely high.  For those reasons, a "teaming" approach is often essential in bringing a *qui tam* case, in which more than one law firm represents the relator.  The presence of multiple law firms on the relator's "team" of attorneys not only makes it possible to present the case most effectively, but also helps convince the DOJ that the case is meritorious enough that the DOJ should devote its own resources to the case.  This follows from the likely DOJ conclusion that a number of law firms would not have taken on the investment of time and expense evidenced by the Trial Lawyers here to bring the case to the DOJ, unless they had independently concluded the case was worth pursuing.

One of the most important goals in representing a relator in a *qui tam* case is to get the government to intervene in the case.  In this respect, the work performed here to get the government to intervene, particularly after an initial declination when the original complaint was filed, was a significant and important development to the overall success of the case.

Once the United States has intervened in a *qui tam* case, the statute provides that it assumes primary responsibility for litigation and resolution.  The relator remains a party, also by operation of statute, but as a collaborator with and supplier of resources and assistance to the United States, which controls the course of litigation.

Significantly, statistics made available through the DOJ confirm the importance of government intervention into the success of *qui tam* cases.  When the federal government intervenes in a *qui tam* action, the case is successful 90% of the time, as opposed to a success rate of 25-30% without government intervention.

More specifically, there is generally a conventional set of steps involved in a successful *qui tam* action.  The first milestone is filing the complaint.  After filing the complaint, the next milestone in a case with co-relators is working out a co-relator arrangement.  Once a co-relator arrangement is finalized, the subsequent milestone is to persuade the government to intervene.  Here, within a month of the announcement of the co-relator arrangement between Dr. LaCorte and Ms. Kieff, the government informed the parties that it was preparing a memorandum for intervention.  Thus, the co-relator arrangement provided the foundation for the next stage of the litigation.

After intervention, the DOJ takes the lead.  The DOJ tells relators' counsel what they want by way of support.  Additional milestones include motion to dismiss practice, discovery, motion for summary judgment practice, and trial preparation.

Thus, as a general proposition, a successful *qui tam* case can be bifurcated in two parts: pre-government intervention and post-government intervention.  Before government intervention, the relators have things to do in order to sell their case.  After government intervention, the relators are taking orders, more or less, from the government.  Accordingly, *quantum meruit* compensation should be allocated with these two basic phases to a successful False Claims Act case in which the government has effectively intervened in mind.

Ms. Kieff's case was never declined.  Dr. LaCorte's case initially was declined by the government.  I also observe that when Dr. LaCorte's complaint is measured next to Ms. Kieff's complaint, they are not fighting in the same weight class.  Nevertheless, I find Dr. LaCorte's team, including V&G and B&S, was eventually able to capture the government's attention and sufficiently present the merits of the case so that the government intervened largely because of their efforts.

In sum, I find that V&G and B&S rendered meaningful legal services to Dr. LaCorte in the *Wyeth* matter that turned a case in which the government had declined intervention into one that

70

culminated in the government intervening and then succeeding in settling with *Wyeth*.  I turn now to a more granular evaluation of the Rule 1.5(a) factors.

1.  <u>The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly</u>

At the outset, Dr. Sakla's expertise was, generally speaking, in the practical inner workings of hospitals and pharmacies.  Through the ensuing years, he doggedly developed additional skills useful to the success of the *Qui Tam*.  In the discovery phase, Dr. Sakla electronically stored Wyeth's six million pages of documents in a searchable litigation database. The Sakla Parties also spent several years working collaboratively with counsel for Ms. Kieff, as evidenced in the extensive meetings, telephone conferences and email exchanges that occurred over the years between the two teams.  Dr. Sakla submitted billing summaries in which he claimed with questionable precision that his firm spent some 7,876.9 attorney hours (including 818.5 travel hours billed at 50% rate) and 3,085 paralegal hours on the case.  A reasonable estimate is more than 10,000 hours.

Mr. Vezina testified that he spent 700-750 hours in the *Wyeth* case and offers a jumbled mass of restated daily activities, to support that figure.  V&G investigated claims, drafted pleadings including the original complaint, the first

amended complaint, and the second amended complaint, developed the key legal theory of bundling/best price that was the subject of the government's intervention and the subject of the covered conduct under the *Wyeth* settlement agreement, served as the point person for Dr. LaCorte in interactions with the federal government lawyers and states' attorneys, and participated in the negotiations with Ms. Kieff.

Similarly, though less extensively, B&S provided input on the complaints.  Most importantly, B&S took the lead on the negotiations of the co-relator agreement, and provided the experienced perspective of trial counsel to the strategies, theories of liability, and development of potential damages. B&S provides the conclusory assertion that it put in between 400-450 hours on the case.

The assistance and support provided to the government by V&G after its discharge by Dr. LaCorte is noteworthy.  V&G assisted and supported the government lawyers in preparing their respective oppositions to Wyeth's motions to dismiss and motions for summary judgment, provided research and briefs on legal issues, and provided assistance on potential damages theories and models.  I find that this assistance and support was of significant value in the eventual outcome of the matter.

In conclusion, the record establishes that both V&G and B&S were significantly involved in at least two of the pre-

government intervention milestones—negotiating the co-relator
agreement with Ms. Kieff's counsel and the government's ultimate
intervention.  Specifically, V&G's constant interactions with
the government attorneys and B&S's lead role in negotiations
with Ms. Kieff's counsel secured the success at these
milestones.  I do not, however, diminish the Sakla Parties'
assistance post-government intervention, which included the
creation and maintenance of the electronic litigation database.

> 2.   The likelihood, if apparent to the client, that the
>      acceptance of the particular employment will preclude
>      other employment by the lawyer

The majority of the Sakla parties' resources were dedicated
to the prosecution of Dr. LaCorte's claims.  Dr. Sakla also,
however, continued working as an emergency room physician during
the period in which Dr. LaCorte's legal team was drafting the
first complaint.  Mr. Vezina was involved in the case for six
years, and B&S was involved for nearly five years before
termination.  For V&G and B&S, I find the *Wyeth* litigation was
not all-consuming during these years, nor after the government
intervened.

> 3.   The fee customarily charged in the locality for
>      similar legal services

Dr. Sakla's billing summary claims a $850 per hour rate for
himself, $775 per hour for another Sakla firm attorney who
worked on the *Wyeth* matter, and $175 per hour for paralegal

work.  Mr. Vezina claimed a billing rate from 2002 to 2008 of $275 to $400 an hour.  The rate at which B&S billed during this time period cannot be drawn from the record but, as experienced litigators, the B&S attorneys likely could have demanded a higher hourly rate than the V&G and Sakla Party attorneys.

All three law firms, however, were working solely on a contingency fee basis, so their hourly billing rate at the time of the *Wyeth* litigation is relevant only to the extent it aids in an understanding of what would be reasonable to receive in fees, i.e. the value of their services to Dr. LaCorte. *Eichholz*, 783 S.E.2d at 468.

### 4.   The amount involved, and the results obtained

From initial complaint to final settlement, the *Wyeth qui tam* litigation lasted fourteen years.  Wyeth ultimately agreed to pay a settlement to the federal government and intervening states in the amount of $784,600,000, of which Dr. LaCorte received $98,367,074.19 as his relator's share.

### 5.   The time limitations imposed by the client or by the circumstances

From the testimony and submissions of all three law firms, it is clear that Dr. LaCorte was a demanding client who required close and constant collaboration with his counsel.  Dr. LaCorte expected his attorneys to be responsive at any time and often sent emails and demanded phone calls at all hours of the day.

Dr. Sakla bore the greatest day to day burden of Dr. LaCorte's demands.  But V&G and B&S also felt the lash of his demands.

> 6.   The nature and length of the professional relationship with the client

 Since the late 1990s, Dr. Sakla had counseled Dr. LaCorte with regard to a wide spectrum of legal issues, including medical malpractice, physician's employment agreements, hospital staff issues, and medical business disputes.  Dr. LaCorte previously hired Dr. Sakla in 1999 after discovering a separate unlawful bundling scheme perpetrated by *Merck*.  Dr. Sakla was not merely the originating attorney for the relator's litigation; he properly can be characterized as lead attorney for the relator's team.

 V&G and B&S had a much shorter professional relationship with Dr. LaCorte.  Mr. Vezina began meeting with Mr. LaCorte in late 2001 and worked for him as his attorney in several *qui tam* cases until his termination in January 2008.  B&S came onto the Dr. LaCorte's legal team in 2003 and worked for him until February 2008.

> 7.   The experience, reputation, and ability of the lawyer or lawyers performing the services

 Dr. Sakla has been a board-certified physician for over 30 years and has been a licensed attorney since 1997.  He represented Dr. LaCorte in the other *qui tam* actions in which Dr. LaCorte was the relator.  Dr. Sakla asserts that his

education and work as a physician and medical director in an
emergency room as well as his "expertise in the intricate inner
workings of hospitals and pharmacies. . .  hospital billing;
[and] federal rules and regulations regarding inpatient and
outpatient billing" were significant factors that led Dr.
LaCorte to retain him.  However, although Dr. Sakla at the
outset had an abundance of experience in the medical field, he
still was a relatively inexperienced lawyer when he began
working for Dr. LaCorte.  He was representing Dr. LaCorte in the
other *qui tam* cases but his work with Dr. LaCorte was the first
*qui tam* litigation he had ever been part of and "didn't even
know what the word *qui tam* meant" when he was approached by Dr.
LaCorte to work on the *qui tam* matters.

    Mr. Vezina was three years out of law school at the time
Dr. Sakla asked him to get involved in Dr. LaCorte's case.  Both
Dr. Sakla and Mr. Vezina were relatively inexperienced FCA
lawyers.  Neither of them had ever done a FCA case before.

    The B&S attorneys, on the other hand, were brought on
because of their extensive trial experience and experience with
complex civil cases in federal court.  By the time B&S began
working on the *Wyeth* matter, Mr. Boone and Mr. Stone had been
practicing law for decades and had received multi-million-dollar
verdicts and settlements.

8.   Whether the fee was fixed or contingent

It is undisputed that the fee to be split among the three law firms was contingent upon a successful verdict or settlement in the *Wyeth* matter. The law firms were not representing Dr. LaCorte for a fixed fee.  The allocation at issue, however, concerns a fixed amount of fee money available for distributions.

**E.   Conclusion**

Although V&S and B&G were terminated by Dr. LaCorte mid-way though the litigation, the firms performed significant work on behalf of Dr. LaCorte.  Their contributions to the case should be compensated.  After considering the parties' arguments regarding how to apportion the attorneys' fees for the legal work the firms performed, I find and conclude that a reasonable award is: **55% for the Sakla Parties, 30% for V&G, and 15% for B&S**.  This division of the 38% contingency attorneys' fees takes into account the eight factors listed under Rule 1.5 and applies the firms' contributions to the case.

With respect to Dr. Sakla and the Sakla Parties, I find and conclude their work for Dr. LaCorte in the *Wyeth* litigation from start to finish was indispensable in the sense that without Dr. Sakla's involvement, Dr. LaCorte would not have been able to mount a False Claims Action against Wyeth.  This indispensability requires calibration with the other Trial

Lawyers by recognition that Dr. Sakla was a relatively junior attorney when he first began working on the case and, through his work horse role, developed over the years increasingly invaluable experience.

I allocate **55%** of the funds remaining in the registry of the court for distribution in the *Wyeth* matter to the Sakla Parties.

V&G was not indispensable in the sense the Sakla Parties were.  Their relationship with Dr. LaCorte was through Dr. Sakla, who could have substituted other attorneys with government lobbying and interfacing practices.  I find that in several aspects their involvement in the litigation was nevertheless singularly important.  Mr. Vezina's development of the bundling theory that was eventually incorporated into the complaint — what has been described as his "eureka moment" — was an inflection point in the case that is deserving of recognition through an enhanced distribution.  I also find it appropriate to recognize the diffused work reported by Mr. Vezina and his firm performed in assisting the DOJ, after the government intervened in the case, despite the fact that he was no longer formally representing Dr. LaCorte.

I allocate **30%** of the funds remaining in the registry of the court for distribution in the *Wyeth* matter to V&G.

78

For the five years B&S was involved in this case, the firm provided expertise and experience that the other firms, comprised of relatively junior lawyers, needed in order to move the case forward.  While not indispensable because alternate firms could be found to preform that function, B&S is credited, by Dr. Sakla and others, with providing necessary work at crucial points in the litigation, particularly in developing the complaints and negotiating the co-relator agreement.

I allocate **15%** of the funds remaining in the registry of the court for distribution in the *Wyeth* matter to B&S.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
United States District Judge